UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHEILA ROBINSON,

                              Plaintiff,

v.                                                          6:22-CV-0982
                                                            (GTS/ML)
MARK WILLIAMS, et al.,

                              Defendants.
_____

APPEARANCES:                                        OF COUNSEL:

SHEILA ROBINSON
  Plaintiff, *Pro Se*
511 Tronolone Place, Apt. 4
Niagara Falls, New York 14301


MIROSLAV LOVRIC, United States Magistrate Judge


**<u>REPORT-RECOMMENDATION</u>**

        The Clerk has sent a *pro se* revised amended complaint in the above captioned action

filed by Sheila Robinson ("Plaintiff") to the Court for review.  (Dkt. No. 12.)  For the reasons

discussed below, I recommend that Plaintiff's revised Amended Complaint be dismissed in its

entirety without leave to amend.  (*Id*.)

## I.      BACKGROUND

        Plaintiff commenced this action on September 19, 2022, by the filing of a complaint

together with a motion for leave to proceed *in forma pauperis* ("IFP").  (Dkt. Nos. 1, 2.)  On

December 22, 2022, Plaintiff filed a motion to appoint counsel.  (Dkt. No. 5.)  On January 12,

2023, the undersigned issued an Order and Report-Recommendation granting Plaintiff's motion

to proceed IFP, denying without prejudice Plaintiff's motion for appointment of counsel, and recommending that Plaintiff's Complaint be dismissed in its entirety.  (Dkt. No. 6.)

On April 14, 2023, Plaintiff filed objections to the undersigned's Order and Report-Recommendation dated January 12, 20223.  (Dkt. No. 9.)  In addition, on April 14, 2023, Plaintiff filed an amended complaint.  (Dkt. No. 10.)

On April 18, 2023, United States District Judge Glenn T. Suddaby accepted and adopted the undersigned's Order and Report-Recommendation.  (Dkt. No. 11.)  More specifically, Judge Suddaby dismissed the following claims: (1) Plaintiff's claims against Utica Police Department, the City of Utica, and Judge Stanton; (2) Plaintiff's claims against the New York State Attorney General and unnamed New York State officials; and (3) Plaintiff's stalking, cyberstalking, and harassment claims against Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg.  (*Id*.)  In addition, Judge Suddaby ordered that the following claims were dismissed without further order of the Court unless, within thirty days, Plaintiff filed an amended complaint that corrected the pleading defects identified: (1) Plaintiff's claims under 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, DeTraglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, Hopskin, Schultz, Vomer, and Sanders; and (2) Plaintiff's defamation claims against Defendants Schultz, Vomer, and Sanders.  (*Id*.)  Judge Suddaby directed Plaintiff to either (1) notify the Court in writing that her proposed Amended Complaint (Dkt. No. 10) "is indeed the Amended Complaint on which she wishes to proceed," or (2) file a revised Amended Complaint. (*Id*.)

On May 12, 2023, Plaintiff filed the revised Amended Complaint, which is currently pending before the Court for a review pursuant to 28 U.S.C. § 1915.  (Dkt. No. 12.)

Plaintiff's revised Amended Complaint largely duplicates her Complaint.  (*Compare* Dkt. No. 1 at 3-12, *with* Dkt. No. 12 at 5-14.)  However, Plaintiff appears to assert several additional causes of action.  (*See* Dkt. No. 12 at 14-26.)  Notwithstanding the addition of numerous pages and causes of action, Plaintiff does not appear to include additional relevant factual allegations. (*Compare* Dkt. No. 1, *with* Dkt. No. 12.)

Construed as liberally[1] as possible, Plaintiff's revised Amended Complaint alleges that she formed clothing brands and has been targeted and harassed by several online companies, people, and government entities.  (*See generally* Dkt. No. 12.)  The caption of the revised Amended Complaint includes the following defendants who were also included in the Complaint: Mark Williams, Kyle Piersall, John De Traglia, Joseph Aiello, Brian Baye, Marissa Vomer, K. Phillips, Benny Grullon, Derek Schultz, Reginald Sanders, Brian French, Hiram Rios, New York State Judge Louis L. Stanton, New York State Erap officials unknown John Does, New York State Attorney Letitia James, New York Senator Chuck Schumer, Amazon.com, Jeff Bezio CEO of Amazon.com, Facebook.com, Mark Zuckerberg CEO of Facebook, Google.com, Sergin Brin of Google, Larry Page of Google, Sundar Pichai CEO of Google, Zazzle.com, Robert Beaver CEO of Zazzle, Cafepress.com, Bob Marino CEO of Cafepress.com, Fred Durham of Cafepress.com, Redbubble.com, Barry Newstead of Redbubble.com, Martin Hopskin

---

[1]     The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

of Redbubble.com.[2]  (Dkt. No. 12 at 1.)  In addition, the revised Amended Complaint adds

defendants Jason Apfel CEO of fragrance.net, David Brown CEO of Networksolutions.com,

Scott Wagner CEO of GoDaddy, Sean Moriarty CEO of ENOM, Elliot Noss CEO of Enom and

Tucows, Jeff Berry CEO of Huge Domains, Andrew Berry CEO of Huge Domains, Domenico

Sole CEO of Gucci, Vilnius Koliz CEO of Vostok Watches, Koliz Vostoc CEO of Costok

Europe Watches, David McConnell of Gorgeous Cosmetics, Helen Gibson CEO of Hello

Gorgeous, and John Does (unknown co-conspirators).[3]  (Dkt. No. 12 at 1-2.)

　　　　The revised Amended Complaint—like the Complaint—is a series of run-on sentences

that are difficult to decipher and fail to include specific allegations of actions taken by

individuals or entities.  By way of example, the revised Amended Complaint alleges:

> A criminal complaint against the tech-giants
> Google,Amazon,redbubble,zazzle.com,cafepress.com
> redbubble.com,facebook.com,yahoo.com,and associates , for
> ,cyberstalking,stalking,plaintiff and plaintiff's top brands GORGEOUS
> JEANS INTERNATIONAL and INSIDE LIMOS CLOTHING and
> INSIDE LIMOS ENTERPRISES and obvious stalking to residence,and
> the Utica New York police following plaintiff to park multiple times ,and
> Utica Police department intimidating ,and refusing to enforce criminal acts
> upon violations that plaintiff has had to call the police on .

(Dkt. No. 12 at 6 [errors in original].)

　　　　Notwithstanding, based on the undersigned's review of the revised Amended Complaint,

it generally appears to allege Plaintiff's clothing companies have been targeted by "online tech

giants," which have "embezzle[d] [P]laintiff[']s brand and brand products profits."  (Dkt. No. 12

at 4.)  Plaintiff alleges that she has received unwanted and unusual police contact and that her

---

[2]　　　The revised Amended Complaint does not include Utica New York Police Department
and City of Utica in New York State as defendants.  Those municipal entities were included as
defendants in the Complaint.

[3]　　　The Clerk of the Court is directed to add these individuals to the docket as defendants.

friends and associates have complained to her about receiving the same unusual harassment-type of conduct related to Plaintiff. (*Id.*)

Plaintiff alleges that she frequented Miller Park in Utica, New York. (Dkt. No. 12 at 7.) Plaintiff alleges that when she would go to Miller Park, Utica police officers would also be present in the park and that the police officers' presence in the park at the same time as Plaintiff put her in "fear of [her] safety and well being" such that she "stopped going to [the] park in fear of being shot by the [U]tica police." (*Id.*)

Plaintiff alleges that, at some point in time, she called the police regarding issues she was having with third-party, Biory Chavez Tinco. (*Id.* at 8.) Plaintiff alleges that she attempted to pursue charges against Mr. Tinco and to obtain a restraining order against him, but that the Utica police officers refused to arrest Mr. Tinco or assist Plaintiff in obtaining an order of protection. (*Id.*)

Plaintiff alleges that, at some point in time, she went to get her mail and an unnamed maintenance person "came out and provoked [P]laintiff into accidentally macing,"[4] the maintenance person then called the police, Plaintiff was arrested, and paid a $300 fine. (*Id.*)

Plaintiff alleges that a building located next to her residence is a nuisance because it is a gathering place for drug users and dealers. (*Id.* at 9.) Plaintiff alleges that she sought police assistance "multiple times" to address individuals from the property next door who trespassed on to her property. (*Id.*) However, Plaintiff alleges that the Utica police refused to arrest individuals that criminally trespassed and did not conduct warrant checks on the trespassers. (*Id.*)

---

[4]     It is unclear if Plaintiff intended to state that she "accidentally menaced" the maintenance person or that she "accidentally" used mace or some form of pepper spray.

Plaintiff alleges that Defendant Derek Schultz filed a false statement that Plaintiff was suffering from mental illness. (*Id*.) Plaintiff alleges that Defendant Marissa Vomer filed a false statement stating that Plaintiff was rambling. (*Id*.) Plaintiff alleges that Defendant Reginald Sanders retaliated against Plaintiff by refusing to arrest third-party T. Jones and stating to Plaintiff "you wanted Utica police fired[.] [W]hy should we help you[?]" (*Id.* at 9-10.)

Plaintiff alleges that Defendant Louis Stanton was the assigned judge to another one of her civil cases and that he conspired to violate Plaintiff's right to a jury trial. (*Id*. at 10-11.) More specifically, Plaintiff alleges that Defendant Stanton dismissed Plaintiff's civil case against "tech-giants" via electronic notice so that Plaintiff would not receive the notice in time to appeal the decision. (*Id*. at 11.)

Plaintiff alleges that she contacted the New York State Attorney General's office multiple times regarding the harassment she experienced by "one or more of the tech-giants" and the stalking that she experienced at Miller Park by the Utica police officers but that the New York State Attorney General's office informed her that it does not investigate those matters and directed Plaintiff to obtain her own attorney. (*Id*. at 11-12.)

Plaintiff alleges that unnamed "New York State Officials" deprived her of "Erap arrears" by incorrectly and "intentionally posting online that [P]laintiff had not uploaded [the] required documents." (*Id*. at 13.)

Plaintiff alleges that she contacted Defendant Schumer to help her "stop and collect the unauthorized apparel from [A]mazon warehouses" after Plaintiff saw that her clothing line brand was being improperly sold by Defendant Amazon.com. (*Id.* at 13.) Plaintiff alleges that Defendant Schumer failed to assist her because his family members are employed by Defendant Amazon.com. (*Id*. at 13-14.)

Plaintiff alleges that third-party Yahoo.com and Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg, conspired to target, cyberstalk, and stalk Plaintiff to interfere with her civil right to make online profits.  (*Id*. at 14.)  Plaintiff also alleges that Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg racially targeted her because she is a Black American and they are white or of Asian descent.  (*Id.*)

Plaintiff alleges that Defendants used their computers and servers to redirect individuals searching for Plaintiff's websites to other websites which allowed Defendants to collect profits for themselves and reduce Plaintiff's profits.  (*Id*. at 14-15.)  Plaintiff alleges that Defendants disregarded her trademarks and used their computers and servers to allow others to sell counterfeit products of Plaintiff's items.  (*Id*. at 16-19.)  Plaintiff alleges that Defendants "coierc[ed] other designers to infringe and manufacture goods of [P]laintiff[']s to sell on their websites."  (*Id*. at 21.)

Plaintiff alleges that she contacted the Federal Bureau of Investigations ("FBI") several times about her concerns but that the FBI "had been working with the Tech Giant companies and giving the tech Giants special treatment for their acts,[ ] ignoring complaints."  (*Id*.)

Based on these factual allegations, Plaintiff appears to assert the following fifty-two claims: (1) a claim against Utica Police Department[5] for its conduct at Miller Park in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim against Utica Police Department[6] for

---

[5]    As set forth above in note 2, the revised Amended Complaint did not include the Utica Police Department as a defendant.

[6]    *See*, *supra*, note 5.

its refusal to arrest Mr. Tinco and obtain an order of protection in favor of Plaintiff in violation

of the Fourteenth Amendment and 42 U.S.C. § 1983; (3) a claim against Utica Police

Department[7] for its refusal to arrest individuals who trespassed on Plaintiff's residence in

violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (4) a claim against Defendant

Stanton for violating Plaintiff's due process right to a jury trial pursuant to the Fourteenth

Amendment and 42 U.S.C. § 1983; (5) a claim against Defendant Stanton for sending a dismissal

notice electronically in violation of the First Amendment and 42 U.S.C. § 1983; (6) a claim

against Defendant New York State Attorney General's Office for failure to investigate and

enforce the laws in violation of the Fourteenth Amendment and 42 U.S.C § 1983; (7) a claim

against unnamed New York State officials for interfering with Plaintiff's right to equal housing

in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (8) a claim against Defendant

Schumer for violating Plaintiff's right to equal protection under the law pursuant to the

Fourteenth Amendment and 42 U.S.C. § 1983; (9) a claim against third party Yahoo.com and

Defendants Amazon.com, Bezio, Facebook.com, Zuckerberg, Google.com, Brin, Page, Pichai,

Zazzle.com, Beaver, Cafepress.com, Marino, Durham, Redbubble.com, Newstead, Hopskin,

Apfel, Brown, Wagner, Moriarty, Noss, Jeff Berry, and Andrew Berry (collectively "Defendant

Tech Giants")[8] for conspiracy to deprive Plaintiff of equal protection under the law pursuant to

the Fourteenth Amendment and 42 U.S.C. § 1983; (10) a claim against Defendant Tech Giants

for violating the Sherman Act pursuant to 15 U.S.C. related to her website

---

[7]      *See*, *supra*, note 5.

[8]      Throughout the revised Amended Complaint, Plaintiff often refers to "Defendant Giants" as defendants #17-40 based on the numbering she assigned them in the caption. (Dkt. No. 12 at 1-2.) The undersigned notes that Plaintiff's assigned numbering system omitted the number 28. (*Id*. at 1.)

www.gorgeousjeans.com; (11) a claim against Defendant Tech Giants for violating the Sherman Act pursuant to 15 U.S.C. related to her website www.insidelimosclothing.com; (12) a claim against Defendant Tech Giants for trademark infringement in violation of 15 U.S.C. § 1125(d); (13) a claim against Defendant Tech Giants for fraudulent concealment; (14) a claim against Defendant Schumer for fraudulent concealment; (15) a claim against Defendant Tech Giants for computer fraud in violation of 18 U.S.C. 1030 related to her brand GORGEOUS JEANS INTERNATIONAL INC; (16) a claim against Defendants Amazon.com, Bezio, Facebook.com, Zuckerberg, Google.com, Brin, Page, Pichai, Zazzle.com, Beaver, Cafepress.com, Marino, Durham, Redbubble.com, Newstead, and Hopskin, for computer fraud in violation of 18 U.S.C. 1030 related to her brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISES; (17) a claim against Defendant Tech Giants for wire fraud; (18) a claim against Defendant Tech Giants for wire fraud related her brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISES and its associated website; (19) a claim against Defendant Tech Giants for mail fraud related her brand GORGEOUS JEANS INTERNATIONAL; (20) a claim against Defendant Tech Giants for mail fraud related her brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISES; (21) a claim against Defendant Tech Giants for misappropriation of trade secrets; (22) a claim against Defendant Tech Giants and Defendants Sole, Koliz, and Vostoc for engaging in economic espionage; (23) a claim against Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson for engaging in conversion related to Plaintiff's company GORGEOUS JEANS INTERNATIONAL; (24) a claim that Defendant Tech Giants engaged in conversion related to Plaintiff's brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISES; (25) a claim that Defendant Tech Giants engaged in constructive fraud; (26) a claim that Defendant Tech Giants engaged in fraudulent misrepresentation or false advertising in

9

violation of 15 U.S.C. § 1125(a) related to Plaintiff's brand GEORGEOUS JEANS INTERNATIONAL; (27) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in fraudulent misrepresentation or false advertising in violation of 15 U.S.C. § 1125(a) related to Plaintiff's brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISES; (28) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in tortious interference with business relations related to Plaintiff's online websites; (29) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in international misrepresentation; (30) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in unfair competition and deceptive trade practices in violation of 15 U.S.C. § 1125(c) related to Plaintiff's brand GORGEOUS JEANS INTERNATIONAL; (31) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in unfair competition and deceptive trade practices in violation of 15 U.S.C. § 1125(c) related to Plaintiff's brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISES; (32) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in idea misappropriation related to Plaintiff's brand GORGEOUS JEANS INTERNATIONAL; (33) a claim that Defendants Amazon.com, Bezio, Facebook.com, Zuckerberg, Google.com, Brin, Page, Pichai, Zazzle.com, Beaver, Cafepress.com, Marino, Durham, Redbubble.com, Newstead, and Hopskin engaged in idea misappropriation related to Plaintiff's brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISE; (34) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in primary/secondary trademark infringement/false designation of origin/false advertising in violation of 15 U.S.C. § 1125(a) related to Plaintiff's brand

GORGEOUS JEANS INTERNATIONAL; (35) a claim that Defendants Amazon.com, Bezio, Facebook.com, Zuckerberg, Google.com, Brin, Page, Pichai, Zazzle.com, Beaver, Cafepress.com, Marino, Durham, Redbubble.com, Newstead, and Hopskin engaged in primary/secondary trademark infringement/false designation of origin/false advertising in violation of 15 U.S.C. § 1125(a) related to Plaintiff's brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISE; (36) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in trademark infringement in violation of 15 U.S.C. § 1125(c) related to Plaintiff's brand GORGEOUS JEANS INTERNATIONAL; (37) a claim that Defendant Tech Giants engaged in trademark infringement in violation of 15 U.S.C. § 1125(c) related to Plaintiff's brand INSIDE LIMOS CLOTHING/INSIDE LIMOS ENTERPRISE; (38) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson harassed Plaintiff in violation of N.Y. Penal Law § 240; (39) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson cyberstalked Plaintiff in violation of 18 U.S.C. § 2261(a) and N.Y. Penal Law § 120.45; (40) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in fraud in violation of 15 U.S.C. § 1064 and 15 U.S.C. § 1125; (41) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in cybersquatting in violation of 15 U.S.C. § 1125(a)(d); (42) a claim that Defendants Williams, Piersall, De Traglia, Aiello, Baye, Vomer, Phillips, Grullon, Schultz, Sanders, French, Rios, Stanton, New York State Erap officials unknown John Does, New York State Attorney Letitia James, Schumer, Amazon.com, Bezio, Facebook.com, Zuckerberg, Google.com, Brin, Page, Pichai, Zazzle.com, Beaver, Cafepress.com, Marino, Durham, Redbubble.com, Newstead, and Hopskin aided and abetting the harassment of Plaintiff; (43) a

claim that Defendant New York State Attorney General engaged in gross negligence in violation of New York common law; (44) a claim that Defendant Tech Giants engaged in embezzlement; (45) a claim that Defendant Tech Giants engaged in money laundering; (46) a claim that Defendants Williams, Piersall, De Traglia, Aiello, Baye, Vomer, Phillips, Grullon, Schultz, Sanders, French, Rios, Stanton, New York State Attorney Letitia James, and Schumer engaged in obstruction of justice; (47) a claim that Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson engaged in a hate crime; (48) a claim requesting "injunction relief" against Defendant Tech Giants and Defendants Sole, Koliz, Vostoc, Mcconnell, and Gibson; (49) a claim against Defendants for engaging in racketeering in violation of 18 U.S.C. § 1962(a); (50) a claim against Defendants for engaging in racketeering in violation of 18 U.S.C. § 1962(b); (51) a claim against Defendants for engaging in racketeering in violation of 18 U.S.C. § 1962(c); and (52) a claim against Defendants for engaging in racketeering in violation of 18 U.S.C. § 1962(d).  (*See generally* Dkt. No. 12.)

As relief, Plaintiff seeks, *inter alia*, $100,000,000,000.00 in compensatory damages, permanent injunctive relief against "the named Tech-Giants," "Royalty damages $20 Billion Dollars," "Corrective Advertising damages of $10 Billion Dollars," punitive damages in the amount of $300,000,000,000.00, and "PRO SE fee[]s $1 Billion dollars."  (*Id.*)

## II.    LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e).  Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that— . . . (B) the action . . . (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[9]

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate

---

[9]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

notice of the claims against them" is subject to dismissal.  *Sheehy v. Brown*, 335 F. App'x 102,

104 (2d Cir. 2009).

## III.   ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his

pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Having reviewed Plaintiff's revised Amended Complaint with this principle in mind, I

recommend that all causes of action be dismissed.

The undersigned and Judge Suddaby were extremely liberal in the construction of

Plaintiff's Complaint.  (Dkt. No. 1; Dkt. No. 6; Dkt. No. 11.)  However, it is clear that Plaintiff's

revised Amended Complaint is frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).  By way of

example, the revised Amended Complaint alleges that:

> [after] discovering in 2023, that the Tech Giant defendants #17-40 where
> working in concert with the Federal Bureau of investigations,enjoining
> them in their acts to stop and suppress plaintiffs multiple criminal
> complaints against the online Tech Giants and co-conspirators.  The
> Plaintiff became aware of the actual facts of the unfair advantage in the
> continued acts against plaintiff and plaintiffs brands and brands product
> lines from multiple media sources in 2023 , accusing the FBI of operating
> in concert with the online Tech-Giants,in which the Tech-Giants refused
> to stop or cease the online TechGiants repeated acts against online brand
> companies or complaints,allowing the Tech-Giants to continue their acts.

(Dkt. No. 12 at 15 [errors in original].)

A "[p]laintiff's beliefs—however strongly he may hold them—are not facts."  *Morren v.*

*New York Univ.*, 20-CV-10802, 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) (citation

omitted), *report and recommendation adopted by*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022).

Plaintiff provides no factual basis for her assertions that she was the victim of a broad conspiracy

perpetrated by the "Tech Giants," FBI, Utica Police Department, and third parties.  *See Lefkowitz*

*v. John Wiley & Sons, Inc.*, 13-CV-6414, 2014 WL 2619815, at *10 (S.D.N.Y. June 2, 2014)

(complaint must set forth facts showing basis for information and belief); *Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 266 (W.D.N.Y. 2010) (even where necessary evidence is in "exclusive control of the defendant, . . . plaintiff must still set forth the factual basis for that belief").

Plaintiff fails to provide "any plausible support for [her] claims and [the allegations contained in the revised Amended Complaint] rise to the level of irrational." *Muzumala v. Unknown Federal Agents*, 22-CV-7851, 2023 WL 5530308, at *4 (S.D.N.Y. Aug. 28, 2023) (citing *Livingston v. Adirondack Bev. Co.*, 141 F.3d 434, 437 (2d Cir. 1998)). Instead, "Plaintiff's allegations amount to conclusory claims and suspicions that are not plausible and must be dismissed as frivolous." *Muzumala*, 2023 WL 5530308, at *4 (citing *Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2020) (holding that "the district court did not err in *sua sponte* dismissing the complaint as frivolous," based on the plaintiff's allegations that he had "been the subject of 24-hour, multi-jurisdictional surveillance by federal 'fusion centers' and the New York State Intelligence Center, which put a 'digital marker' on him in order to collect his personal data and harass him."); *Khalil v. United States*, 17-CV-2652, 2018 WL 443343, at *4 (E.D.N.Y. Jan. 12, 2018) (dismissing complaint where "[p]laintiff allege[d] a broad conspiracy involving surveillance of and interference with his life by the United States and various government actors" because his allegations were "irrational and wholly incredible")).

As a result, I recommend that Plaintiff's revised Amended Complaint be dismissed in its entirety because it is frivolous. *See Uzamere v. Uzamere*, 22-CV-4876, 2022 WL 4451107, at *4 (E.D.N.Y. Sept. 23, 2022) (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (holding that even a well-pleaded complaint may be dismissed as factually frivolous "if the sufficiently well-pleaded facts are clearly baseless—that is, they are fanciful, fantastic, or delusional.");

*Denton v. Hernandez*, 504 U.S. 25, 33 (1992) ("[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the whole incredible, whether or not there are judicially noticeable facts available to contradict them.")) (dismissing as frivolous the plaintiff's complaint that "contains allegations of the delusional variety.").[10]

## IV.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[11]

---

[10]    To the extent that the Court rejects this recommendation, it is requested that the revised Amended Complaint be returned to the undersigned for a review pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), (iii).

[11]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be

Out of deference to Plaintiff's *pro se* status, the undersigned previously recommended that she be permitted to amend her Complaint. (Dkt. No. 6 at 22-25.) However, it is clear that further amendment would be futile and I therefore recommend that the Court decline to grant Plaintiff leave to amend. *See Muzumala v. Unknown Federal Agents*, 22-CV-7851, 2023 WL 5530308, at *5 (S.D.N.Y. Aug. 28, 2023) (declining to grant the plaintiff leave to amend the frivolous complaint because the defects in the complaint cannot be cured with an amendment); *Allen v. Tenev*, 21-CV-4119, 2021 WL 3848871, at *3 (S.D.N.Y. Aug. 26, 2021) (declining to grant the plaintiff leave to amend after dismissing his factually frivolous claims).

Moreover, the undersigned notes that Plaintiff has already amended the complaint twice, including one amendment that was filed after the Court's analysis identifying the deficiencies in the Complaint. (*See generally* docket sheet.) "In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend." *Sherman v. Yonkers Public Schs.*, 21-CV-7317, 2023 WL 137775, at *11 (S.D.N.Y. Jan. 9, 2023) (citing *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories of seriatim."); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the

---

successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Consolidated Amended Complaint by defendants and given a chance to amend their

Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended

complaint that would cure these pleading defects"), *aff'd sub nom.*; *Bellikoff v. Eaton Vance*

*Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an

advisory opinion from the Court informing them of the deficiencies in the complaint and then an

opportunity to cure those deficiencies.")).  As a result, I recommend that the revised Amended

Complaint be dismissed without leave to replead.  *See Official Comm. of Unsecured Creditors of*

*Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos*

*v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998))

(finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to

amend the complaint because there was a 'repeated failure to cure deficiencies by amendments

previously allowed.'"); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997)

("Three bites at the apple is enough.").

     **ACCORDINGLY**, it is

     **ORDERED** that the Clerk of the Court add the following thirteen individuals to the

docket as defendants: (1) Jason Apfel CEO of fragrance.net, (2) David Brown CEO of

Networksolutions.com, (3) Scott Wagner CEO of GoDaddy, (4) Sean Moriarty CEO of ENOM,

(5) Elliot Noss CEO of Enom and Tucows, (6) Jeff Berry CEO of Huge Domains, (7) Andrew

Berry CEO of Huge Domains, (8) Domenico Sole CEO of Gucci, (9) Vilnius Koliz CEO of

Vostok Watches, (10) Koliz Vostoc CEO of Costok Europe Watches, (11) David McConnell of

Gorgeous Cosmetics, (12) Helen Gibson CEO of Hello Gorgeous, and (13) John Does (unknown

co-conspirators); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD**

Plaintiff's revised Amended Complaint (Dkt. No. 12) because it is frivolous pursuant to 28

U.S.C. § 1915(e)(2)(B)(i); and it is further respectfully

**ORDERED** that the Clerk of the Court shall file a copy of this Report and

Recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[12]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within

which to file written objections to the foregoing report.[13] Such objections shall be filed with the

Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013);

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September  8 , 2023
          Binghamton, New York

_____
Miroslav Lovric
U.S. Magistrate Judge

---

[12]      The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein
in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[13]      If you are proceeding *pro se* and served with this report, recommendation, and order by
mail, three additional days will be added to the fourteen-day period, meaning that you have
seventeen days from the date that the report, recommendation, and order was mailed to you to
serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2022 WL 1666918
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,

v.

NEW YORK UNIVERSITY,
UCATS Local 3882, Defendants.

No. 20-CV-10802 (JPO) (OTW)
|
Signed 04/29/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree
Deakins, New York, NY, for Defendant New York University.

Gregory Ainsley, Robert T. Reilly, Serge Ambroise,
Ambroise Law, Rachel Sonia Paster, Cohen, Weiss and Simon
LLP, New York, NY, for Defendant Ucats Local 3882.

**REPORT AND RECOMMENDATION**

ONA T. WANG, United States Magistrate Judge:

**\*1  To the Honorable J. PAUL OETKEN, United States
District Judge:**

## I. INTRODUCTION

Plaintiff Darwyn M. Morren brings this action against the
defendants, New York University ("NYU"), and UCATS
Local 3882 ("UCATS"). (ECF 2). Plaintiff alleges that: (1)
Defendants discriminated against Plaintiff on the basis of race
and national origin under Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 1981, the New York City Human
Rights Law ("NYCHRL"), and the New York State Human
Rights Law ("NYSHRL"); (2) Defendants discriminated
against Plaintiff under the Americans with Disabilities Act
("ADA"), the NYCHRL, and the NYSHRL; (3) Defendants
violated the Family and Medical Leave Act of 1993; (4)
NYU breached a contract by terminating him; (5) UCATS
breached the Collective Bargaining Agreement ("CBA") with
NYU by failing to submit grievances on his behalf; (6)
UCATS breached their duty of fair representation to Plaintiff
(ECF 2, ECF 25); (7) Defendants conspired to deprive

Plaintiff of equal protection under 42 U.S.C. § 1985 (ECF
25); (8) Defendants violated Plaintiff's Civil Rights under
Civil Rights Law § 79-n (ECF 25); and (9) negligent
infliction of emotional distress against both Defendants. (ECF
25). Plaintiff seeks "compensatory damages in the sum of
$100,000,000 [f]or emotional and psychological distress.
[P]lus any punitive damages which is exclusive of the
$100,000,000 demand." (Am. Compl. 6).

## II. PROCEDURAL HISTORY

Plaintiff filed a Charge with the U.S. Equal Employment
Opportunity Commission ("EEOC") on August 25, 2020.
(ECF 2). Plaintiff alleges that he received his Rights of
Notice to Sue from the EEOC, dated September 21, 2020, on
September 28, 2020. (ECF 2).

On December 18, 2020, Plaintiff filed his *pro se* Complaint
against Defendants NYU and UCATS. (ECF 2). The
Honorable John P. Cronan referred this case to me for General
Pretrial Management and Dispositive Motion on April 14,
2021. [1] (ECF 15). Plaintiff filed his First Amended Complaint
on June 4, 2021, which adds additional details, but no
additional claims. (ECF 25 (hereinafter "Am. Compl.")). On
June 9, 2021, the parties agreed to a briefing schedule for
Defendants' motions to dismiss the Amended Complaint.
(ECF 29, 33). Plaintiff requested a 31-day extension of
the briefing schedule because of health concerns, which I
granted on July 7, 2021. (ECF 37, 38). The day Defendants'
submissions were due (August 9, 2021), Plaintiff attempted
to amend his First Amended Complaint, without the Court's
leave and without Defendants' consent. (ECF 40, 43). I denied
this request as untimely. [2] (ECF 43).

Defendants filed their respective Motions to Dismiss on
August 9, 2021, in accordance with the amended briefing
schedule. (ECF 46, 48). Ten days later, Plaintiff sought
another extension to file his opposition, which I granted. [3]
(ECF 55, 60). Plaintiff filed his opposition on October 7,
2021, and Defendants filed their replies on October 28, 2021.
(ECF 65, 68, 70).

## III. FACTUAL BACKGROUND [4]
**\*2**  Plaintiff identifies as an "Afro-Caribbean male (black/
[A]frican descent), of Trinidadian [n]ational [o]rigin" with
ADHD. (Am. Compl. 22). [5] He began working at NYU's
Bobst Library in November 2016 as an "ADRSS" (Access

Delivery Resource Sharing Services) assistant. (Am. Compl. at 22). His job responsibilities included "various administrative tasks in the library, including checking out, shelving, unshelving, and stacking books; creating and managing patrons' accounts; working in the course reserves section amongst other responsibilities." (Am. Compl. 23 at ¶ 1). Upon starting work, Plaintiff joined UCATS, where Linda Wambaugh was his union representative. (Am. Compl. 23 at ¶ 2). NYU terminated Plaintiff's employment effective on December 13, 2019. (Am. Compl. 33 at ¶ 49).

### *1. Plaintiff is Assigned a Less Convenient Work Schedule.*

Plaintiff reported to several individuals when he worked at NYU. (Am. Compl. at 23 ¶ 1). His immediate supervisor was Patricia Warrington. (Am. Compl. 23 at ¶ 1). Plaintiff and Warrington both reported to the circulation manager, Deborah Caesar, who was later replaced by Frances Rodriguez. (Am. Compl. 23 at ¶ 1).

In December 2016, Plaintiff met with "management" [6] and was told that he "exceeded expectations" in performance and attendance. (Am. Compl. 23 at ¶ 3). At this meeting, Plaintiff complained that two coworkers were "affecting teamwork/ morale," and were "ma[king] [the workplace] a hostile work environment." [7] (Am. Compl. 23 at ¶ 3). "Management" responded by telling Plaintiff, "don't worry about it, and just worry about yourself." [8] (Am. Compl. 23 at ¶ 3).

Around December 2016 or January 2017, Gary Speizale, Plaintiff's coworker, complained about the shift schedule. (Am. Compl. 23 at ¶ 4). Plaintiff alleges that, as a result, Plaintiff's schedule was changed so that he no longer had consecutive days off, while his coworkers, including Speizale, did. (Am. Compl. 23 at ¶ 4). Plaintiff complained to Warrington, Caesar, and Rodriguez that the new schedule was unfair, but "they" told Plaintiff that the schedule was based on seniority, and Plaintiff had the "least amount of seniority" among his coworkers because he was "the most recent hire." (Am. Compl. 23 at ¶ 4). Plaintiff complained to Wambaugh about the schedule, explaining that he was not the most recent hire, but she also said that Speizale was senior to Plaintiff. [9] (Am. Compl. 23–24 at ¶ 4). The Union did not file a grievance on Plaintiff's behalf. [10] (Am. Compl. 24 at ¶ 4).

### *2. Plaintiff is Reprimanded for Taking a Previously-Scheduled Trip to a "Religious Festival."*

**\*3** Plaintiff told his employer "[b]efore [he] [s]tarted employment" in November 2016 that he had plans to attend an annual "Cultural and Religious Festival/carnival [sic]" in Trinidad. (Am. Compl. 24 at ¶ 6). Before he began working, Plaintiff alleges that he was told that he could attend this event, and that he would be paid during his absence. [11] (Am. Compl. 24 at ¶ 6). Then, in February 2017, days before attending the "Cultural and Religious Festival/carnival in Trinidad," "they" told Plaintiff that he would not be paid for the time off he was taking. [12] (Am. Compl. 24 at ¶ 6). Plaintiff went to the festival, but "was accused of misusing sick time" and upon his return, was told that he would be terminated. (Am. Compl. 24 at ¶ 8). "[Plaintiff] explained that [he] was only doing what Rodriguez told [him] to do, and that in any event, [he] had a doctor's note." (Am. Compl. 24 at ¶ 8). Ultimately, Plaintiff was not "disciplined." (Am. Compl. 24 at ¶ 8).

Plaintiff also alleges that in July 2019, he requested time off for his vacation to Trinidad in February 2020, which Rodriguez denied. (Am. Compl. 15). Plaintiff alleges that Caesar had approved Plaintiff's request the past three years (which is inconsistent with his earlier allegations). (Am. Compl. 15). Plaintiff halved the vacation days he initially requested and later cancelled his flight because with fewer days, the cost was higher. (Am. Compl. 15).

### *3. Plaintiff's Probation is Extended.*

In February 2017, Plaintiff complained to NYU and UCATS "that [his] probation period had been extended." (Am. Compl. 24 at ¶ 7). Caeser and Rodriguez told Plaintiff that the extension was because of his "performance issues." (Am. Compl. 24 at ¶ 7). Plaintiff was unaware of any performance issues because he had allegedly been told "numerous of times [sic] that [he] performed [his] job duties beyond expectations and [his] attendance was perfect, unlike others on probation and ... their probation wasn't extended." (Am. Compl. 24 at ¶ 7). Plaintiff also complained about his "coworkers not getting along with one another" at this time. (Am. Compl. 24 at ¶ 7). In response, Rodriguez told Plaintiff, "You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around." (Am. Compl. 24

at ¶ 7). Plaintiff alleges that at the time, Warrington added, "Why don't you just go back to Trinidad to live since you['re] always complaining about what we do here?" (Am. Compl. 15). When Plaintiff told Wambaugh about this interaction, she told him that "the Employer would have fired [him]," and only had not because Plaintiff "had ADHD, [and] they did not want any complaints." [13] (Am. Compl. 24 at ¶ 7). Plaintiff ultimately completed his probationary period in April 2017. (Am. Compl. 24 at ¶ 7).

### *4. Plaintiff Grows Increasingly Suspicious of His Coworkers and Others.*

**\*4** Plaintiff alleges that one to two months into his employment (in December 2016 or January 2017), Plaintiff "complained numerous times about coworkers making false statements and claims in order to get [him] fired and sabotage [his probation]." (Am. Compl. 24 at ¶ 5). Between 2017 and 2018, Plaintiff "repeatedly complained to Caesar that Rodriguez" was trying to get him "disciplined or fired." (Am. Compl. 24 at ¶ 8). Caesar's response was that Plaintiff should "not worry about it." (Am. Compl. 24 at ¶ 8). Plaintiff does not state who else, if anyone, tried to get him fired or what statements Rodriguez or others made.

On three occasions between late 2018 and April 1, 2019, Plaintiff complained to Rodriguez and Caesar that "some full-time coworkers seemed to be manipulating students and student-workers to do illegal things, who worked in the library, to look at [him] and treat [him] in a different or suspicious way." (Am. Compl. 25 at ¶¶ 10–12). Plaintiff also complained about Chris Crowe, a Union Representative (who also allegedly lived with Speizale), engaging in this behavior. (Am. Compl. 25 at ¶ 11). Plaintiff further complained that on multiple occasions he was being "stalked" by coworkers and students, and mistreated by students, staff, and professors. (Am. Compl. 25 at ¶ 13). This included allegations that: (1) "students came into the library and pointed and laughed at [Plaintiff]"; (2) students "were recording [Plaintiff]"; and (3) a student bumped into him and another student recorded the incident, "almost as if to catch [Plaintiff] doing something to the student who bumped [him]." (Am. Compl. 25 at ¶ 13). Plaintiff verbally reiterated these complaints to Rodriguez and Caesar for the next two months. (Am. Compl. 25 at ¶ 14). Rodriguez and Caesar did not escalate the complaints; rather, Caesar called Plaintiff "paranoid." (Am. Compl. 25 at ¶ 14). Plaintiff also complained to Wambaugh, who told Plaintiff that there was "no grievance[s] that could be filed

about [his] coworkers, students, and professors doing this to [him]." (Am. Compl. 25 at ¶ 14).

At some unspecified time, Plaintiff alleges that he complained to Wambaugh about his coworkers stalking him, sabotaging his work, and making derogatory comments to him. In response, Wambaugh allegedly said, "they just don't like you" and "they don't have to be nice to you." (Am. Compl. 9). Wambaugh did not file a grievance about Plaintiff's complaint. (Am. Compl. 9).

Plaintiff filed formal written complaints about the above actions in June and July 2019 to Rodriguez and Caesar, which complaints were then forwarded to Human Resources ("HR"). (Am. Compl. 25–26 at ¶ 15). Plaintiff did not feel comfortable discussing the matter with HR, however, because he "believed[d] that management was involved in the mistreatment." (Am. Compl. 26 at ¶ 15). Around this time, Plaintiff also complained to Wambaugh that: (1) a new student coworker was stalking Plaintiff; and (2) Caesar was dating a coworker who was harassing Plaintiff. [14] (Am. Compl. 26 at ¶¶ 16, 17). Wambaugh said that the Union could not file a grievance about the stalking, and that the Union and NYU knew about Caesar's relationship, but "there was nothing that could be done." (Am. Compl. 26 at ¶¶ 16, 17). A few weeks later, Rodriguez took over Caesar's role as circulation manager and Caesar began working in HR. (Am. Compl. 26 at ¶ 18).

"At around the same time," Plaintiff alleges "that [his] electronic devices and personal, NYU email accounts and other accounts had been hacked by the Employer." [15] (Am. Compl. 26 at ¶ 19). Plaintiff believes he was hacked because on one occasion Plaintiff could not log into his NYU email, and on another occasion, he "learned that an NYU VPN had been created with [his] work ID and password" when he was not at work. (Am. Compl. 26 at ¶ 19).

**\*5** After moving apartments in July 2019, Plaintiff alleges that NYU was sending people to stalk his whereabouts. [16] (Am. Compl. 26–27 at ¶ 20). In response to Plaintiff's complaints about this behavior, Warrington told Plaintiff "that [he] was paranoid," and Wambaugh "asked [Plaintiff] what this had to do with the Union." (Am. Compl. 27 at ¶ 20). Wambaugh did not file a grievance. (Am. Compl. 27 at ¶ 20). Plaintiff alleges, however, that after he complained about the stalking, "the Employer changed [his] address in its system back to [his] old address in the Bronx" even though he "never gave them [his] Queens address, but [he] ha[s] mailings from

the Union [a]nd NYU with [his] Queens [a]ddress." (Am. Compl. 27 at ¶ 21).

At some unspecified time, Plaintiff told Rodriguez that he was having sleeping issues. (Am. Compl. 28 at ¶ 26). Plaintiff then alleges that in July or August 2019, Rodriguez recommended that Plaintiff receive treatment from his psychiatrist regarding his sleeping issues. [17] (Am. Compl. 38 at ¶ 72).

### 5. Plaintiff Arrives at Work Late and Takes Time Off.

On September 30, 2019, Rodriguez told Plaintiff that he noticed Plaintiff had been "late a couple times" and warned Plaintiff that if it continued he would be "disciplined." (Am. Compl. 27 at ¶ 23). Plaintiff responded that he "always got to the desk on time, as per [his] schedule, to deal with library patrons," but Rodriguez said that "didn't matter." (Am. Compl. 27 at ¶ 23). Plaintiff told Rodriguez "that other employees had more late arrivals than [he] did, [and] were not disciplined," but Rodriguez "told [Plaintiff] not to worry about other workers." (Am. Compl. 27 at ¶ 23). Plaintiff expressed to Rodriguez that he was "going through a lot," including that he was being stalked to and from work, his devices were being hacked, and he was "traumatized by the harassment at work." [18] (Am. Compl. 27 at ¶ 23). Rodriguez suggested that Plaintiff apply for FMLA leave. [19] (Am. Compl. 27 at ¶ 23). Plaintiff alleges that he applied for FMLA leave in early October 2019. (Am. Compl. 28 at ¶ 25).

At another unspecified time, Plaintiff received "troubling texts" from a number he believes was "pretending to be someone else in [his] contacts." (Am. Compl. 28 at ¶ 26). The texts made "derogatory statement[s], [20] "question[ed]" whether Plaintiff was actually sick, and "stat[ed] that [his] meds are the reason [he] can't get any sleep." (Am. Compl. 28 at ¶ 26). Plaintiff intimates that Rodriguez is the unidentified sender because he told Rodriguez he was not getting any sleep "because of the ongoing harassment from NYU." (Am. Compl. 28 at ¶ 26).

**\*6** In early October 2019, Plaintiff took some sick days. (Am. Compl. 28 at ¶ 27). On October 12, 2019, Plaintiff's coworker, Freddie Olivia, approached Plaintiff, "put [him] in a chokehold from behind," and asked him where he had been the past few days. [21] (Am. Compl. 28 at ¶ 27). Plaintiff told Olivia that he was "concerned" that he was being harassed at work, and also complained that his "work

in the Course Reserve Department ... was not being used effectively" because no one would "ever take the books outor [sic] barely." (Am. Compl. 28 at ¶ 27). Plaintiff does not describe what his "work in the Course Reserve Department" entails.

In the days following this interaction, Plaintiff alleges that "faculty members came up to [him] on several occasions and nervously told [him] why they weren't using their Course Reserve items." (Am. Compl. 28 at ¶ 28). Plaintiff also alleges that items were showing up "on [his] account when [he] wasn't doing Course Reserve work." [22] (Am. Compl. 28 at ¶ 28).

### 6. Plaintiff is Suspended for Fighting at Work.

On November 1, 2019, Plaintiff alleges that Olivia was "staring over [his] shoulder and following [his] movements." (Am. Compl. 28–29 at ¶ 29). Plaintiff confronted Olivia about this behavior and Olivia responded by "aggressively trying to [i]ncite a fight [with Plaintiff] and [saying], 'So [w]hat's up?!' " (Am. Compl. 29 at ¶ 29). Plaintiff began to walk away when another coworker, Robert Jameson, ran toward Plaintiff and "grabbed and/or pushed [Plaintiff]." (Am. Compl. at 29 ¶ 29). Plaintiff claims to have self-recorded audio of this interaction. (Am. Compl. 29 at ¶ 31).

That same day, Plaintiff was working alongside Adjoa Walker, a student-worker. (Am. Compl. 29 at ¶ 30). Plaintiff repeatedly asked Walker to help him check out customers until Walker began crying. (Am. Compl. 29 at ¶ 30). Plaintiff asked whether Walker was okay, and "suspect[ed] that she was crying because she was torn between harassing and agitating [him], at the request of the Employer, and doing her job." (Am. Compl. 29 at ¶ 30). Later that day, Plaintiff was called to HR where he met with Katie O'Brien, the Assistant Director of HR, and Enrique Yanez, the Director of HR. [23] (Am. Compl. 29 at ¶ 31). The exact order of the following events is unclear:

- O'Brien and Yanez left the room during the meeting because a security guard asked to speak with Plaintiff alone. (Am. Compl. 29 at ¶ 31).

- Plaintiff told the security guard that "[he] had a legal right to union representation if they were going to discipline

[him], and that [he] didn't want to start the meeting" without representation. (Am. Compl. 29 at ¶ 31).

• When Plaintiff requested his Union Representative join the meeting, the meeting "was called to an end." (Am. Compl. 29 at ¶ 31).

• The security guard escorted Plaintiff out of the room. (Am. Compl. 29 at ¶ 31).

No grievance was filed by Wambaugh following this incident. [24] (Am. Compl. 29 at ¶ 32).

**\*7** Plaintiff then alleges a series of HR meetings involving Yanez, O'Brien, Rodriguez and possibly others, but does not coherently state the topic of each meeting or the events at each meeting. (Am. Compl. 30). On November 6, 2019, a meeting was scheduled between Plaintiff, Yanez, O'Brien, and a shop steward to discuss the November 1, 2019 incident with Jameson. (Am. Compl. 29–30 at ¶ 33). Plaintiff sent an audio file of the incident to those present. (Am. Compl. 30 at ¶ 33).

From November 6 to November 19, Plaintiff does not state whether he was working, suspended, or on unpaid leave. On November 14, 2019, Yanez and O'Brien asked to meet with Plaintiff because they "had new information on the case." (Am. Compl. 30 at ¶ 34). Plaintiff responded that he was not comfortable coming to the building because of the "[r]egular harassment [he] had been suffering from NYU", and that he "was under the weather[ ]." (Am. Compl. 30 at ¶ 34). On November 18, 2019, Plaintiff was called into a scheduled meeting via conference call with Wambaugh and O'Brien to discuss a complaint Rodriguez made about Plaintiff "ma[king]" Walker cry. (Am. Compl. 30 at ¶ 35). At the meeting, Plaintiff explained to O'Brien "that [he] just asked the student to help with the long line which is her job." (Am. Compl. 30 at ¶ 35). O'Brien reminded Plaintiff of the policy regarding how many patrons must be present for him to ask for help (which Plaintiff argued was incorrect). (Am. Comp. 30 at ¶ 35). Plaintiff additionally notes that "O'Brien stated that [Rodriguez] said she thinks [Plaintiff] felt guilty about what [he] did to the student, and labeled [his] concerns about the student as 'small talk.' " (Am. Compl. 30 at ¶ 35). At some point, O'Brien sent Plaintiff an email allowing him to return to work the next day. (Am. Compl. 30 at ¶ 36). In this email, Plaintiff was given a "final" warning. [25] (Am. Compl. 30 at ¶ 36). Plaintiff claims that aside from the warning about his attendance, "this is the only warning [he] had ever received." (Am. Compl. 30 at ¶ 36).

On November 19, 2019, Plaintiff returned to work. (Am. Compl. 30 at ¶ 37). Plaintiff "immediately" attended a meeting with O'Brien, Yanez, and Wambaugh at which O'Brien told Plaintiff that he was suspended for three days because [Plaintiff] exhibited threatening and violent behavior." [26] (Am. Compl. 30 at ¶ 36). Plaintiff does not clearly allege whether his suspension was because of the fight with Jameson or his interaction with Walker. (Am. Compl. 30 at ¶ 36). Wambaugh also informed O'Brien "that the Union was filing a grievance over [his] suspension." (Am. Compl. 30 at ¶ 38). The grievance concerned the November 19, 2019 suspension and the final written warning. HR notified Plaintiff on December 9, 2019 that "the November 19 grievance had been closed, and that the Employer was denying the grievance." (Am. Compl. 31 at ¶ 41). (ECF 49-2, Exhibit 2 (November 21, 2019 Step 2 Grievance) at 59).

### 7. Plaintiff Suspects Additional Foul Play from Coworkers.

On November 30, 2019, Plaintiff recognized an application ("app") on his phone that was also on his NYU work computer, although he claims that *he* never installed the app. (Am. Compl. 31 at ¶ 39). [27]

**\*8** On December 10, 2019, Plaintiff asked Warrington if he could leave early that day "because [he] wasn't feeling good as [he was] being harassed by [his] coworkers, who were stalking [him]." (Am. Compl. 31 at ¶ 43). Warrington said no. (Am. Compl. 31 at ¶ 43). Rodriguez then asked Plaintiff to attend a meeting with HR. (Am. Compl. 31 at ¶ 43). Plaintiff said he needed Wambaugh to represent him, and the meeting was rescheduled for the next day. (Am. Compl. 31 at ¶ 44). Plaintiff asked to reschedule to either a different time the next day, or to December 16. (Am. Compl. 31–32 at ¶ 44). Neither O'Brien, Yanez, nor Rodriguez responded to this request. (Am. Compl. 32 at ¶ 44).

### 8. Plaintiff's Employment is Suspended at Least a Second Time, and then Terminated.

Plaintiff does not clearly allege the order of the following events:

• On December 11, 2019, Plaintiff "saw some of the same suspicious Amazon IP addresses." [28] (Am. Compl. 32

at ¶ 47). Plaintiff alleges, however, that one of the "IP addresses" was "traceable to the Massachusetts Institute of Technology, which is an NYU partner [and that] (this IP hacked [Plaintiff's] personal email again on 5/21/20)." (Am. Compl. 32 at ¶ 47).

- At some point between December 10 and 12, 2019, Plaintiff was emailing "multiple parties" about "the harassment and retaliation that was ongoing" when Rodriguez approached Plaintiff and told him he could leave and would be paid for the rest of the time that he was scheduled to work. (Am. Compl. 32 at ¶ 45). Plaintiff again asked Rodriguez the time of the December 11 meeting. [29] (Am. Compl. 32 at ¶ 45). Rodriguez walked away and "about two minutes later [Plaintiff] heard her speaking by the entrance of the circulation Dept and use the words 'black man being aggressive.' " (Am. Compl. 32 at ¶ 45). Fifteen minutes later, two security guards and two NYPD officers arrived at the scene and stated that there was a complaint about Plaintiff "being aggressive, and trespassing." (Am. Compl. 32 at ¶ 45). Plaintiff responded that he worked there and that he was being harassed. (Am. Compl. 32 at ¶ 45). O'Brien cancelled the tentatively set December 11, 2019 HR meeting. (Am. Compl. 32 at ¶ 47).

- Plaintiff states that he was suspended because "the Employer knew, through its control of [his] devices, [he] discovered the Amazon web IP addresses logged into [his] personal and NYU email accounts." (Am. Compl. 32 at ¶ 47).

- Plaintiff asked Wambaugh "how [he] could be suspended without a meeting." (Am. Compl. 32 at ¶ 47).

On December 14, 2019, Plaintiff saw an email regarding his termination effective on December 13, 2019. (Am. Compl. 33 at ¶ 49). The email stated that "[Plaintiff] denied [a] meeting with management and HR ... and that [he] was aggressive and insubordinate ... which required the Employer to call the police to escort [him] out of the building." (Am. Compl. 33 at ¶ 49). Plaintiff alleges that "[his] suspension was converted to a termination because the Employer, having hacked [his] phone, knew that [he] had gone to the doctor to start FMLA leave, which would have given [him] job protection, and also went [to] a lawyer on December 12." (Am. Compl. 33 at ¶ 49).

### 9. Plaintiff Engaged in a Post-Termination Grievance Process.

On December 19, 2019, Plaintiff asked Wambaugh "how [he] could be terminated without even having the suspension meeting." (Am. Compl. 33 at ¶ 51). Wambaugh told Plaintiff that she would file a grievance about Plaintiff's suspension and termination. [30] (Am. Compl. 33 at ¶ 52). Plaintiff also asked Wambaugh to "file a grievance alleging ADHD discrimination," which Wambaugh said she would do. (Am. Compl. at 33 ¶ 51); (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance)). Plaintiff alleges that he "turned down" severance and unemployment benefits. (Am. Compl. 33 at ¶ 51).

**\*9** On December 20, 2019, Plaintiff reached out to Wambaugh about the status of his suspension and termination grievances. (Am. Compl. 33 at ¶ 52). Plaintiff requested a grievance be filed about the grievance process along with an ADHD discrimination grievance. [31] (Am. Compl. 34 at ¶¶ 51, 53, 57) On the same day, Peter Lanzo, a New York State United Teachers representative, was assigned to Plaintiff's case. (Am. Compl. 34 at ¶ 54). Plaintiff asked Lanzo to give him access to his NYU email records, [32] which Plaintiff was initially denied because he was "rightfully terminated." (Am. Compl. 34 at ¶ 53); (Am. Compl. 36 at ¶ 62). Lanzo responded that he would speak with NYU regarding the email account access. (Am. Compl. 36 at ¶ 62).

On January 6, 2020, Plaintiff informed Lanzo that the grievances UCATS filed were missing important information; on January 22, 2020, Plaintiff asked that they be corrected. [33] (Am. Compl. 34 at ¶ 56); (Am. Compl. 35 at ¶ 58). The grievances were amended to reflect this missing information [34] on January 23, 2020. (Am. Compl. 35 at ¶ 58).

In May 2020, Plaintiff spoke with Lanzo and Marc Laffer, Lanzo's supervisor, who assured Plaintiff that the grievances were filed on time. (Am. Compl. 36 at ¶ 64). Lanzo and Laffer suggested that Plaintiff start the grievance process without the emails. (Am. Compl. 36 at ¶ 64). Plaintiff does not plead any facts about the grievance process, its timing, or any other details. Plaintiff alleges that he had wanted to set up a meeting with "management," which Lanzo suggested was not a good idea. (Am. Compl. 36 at ¶ 64).

A few days later, Plaintiff received an email from O'Brien asking Plaintiff to confirm a grievance meeting that Lanzo had attempted to schedule. (Am. Compl. 36–37 at ¶ 65). Plaintiff declined the meeting because he did not want to move forward with the meeting without his emails. (Am. Compl. 37 at ¶ 65).

Around the end of May or beginning of June 2020, Plaintiff alleges that he emailed Lanzo alerting him that the grievances were filed late. (Am. Compl. 37 at ¶ 66). Plaintiff alleges that Lanzo said, "let's see if the employer notices." (Am. Compl. 37 at ¶ 66). Lanzo "took responsibility for the grievances being filed late." (Am. Compl. 37 at ¶ 66).

Plaintiff alleges that his suspension and termination grievances are still open and that the grievances he asked Wambaugh to file were never filed. (Am. Compl. 37 at ¶ 67).

### 10. Plaintiff's Other Factual Allegations

On or about September 30, 2019, Rodriguez suggested that Plaintiff take FMLA leave. (Am. Compl. 27 at ¶ 23). Plaintiff asked Rodriguez for instructions, and Rodriguez told Plaintiff that he needed "to get certification" from his medical provider. (Am. Compl. 27 at ¶ 23). Wambaugh told Plaintiff the same thing. (Am. Compl. 27 at ¶ 24). Plaintiff also alleges that both Rodriguez and Wambaugh incorrectly gave him FMLA instructions that applied to non-union employees. (Am. Compl. 28 at 17). Plaintiff alleges that he applied for FMLA leave through "Lincoln Financial" in early October, but did not hear anything back for several months. (Am. Compl. 29 at ¶ 25).

**\*10**  On December 12, 2019, Plaintiff was "in the process" of pursuing FMLA leave and visited a health care provider. (Am. Compl. 32–33 at ¶ 48). Plaintiff mentions that he has a diagnosis of ADHD, but that the doctor also "wanted to include a diagnosis of insomnia and major depression," which Plaintiff avers he had "never been tested for or diagnosed with." (Am. Compl. 32–33 at ¶ 48). Plaintiff's medical provider said that he would send Plaintiff's diagnosis to the insurance company so that Plaintiff could pursue FMLA leave. (Am. Compl. 32–33 at ¶ 48). On or about December 24, 2019, Plaintiff called Lincoln Financial to see if they received his FMLA leave request, which they said they did not. (Am. Compl. 34 at ¶ 54).

On December 26, 2019, however, Lincoln Financial notified Plaintiff that his claim had been denied "because [he] was

no longer employed." [35] (Am. Compl. 34 at ¶ 54). Then in February 2020, Plaintiff "learned that Lincoln Financial ... without [his] permission, opened up another claim for [him], and approved a leave claim, which [he] wasn't qualified for or asked for ([i]nsurance fraud)." (Am. Compl. 35 at ¶ 61). Through his own research, Plaintiff "learned the FMLA instructions given to [him] by [NYU] and [UCATS] was [sic] in fact incorrect information, which was later confirmed by Lanzo." (Am. Compl. 36 at ¶ 61). Plaintiff confronted Lincoln Financial and NYU. Plaintiff alleges Lincoln Financial apologized; NYU never responded. [36] (Am. Compl. 36 at ¶ 61).

### 11. Plaintiff's Other Allegations of Stalking, Harassment, and Spying.

Plaintiff alleges that from April 2019 to February 4, 2020, several unidentified individuals had acted on Defendants' behalf to stalk and harass Plaintiff, but does not tie these allegations to any Defendants:

- On February 4, 2020, Plaintiff went to T-Mobile, where the representative helping him engaged in "unusual conversation" and had spent an hour setting up Plaintiff's phone when it should have only taken 10 minutes. (Am. Compl. 35 at ¶ 59).

  - During this interaction, a man with sunglasses standing across the street kept looking at Plaintiff, and got into his car when Plaintiff walked past him. (Am. Compl. 35 at ¶ 59).

- On February 5, 2020, Plaintiff's phone had "the same amazon.com [IP] addresses that were being used by [NYU] in [his] phone[.]" (Am. Compl. 35 at ¶ 59).

- On February 9, 2020, Plaintiff was at a store across from a different T-Mobile store where someone "follow[ed] ... and harass[ed]" him in the store, which other patrons allegedly noticed. (Am. Compl. 35 at ¶ 60).

- Plaintiff's landlord, Tevia Clarke, who is an NYU alumna, has "harass[ed] ... and agitat[ed]" Plaintiff from July 2019 to April 2020, by "hacking [Plaintiff's] electronic devices and taking and/or tampering with ... packages sent to [his] house ... calling [him] 'weird' or stating [he is] crazy ... [and] constantly trying to start arguments in the apartment to get a violent reaction out of [him]." (Am. Compl. 37 at ¶ 68).

**\*11**  • Plaintiff alleges that one time he had not been receiving messages from Clarke and when he made her aware of this, "she pressed something on her phone and all of the text messages from her and other people, voicemails came thr[ough] at the exact same time." (Am. Compl. 37 at ¶ 68).

• On April 27, 2020, Plaintiff alleges "[he] saw Tevia Clarke Verizon IP address in [his] personal VPN account ... which is linked to [his] personal email address and is password protected." (Am. Compl. 37 at ¶ 68).

• Plaintiff alleges that Clarke is being bribed by Defendants to retaliate against him. (Am. Compl. 37 at ¶ 68). To support this allegation, Plaintiff notes that "[he] received mailings from the Union in May 2019 or June 2019, which had the Queens address on it, even though [he] did not move or change [his] address until mid July 2019." (Am. Compl. 37 at ¶ 68). Further, Plaintiff alleges Clarke gave Plaintiff's address to NYU UCATS. (Am. Compl. 37 at ¶ 68).

• Plaintiff alleges that "NYU has been contacting lawyers to either not take or diminish [his] case at[ ]least since December 2019 ... since filing [his] case on 12/18/20." (Am. Compl. 38 at ¶ 74).

• On January 31, 2021, Plaintiff discovered text messages from Cindy Morren (his sister and an NYU student) and his mother, in which Cindy was texting from Plaintiff's phone number through iMessage and "pretending to be [Plaintiff] and pretending to have a good relationship with [his] mother." (Am. Compl. at 38). Plaintiff alleges that his sister got his Apple ID through his ex-girlfriend, who also worked at NYU. (Am. Compl. 38 at ¶ 74).

• Plaintiff alleges that on June 3, 2021, his mother "called mental help officials." (Am. Compl. 39 at ¶ 74). Plaintiff alleges that "[he] was not mentally ill and that she was just trying to harass [him] and deter [him] from making further complaints ...." (Am. Compl. 39 at ¶ 74).

• Plaintiff alleges in 2019-2020, Defendant NYU contacted his psychiatrist Dr. Rudoy "to diminish [his] complaints, and prescribe [him] wrong medication for illness he or his other doctors never diagnosed [Plaintiff] with." (Am. Compl. 39 at ¶ 74). Plaintiff was prescribed the medication in August 2019 following his complaints to Defendant NYU. (Am. Compl. 39 at ¶ 74). According to

Plaintiff, Dr. Rudoy did not document any of Plaintiff's complaints and did not tell Plaintiff why. (Am. Compl. 39 at ¶ 74).

## IV. DISCUSSION

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id.* " '[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

**\*12**  As relevant here, a court is "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Therefore, this Court must interpret Plaintiff's submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal citations omitted). "However, the liberal treatment afforded to *pro se* litigants does not excuse a *pro se* party 'from compliance with relevant rules of procedural and substantive law.' " *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (quoting *Maisonet v. Metro Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009)). Accordingly, the Court may not "invent factual allegations that a plaintiff has not pled." *Daly v. Westchester Cty. Bd. of Legislators*, No. 19-CV-4642 (PMH), 2021 WL 229672, at \*4 (S.D.N.Y. Jan. 22, 2021) (alterations and quotations omitted) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). As mentioned, however, the Court may consider facts raised in opposition papers, depending on the circumstances. *Davila v. Lang,* 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018).

In reaching its conclusions, the Court is aware that issues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss, and the Court has not considered them here. *Hughes v. Ester Co.,* 930 F.Supp. 439, 461–62 (E.D.N.Y. 2013) ("[I]ssues concerning the weight that should be given to this study cannot be resolved on a motion to dismiss....").

### *1. Breach of Duty of Fair Representation*

Plaintiff brings a "hybrid" claim against UCATS and NYU under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and based on a union's duty of fair representation, arising from the National Labor Relations Act ("NLRA"). Liberally construed, Plaintiff alleges that NYU violated the CBA when it discriminated against him, and that UCATS breached its duty of fair representation when it: (1) failed to file grievances on Plaintiff's behalf, and (2) misled Plaintiff about the deadline for filing grievances. (Am. Compl. 12–14).

#### i. Applicable Law

The duty of fair representation arises out of a union's status as the exclusive bargaining agent with the employer. *See* *Greco v. Commc'ns Workers of Am., Loc.,* 1104, 824 F.Supp. 2d 351, 356 (E.D.N.Y. 2011). Accordingly, the duty requires a labor organization "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44 (1998) (quotation marks omitted).

It is well established that an employee can sue their employer for breach of a CBA. *Smith v. Evening News Ass'n.,* 371 U.S. 195 (1962). Usually, an employee must exhaust any grievance or arbitration process set forth in the CBA before bringing suit. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652 (1965). In *DelCostello v. International Brotherhood of Teamsters,* however, the Supreme Court recognized that such an exhaustion requirement may result in an "unacceptable injustice" when the union representing the employee in these processes acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello,* 462 U.S. at 164. In such a case, an employee can sue both the employer and the union, regardless of the grievance or arbitration proceeding. *Id.* In doing so, the plaintiff must allege that the union has breached its duty of fair representation and that the employer has breached its CBA. *Id.* A plaintiff has six months from the time he "knew or should have known of the breach of the duty of fair representation" to bring suit. *See* *White v. White Rose Food a Div. of DiGiorgio Corp.,* 128 F.3d 110, 114 (2d Cir. 1997).

**\*13** Breach of duty of fair representation is difficult to plead because "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents," subject to good faith and honesty in exercising its discretion. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953). A breach of this duty only occurs if a union's conduct toward a member of the collective bargaining unit are "shown to have arbitrarily, discriminatorily, or in bad faith foreclosed the employee's opportunities to vindicate such wrong through the grievance process." *Castro v. New York City Bd. of Educ.,* 777 F. Supp. 1113, 1118 (S.D.N.Y.), No. 89-CV-4114 (KTD), *aff'd,* 923 F.2d 844 (2d Cir. 1990). "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America, AFL-CIO-CLC v. Rawson,* 495 U.S. 362, 372–73 (1990).

To support allegations of discrimination in a breach of duty of fair representation claim, a plaintiff must plead facts that show a defendant's conduct was motivated by discriminatory animus. *Rivera v. Communications Workers of America,* No. 16-CV-1673, 2017 WL 4338754, at *5 (E.D.N.Y. Sept. 29, 2017). A plaintiff must then allege "a causal connection between the union's wrongful conduct and their injuries." *White v. White Rose Food, a Div. of DiGiorgio Corp.,* 237 F.3d 174, 179 (quoting *Spellacy,* 156 F.3d at 126).

ii. Plaintiff's Fair Representation Claims are Time-Barred.

As an initial matter, all of Plaintiff's claims for breach of duty of fair representation are time-barred. This Circuit has established that a plaintiff's duty of fair representation claim accrues "at the latest" by the date of his National Labor Relations Board ("NLRB") charge. *Kawowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003) ("His bringing of the NLRB charge establishes that he had actual knowledge of the breach by [the date of his NLRB filing]. It is beyond dispute that his claim had accrued by that date.").

Plaintiff filed an unfair labor practice ("ULP") charge with the NLRB on **June 15, 2020**, alleging that UCATS failed to fairly represent him. (See ECF 65, Ex. 5 (Plaintiff's filed EEOC Charge)). As a matter of law, Plaintiff knew or should have known of UCATS's alleged breach of the duty of fair representation when he filed his ULP. Plaintiff filed his Complaint on **December 18, 2020**. Thus, any alleged breaches that Plaintiff knew or should have known about before **June 18, 2020** (6 months prior to the date of this action), are time-barred. Plaintiff does not argue that this statute of limitations should be tolled. Accordingly, his claim of a breach of duty of fair representation stemming from his June 15, 2020 NLRB charge should be dismissed. *See Kawowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003). [37] Accordingly, I recommend that Plaintiff's claims against UCATS for breach of their duty of fair representation be dismissed. Additionally, because Plaintiff's claims against UCATS are "inextricably interdependent" with his claim against NYU, I recommend that Plaintiff's claim for breach of the CBA against NYU also be dismissed. *See DelCostello*, 462 U.S. at 164; *Tomney v. Int'l Ctr. For Disabled*, 357 F.Supp. 2d 721, 738 ("The Union did not violate its DFR, and so Tomney's claims against [the employer] for violating the CBA are dismissed.").

### 2. Breach of Contract

 **\*14**  Reading the Complaint most liberally, Plaintiff may be seeking to bring additional breach of contract claim(s) against NYU and UCATS. Plaintiff makes references to the "Union" or "Ucats" contract, but does not include any other facts about, or even references to, any other contracts. (Am. Compl. 20) ("WRONGFUL TERMINATION PURUSANT

TO ... BREACH OF CONTRACT"); (Am. Compl. 24 at ¶ 5) ("I complained about potential contract violations to the Employer and to the Union ...."); (Am. Compl. 23 at ¶ 4) ("which it states in the Ucats Contract"); (Am. Compl. at 14) ("The Union Contract does not contain a clear and unmistakable waiver of my right to sue.").

NYU is correct that any state-law breach of contract claim Plaintiff brings against NYU is preempted by Section 301 of the LMRA. (ECF 46 at 20). Although the LMRA does not preempt claims for a violation of the CBA, if Plaintiff is claiming that Defendants violated the CBA, those claims are time barred. *See* Section V. *Cunningham v. Local 30, Int'l Union of Operating Eng'rs*, 234 F.Supp.2d 383, 395 (S.D.N.Y. 2002). Similarly, to the extent Plaintiff complains about UCATS's failure to pursue grievances on his behalf, these would be claims for breach of fair duty of representation, addressed in Section 1, *supra*.

### 3. Employment Discrimination

To state a claim for employment discrimination, a plaintiff must allege that: (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action ("AEA"), and (iv) there are facts suggesting an inference of discriminatory motivation. [38] *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). Specifically, Plaintiff must show either that he "suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or ... demonstrat[e] that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (citing *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)). Similarly, to state a claim for disability discrimination, Plaintiff would need to plausibly allege that (1) Defendants are subject to the relevant statutes; (2) he suffers from a disability within the meaning of the statute; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. [39]

 **\*15**  To survive a motion to dismiss, a plaintiff must allege facts that plausibly suggest that the employer discriminated against him *because of* his race, national origin, or disability.

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). The evidence necessary to satisfy this initial burden is "minimal and *de minimis*." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotations omitted). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If defendant does so, the burden shifts back to the plaintiff to demonstrate that defendant's reason is merely a pretext for discrimination or retaliation. *Id.* In other words, the Court only evaluates "pretext" if Plaintiff adequately alleges a *prima facie* case.

Evaluating his claims under those laws, Plaintiff fails to allege that he experienced any adverse employment action under circumstances that give rise to an inference of discrimination. (Am. Compl. 13). Plaintiff complains that: (1) he was unable to take vacations or sick leave for "religious/cultural event[s]" in Trinidad; (2) his seniority was miscalculated resulting in a less convenient schedule; (3) he experienced a "hostile work environment" because he had been subjected to derogatory comments, was "mocked daily," "ostracized," harassed, cyberstalked, and stalked; (4) NYU "retaliated" against Plaintiff for complaining about these events by "wrongfully suspend[ing] [him] twice" and eventually terminating his employment; and (5) NYU failed to provide him reasonable accommodations for his ADHD (Am. Compl. 14). I evaluate all of Plaintiff's claims for discrimination on the basis of race or national origin first, and then turn to Plaintiff's disability discrimination claim.

### i. Plaintiff Does not Allege Discrimination on the Basis of Race or National Origin

I evaluate Plaintiff's first two discrimination claims under a disparate treatment analysis, and in the alternative, a disparate impact analysis. *See Gonzalez v. Police Com'r Bratton*, 2000 WL 1191558, at *20 (S.D.N.Y. Aug. 22, 2000) (acknowledging hostile work environment and disparate treatment claims are "distinct" from one another and "require[ ] different pleading and proof"); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 n.10 (S.D.N.Y. 2009) ("[I]t bears emphasis that the analysis of adverse employment actions involving disparate treatment claims is different [from] that involving retaliation claims."). Notwithstanding the differences between disparate treatment and retaliation, "[t]he burden of proof in retaliation claims follows the general disparate treatment analysis in *McDonnell Douglas Corp.* ..." *Shah v. New York State Dep't of Civ. Serv.*, 341 F. App'x 670, 673 (2d Cir. 2009).

### a. Plaintiff does not Allege Defendants Had a Full Prohibition on Vacation or Restricted his Sick Leave.

Plaintiff alleges that in 2017 or 2018, Plaintiff went to a "Religious/Cultural" festival in Trinidad. Rodriguez instructed Plaintiff to use sick leave during his absence and said Plaintiff would not need a doctor's note. (Am. Compl. 10 & 24 at ¶ 8). Plaintiff alleges that he complained that his coworker, Speziale was treated differently because he "gets religious requests approved" while he did not. Upon return, Caesar told Plaintiff NYU "will have to let [him] go if [he doesn't] have a doctor's note" for the time he was out. (Am. Compl. 10). Ultimately, Plaintiff reported that he was sick, produced a doctor's note, and therefore was not terminated for taking his trip[s] to Trinidad. (Am. Compl. 10).

**\*16** Although it is unclear whether Plaintiff actually lost or was denied vacation time, a loss or denial of vacation time "does not generally rise to the level of an adverse employment action." *Chukwuka v. City of New York*, 795 F.Supp. 2d 256, 261 (S.D.N.Y. 2011); *see Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019). Courts in this District have declined to recognize an employer's denial of a vacation request as an adverse employment action where this denial did not constitute a "complete bar" on a plaintiff's taking vacation. *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."); *see also Roff v. Low Surgical*

*& Med. Supply, Inc.*, No. CV-033655 (SJF) (JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004). Plaintiff here did not allege that NYU completely forbade him from taking vacation; indeed, Plaintiff states at one point that NYU approved Plaintiff's request to go to Trinidad for this event three years in a row. (Am. Compl. 15).

### b. Plaintiff's Seniority Miscalculation Does Not Result in an AEA.

Plaintiff alleges that he was given a worse work schedule than his coworkers, who were less senior to him. (Am. Compl. 23 at ¶ 4). Plaintiff states that both NYU supervisors and UCATS's representative Wambaugh believed Speizale to be senior to Plaintiff, which Plaintiff disputed. Loss of "seniority" in this context is not an adverse employment action because unfavorable work schedules are not an adverse employment action, and Plaintiff alleges no other ramifications or less favorable treatment because of the seniority miscalculation. *See* 🔖 *Antonmarchi v. Consol. Edison Co. of New York*, No. 03-CV-7735, 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) (finding denial of transfer to position with better hours was not an adverse employment action) *aff'd*, 514 F. App'x 33 (2d Cir. 2013); *Daniels v. Connecticut*, No. 12-CV-0093, 2015 WL 4886455, at *8 (D. Conn. Aug. 17, 2015) ("[Plaintiff] also suggests that the ... position is a 'preferred working schedule for officers,' but an unfavorable schedule is not an adverse employment action.") (citing *Albuja v. Nat'l Broad. Co. Universal*, 851 F.Supp. 2d 599, 608 (S.D.N.Y. 2012)).

### c. None of the Alleged Adverse Employment Actions Give Rise to an Inference of Discrimination.

Even if changes to Plaintiff's vacation time and work schedule were considered adverse employment actions, Plaintiff still does not state a claim for employment discrimination because none of Plaintiff's alleged AEAs —including suspension, termination, and hostile work environment—occurred under circumstances that give rise to an inference in discrimination. [40] "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." 🔖 *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a showing, the plaintiff must compare herself to employees

who are 'similarly situated in all material respects.' " *Id.* "Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties.' " *Sollazzo v. Just Salad Rest.*, No. 15-CV-252 (ER), 2018 WL 1273661, at *6 (S.D.N.Y. Mar. 5, 2018) (quoting *DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03-CV-1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004)). A plaintiff also "must show that [his] co-employees were subject to the same performance evaluation and discipline standards." 🔖 *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). While "all material respects" varies, a plaintiff must typically "plead comparators' relevant experience and length of employment in order to raise an inference of discrimination." 🔖 *LeeHim v. New York City Dep't of Educ.*, No. 17-CV-3838 (PAE), 2017 WL 5634128, at *6 (S.D.N.Y. Nov. 21, 2017).

*17 The Amended Complaint lacks factual allegations to support an infererence that similarly situated non-Black or non-disabled employees were treated differently from Plaintiff. The only comparator Plaintiff alleges is Gary Speizale, who he alleges is white, less senior to him, and gets his holiday vacation time approved. (Am. Compl. 10). Plaintiff conclusorily alleges that Speizale is "similarly situated" to him in "all material respects," and does not identify any other comparator. 🔖 *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815 (KPF), 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2, 2016) (finding plaintiff was not similarly situated to comparators where she did not plead facts about their positions, responsibilities, tenure, or experiences). Accordingly, the Complaint's conclusory allegations of differential treatment are insufficient to plausibly suggest an inference of discrimination with regard to work schedule or denial of travel to Trinidad. *See id.*; *see also* 🔖 *Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 68–69 (2d Cir. 2015); 🔖 *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp. 3d 396, 408 (S.D.N.Y. 2014).

Similarly, Plaintiff does not allege discrimination under a disparate impact theory. To do so, Plaintiff must allege that his employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 🔖 42 U.S.C. § 2000e-2(k)(1)(A)(i). This requires: (i) identifying a specific employment practice or policy; (ii) demonstrate that a disparity exists; and (iii)

alleging a causal relationship between the two. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012). To demonstrate a disparity sufficient to withstand a motion to dismiss, plaintiffs must allege statistical evidence or allege that a "neutral employment practice denied equal employment opportunities to a small number of members of a protected class compared to similarly-situated colleagues." *Gordon v. City of N.Y.*, No. 14-CV-6115 (JPO) (JCF), 2016 WL 4618969, at *23 (S.D.N.Y. Sept. 2, 2016).

Plaintiff has not identified any employment practice or policy related to vacation time or his work schedule. [41] *See*

*African Am. Legal Defense Fund v. N.Y. State Dep't of Educ.*, 8 F.Supp. 2d 330 (S.D.N.Y. 1998) (dismissing Title VII disparate impact claim where plaintiff failed to allege any statistics to support allegations that facially neutral hold-harmless provisions had a disparate impact on minorities). Accordingly, I recommend Plaintiff's race and national origin discrimination claims be dismissed.

### ii. Plaintiff Fails to Allege a Hostile Work Environment.

To state a claim for a hostile work environment under § 1983, § 1981, Title VII, or the NYSHRL, a plaintiff must allege facts plausibly demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted). To plead an abusive working environment, a plaintiff must satisfy "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (internal quotation marks omitted). This requires that the incidents be "more than episodic." *Id.* A court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or

even decency." *Bermudez v. City of New York*, 783 F.Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

**\*18** The standards for a union's liability for hostile work environment are different from those governing the liability of an employer. Under Title VII, a union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section." [42] U.S.C. § 2000e–2(c)(3). To plead union liability, Plaintiff must plead (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union. [42] *See Agosto v. Correctional Officers Benevolent Ass'n*, 107 F.Supp. 2d 294, 307 (S.D.N.Y. 2000); *Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 16-CV-6278 (VEC), 2018 WL 4625768, at *21–22 (S.D.N.Y. Sept. 26, 2018).

#### a. Plaintiff Does Not Adequately Allege that NYU or UCATS Stalked or Harassed Plaintiff, or Hacked Plaintiff's Electronic Devices.

Plaintiff's allegations that he was stalked, harassed, and hacked are conclusory. *Gench v. HostGator.com LLC*, No. 14-CV-3592 (RA) (GWG), 2015 WL 3757120, at *10 (S.D.N.Y. June 17, 2015), *R&R adopted*, No. 14-CV-3592 RA, 2015 WL 4579147 (S.D.N.Y. July 29, 2015) (finding plaintiff's allegations that certain conduct "allow[ed] 'criminal host(s) to steal the site content' ... 'manipulate users' web activity," "lose control of her email account, and [ ] be subject to email spam" conclusory). Plaintiff's allegations here—that numerous people, including T-Mobile employees; Plaintiff's roommate/landlord, psychiatrist, sister, or mother; and/or strangers on the subway were hired by Defendants to stalk and harass him—are wholly unsupported by facts and do not state a claim for a hostile work environment. [43] The Court understands that Plaintiff describes these instances in support of his *belief* that there is an ongoing conspiracy against Plaintiff to create a hostile work environment for him. Plaintiff's beliefs—however strongly he may hold them—are not facts. *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic' or 'delusional.' ") (quoting

*Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)); *Tessema v. Env't Prot. Agency*, No. 1:20-CV-9700 (MKV), 2021 WL

2666855, at *4 (S.D.N.Y. June 29, 2021), *appeal dismissed sub nom. Tessema v. United States Env't Prot. Agency,* No. 21-1729, 2021 WL 6427942 (2d Cir. Dec. 16, 2021) (finding that Plaintiff's claims that the EPA has tortured him and subjected him to human experiments involving exposure to hazardous pollutants were "fanciful" in nature and "clearly warrants dismissal"); *Mercier v. Mercier,* No. 07-CV-0523, 2007 WL 1582267, at *1–2 (N.D.N.Y. May 25, 2007) (Kahn, J.); *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."); *see also Banks v. Mental Health Clinicians,* No. 11–CV–7848, 2012 WL 6201259, at *5 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss where the plaintiff alleged that the defendants were deliberately indifferent when they exacerbated the plaintiff's suicide risk by transferring him to a special unit for mentally ill inmates, finding, *inter alia,* that Plaintiff did not state facts that supported his bald allegation that Plaintiffs acted with "punitive intentions") (internal quotation marks omitted).

**\*19** Additionally, Plaintiff has failed to allege sufficient facts from which one could reasonably conclude that the alleged hostile conduct was *because of* Plaintiff's membership in protected classes. *See Wilson v. JPMorgan Chase Bank, N.A.,* No. 20-CV-4558 (JMF), 2021 WL 918770, at *5 (S.D.N.Y. Mar. 10, 2021).

*b. Plaintiff Does Not Adequately Allege Discriminatory Comments That Rise to a Hostile Work Environment.*

Plaintiff also does not plead sufficient facts to support a hostile work environment claim against NYU (and therefore UCATS) arising from allegedly discriminatory comments because the conduct about which Plaintiff complains is not severe or pervasive. [44] *See Benzinger v. Lukoil Pan Americas, LLC,* 447 F. Supp. 3d at 99. Plaintiff alleges he was subject to several derogatory statements and was "ostracized," stalked, harassed, and hacked at work. (Am. Compl. 20). *See also* Am. Compl. 22 ("was labeled a criminal, threatening, violent, aggressive, unprofessional all which are racial steretypes[sic]/profiles for person(s) of [A]frican descent"); Am. Compl. 20 ("Management and my coworkers would say things like 'why don't you go back to your country since you keep complaining', or 'you don't fit the culture here.' "); Am. Compl. 24 at ¶ 7 (" 'You don't fit the culture here, You have to fit the culture, you got another chance,

you better not mess it up this time around' "); Am. Compl. 15 ("Why don't you just go back to Trinidad to live since [you're] always complaining about what we do here."); Am. Compl. 32 at ¶ 45 (Rodriguez used the words 'black man being aggressive' "); Am. Compl. 11 ("subjected to numerous disparaging comments from 4/2/19 to 12/10/19").

Because Plaintiff's Complaint is at times vague and repetitive, I cannot discern for many of the claims the speaker, context, or frequency of these comments. Accordingly, Plaintiff fails to state a claim for hostile work environment based on the comments identified here.

iii. Plaintiff Does not Adequately Allege Retaliation.

To establish a claim of retaliation under § 1981, Title VII and the NYSHRL, Plaintiff must allege facts that plausibly suggest that: (i) he participated in protected activity, (ii) he suffered an adverse employment action, and (iii) there was a causal connection between his engaging in the protected activity and the adverse employment action. [45] *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir. 2010); *see also Wilson,* 2021 U.S. Dist. LEXIS 45132, at *13.

**\*20** Liberally construing the Complaint, Plaintiff claims that he was suspended and fired for seeking to file grievances (or otherwise complaining) about mistreatment in the workplace. *See* Am. Compl. 12 ("[Plaintiff has] complained about a hostile workplace, Harassment, Retaliation, Discrimination and my complaints were either wrongfully labeled as meritless or I was deceitfully told they were filed when they were not."). [46] It is well settled that filing "[a] union grievance can constitute protected activity if it concerns discrimination, but union grievances that complain of matters other than discrimination do not constitute protected activity for purposes of Title VII." *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.,* No. 18-CV-01790 (PMH), 2020 WL 2131771, at *4 (S.D.N.Y. May 4, 2020) (quoting *Mack v. Paris Maint. Co. Inc.,* No. 14-CV-6955, 2016 WL 8650461, at *9 (S.D.N.Y. Feb. 22, 2016), *R&R adopted,* No. 14-CV-6955, 2016 WL 1071030 (S.D.N.Y. Mar. 17, 2016)).

Plaintiff does not adequately allege that he engaged in protected activity. Although Plaintiff alleges that coworkers made racially charged comments to him, Plaintiff does not provide facts about when he sought to file a grievance for this conduct, or for any other **discriminatory conduct** that

he endured based on his race or national origin. Although Plaintiff sought to file many grievances with UCATS, in the majority of the alleged instances, Plaintiff only states that UCATS did not or could not file a grievance—not that he sought to file a grievance because of discrimination on the basis of race or national origin. (Am. Compl. 24 at ¶ 4); (Am. Compl. 25 at ¶ 14); (Am. Compl. 9); (Am. Compl. 26 at ¶ 17); (Am. Compl. 27 at ¶ 20); (Am. Compl. at 30 ¶ 32). Only on three occasions does Plaintiff plead slightly more. Specifically, Plaintiff alleges that: (1) Defendants "maliciously misled [him] into thinking the grievances were filed when they weren't" so that both parties could avoid a breach of a duty of fair representation claim (Am. Compl. 9); (2) Wambaugh "did not file a grievance for racial discrimination, which *she should have known* to [do because] she had the audio evidence" of the fight between Plaintiff, Olivia, and Jameson (Am. Compl. 29 at ¶ 32) (emphasis added); and (3) UCATS violated their duty of fair representation in May 2020 because some grievances UCATS allegedly filed were "not actual grievances and lack sig[ ]natures by all parties." (ECF 68). Plaintiff does not allege any facts that suggest UCATS's decision not to file a grievance for Plaintiff was motivated by discriminatory animus.[47] Accordingly, I recommend that Plaintiff's Retaliation claim be dismissed.

iv. Plaintiff's Disability Discrimination Claim Fails.

Plaintiff does not adequately plead disability discrimination under the ADA, the NYCHRL or the NYSHRL. Plaintiff does not allege that the Defendants are subject to the ADA, that he was in fact disabled under the ADA, or that he suffered an adverse employment action under circumstances giving rise to an inference of disability discrimination.[48]

**\*21** A person has a "disability" within the meaning of the ADA if he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;" or if he is (C) "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i). Plaintiff has not alleged that his ADHD has impacted him in any way.[49]

Moreover, Plaintiff does not plead any facts that support his allegation that Defendants denied him any reasonable accommodation. To state a claim for failure to accommodate, "a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations." Howard v. United Parcel Serv., Inc., 101 F. Supp. 3d 343, 352 (S.D.N.Y. 2015), aff'd sub nom. Howard v. United Parcel Serv., 648 F. App'x 38 (2d Cir. 2016). Here, Plaintiff merely restates the legal standard that employer generally have a duty to accommodate employees with disabilities and checks a box that the Defendants denied him accommodations. (Am. Compl. 5, 14). This is conclusory and insufficient.

Although Plaintiff's November 21, 2019 Step 2 Grievance states that he "was discriminated against based on having a disability," his supporting reasons include that he was "stalked, bullied, harassed[ ], character defamed, privacy breached," among other things. (ECF 49-3 at 3). As addressed above, these allegations are fanciful and should be dismissed. Gallop, 642 F.3d at 368 (2d Cir. 2011). Accordingly, I recommend that the Court dismiss Plaintiff's disability discrimination claims.

### 4. FMLA Interference

Plaintiff believes that UCATS and NYU violated the FMLA because they denied his initial claim, but then approved an FMLA application for Plaintiff that Plaintiff claims he never made. These allegations do not support a claim for FMLA violations against either defendant. To state an FMLA interference claim, Plaintiff must establish: (i) that he is an eligible employee under the FMLA; (ii) that the defendant is an employer as defined by the FMLA; (iii) that he was entitled to take leave under the FMLA; (iv) that he gave adequate notice to the defendant of his intention to take leave; **and** (v) that he was denied benefits to which he was entitled under the FMLA. *See* Graziadio v. Culinary Institute of America, 817 F.3d 415, 424 (2d Cir. 2016).

Plaintiff's claim against UCATS fails because Plaintiff has not (and cannot) allege that UCATS is an "employer" within the meaning of the FMLA. *Eckert v. United Auto. Workers Loc. Union 897*, No. 04-CV-538S, 2005 WL 2126295, at \*9 (W.D.N.Y. Sept. 1, 2005) (concluding that a

union that represented plaintiff's interests and acted on his behalf "relative to [Plaintiff's] employment" is "precisely the opposite" of an employer under the FMLA); *see also Latella v. Nat'l Passenger R.R. Corp. (Amtrak)*, 94 F. Supp. 2d 186, 190 (D. Conn. 1999) (rejecting an argument for breach of duty of fair representation against a union for "not advising him of his rights under the FMLA" because "no private right of action exists for a violation of the FMLA's notice requirements against an employer or a union."). Accordingly, Plaintiff's FMLA claim is not applicable against UCATS, and I recommend that it be dismissed.

**\*22** Plaintiff's claim against NYU also fails. Plaintiff does not allege any facts that identify how NYU interfered with his FMLA rights or resulted in a denial of Plaintiff's benefits. Plaintiff alleges that he applied for FMLA leave in early October 2019, after a September 30, 2019 conversation between Plaintiff and Rodriguez. (Am. Compl. 28 at ¶¶ 23, 25). Plaintiff also alleges that on December 12, 2019 he visited a doctor in "pursu[it] [of] FMLA leave." (Am. Compl. 32–33 at ¶ 48). Plaintiff does not allege whether the FMLA leave he was pursuing in December 2019 was a part of the same request or not. Plaintiff's operative complaint is devoid of any allegations regarding his FMLA process for the two months immediately preceding Plaintiff's termination. NYU terminated Plaintiff's employment on December 13, 2019. (Am. Compl. 33 at ¶ 49). At most, Plaintiff alleges that Rodriguez "deliberately" gave him "the wrong Fmla [sic] request instructions ... which interfered with [his] FMLA rights entitlement." (Am. Compl. 17).

NYU is correct, however, that failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," is insufficient to state a cause of action. 🔖 *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). Plaintiff makes the conclusory statement that Rodriguez's and Wambaugh's errors "interfered with [his] FMLA rights entitlement," but does not allege how being provided non-union employee instructions affected Plaintiff's pursuit of FMLA leave when he knew that he was a union employee. (Am. Compl. 17). Because of conflicting and incoherent allegations, I cannot discern from Plaintiff's pleadings: (1) what Rodriguez's FMLA instructions were; (2) when he requested FMLA leave; or (3) any October 2019 request was approved or denied. Accordingly, I recommend that his FMLA interference claim be dismissed.

**5. Conspiracy under** 🔖 **Section 1985(3).**

Plaintiff fails to assert a 🔖 § 1985 claim against both defendants for the same reason: he fails to allege any facts that suggest either defendant acted in agreement with anyone, or acted with an intent to deprive Plaintiff of any of his rights under the law. As stated in Section VII, Plaintiff also does not allege that any party acted with discriminatory animus.

To state a claim under 🔖 § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons to the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privileges of a citizen of the United States." 🔖 *Trautz v. Weisman,* 819 F. Supp. 282, 290 (S.D.N.Y. 1993). The conspiracy must further be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Cuoco v. U.S. Bureau of Prisons*, No. 98-CV-9009 (WHP), 2001 WL 167694, at *3 (S.D.N.Y. Feb. 16, 2001) (quoting 🔖 *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The claim must be pleaded with "at least some degree of particularity ... [to] establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." 🔖 *Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 671 (S.D.N.Y. 2014). This requires "establish[ing] the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Id.* (quoting *Roach*, at 147 (2d Cir. 1999). An explicit agreement is not necessary but may be shown through a "general conspiratorial objective" among the participants in the conspiracy. 🔖 *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1999) (quoting 🔖 *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir. 1990)). A plaintiff must further allege that the defendant's "overt acts ... were reasonably related to the promotion of the claimed conspiracy." *Id.* (quoting 🔖 *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999)). In making this claim, a plaintiff must adequately allege "the most fundamental aspect of a conspiracy: an agreement." 🔖 *Gropper*, 12 F. Supp. 3d at 671. The Court will not simply infer an agreement from violations of the laws because that would essentially "permit every civil rights case to become

a civil rights conspiracy case, which the Second Circuit has rejected in analogous contexts." *Id.* at 671.

**\*23** Plaintiff alleges that he complained to UCATS about the hostile work environment he experienced, but UCATS told him his concerns were meritless, or told Plaintiff they filed grievances when they had not. (Am. Compl. 9, 12). Defendants' "dishonesty," Plaintiff alleges, is a "clear sign of a conspiracy to deprive [him] of [his] rights." (Am. Compl. 12). While Plaintiff was upset by UCATS's responses that they either would not or could not file a grievance for some of the events about which Plaintiff complained, Plaintiff does not allege sufficient facts to withstand a motion to dismiss. Plaintiff fails to state any facts with particularity that suggest UCATS and NYU employees worked *in concert* (either totally within UCATS, totally within NYU, or some combination of UCATS and NYU) to *deprive* Plaintiff of his constitutional rights.

Plaintiff's allegations are limited to conclusory statements. Complaints that state "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951 (ER), 2017 WL 4011395, at \*8, (S.D.N.Y. Sept. 11, 2017); *see also Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic.' or 'delusional.' ") (quoting *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Evidence to support a conspiracy may be "when, where or with whom an unlawful agreement was made" or "any specific acts performed in furtherance of the alleged unlawful agreement. *Almonte v. Florio*, No. 02-CV-6722 (SAS), 2004 WL 60306, at \*5 (S.D.N.Y. Jan. 13, 2004). None of that is present. Plaintiff does not adequately allege that UCATS or NYU acted in furtherance of a conspiracy to deprive him of his constitutional rights because his allegations are conclusory. As discussed, the Complaint does not adequately allege that NYU or UCATS's actions were motivated by a racial animus. *Blue v. City of New York*, No. 14-CV-7836 (VSB), 2018 WL 1136613, at \*16 (S.D.N.Y. Mar. 1, 2018). Accordingly, I recommend that Plaintiff's § 1985 claim against UCATS be dismissed.

*6. Civil Rights Violation Under Civil Rights Law Section 79-n.*

Civil Rights Law § 79-n creates a cause of action against anyone who "summons a police officer ... without reason to suspect a violation of the penal law, any other criminal conduct, or an imminent threat to a person or property," "because of a belief or perception regarding," *inter alia*, race or disability. Civil Rights Law § 79-n. To state a claim under CRL § 79-n, a plaintiff must allege that a defendant (1) intentionally committed, (2) damage to a person or property, (3) 'because of a belief or perception regarding [that person's] ... [protected characteristic].' " *Le v. Triza Elec. Corp.*, No. 19-CV-5134 (ARR) (PK), 2020 WL 1274977, at \*3 (E.D.N.Y. Mar. 16, 2020). Section 79-n does not provide a remedy "where existing discrimination laws already provide protection, such as in employment ... decisions. Unless a plaintiff could show bias-related violence or intimidation in the hiring ... decision ... [they] could not bring an action under this new section." *Governor's Approval Memorandum*, No. 7, ch. 227, filed with Assembly Bill Number 529.

Plaintiff's Section 79-n claim fails because of the availability of other statutory remedies in the employment context. Even if it did not, Plaintiff would still fail to state a claim. Plaintiff alleges that Rodriguez "falsely summoned" an NYPD officer "to arrest [him] and to escort [him] out for criminal trespassing" as he was writing an email about the hostile work environment he was experiencing. (Am. Compl. 12 at ¶ 6). Rodriguez is not a defendant in this action.[50] Even if this behavior extended to NYU, Plaintiff does not assert that NYU intentionally threatened Plaintiff *because of* his protected characteristics.[51] As best as I can discern, Plaintiff alleges that he was suspended on or before December 11, 2019 because NYU knew, "through its control of [Plaintiff's] devices," that Plaintiff knew NYU hacked his devices. (Am. Compl. 32 at ¶ 47). By Plaintiff's own account, his employment was suspended, and his supervisor suggested he leave. When he did not leave, he overheard Rodriguez say, "black man being aggressive" and NYPD officers appeared to "arrest [him] for criminally trespassing."[52]

### *7. Negligent Infliction of Emotional Distress.*

**\*24**  Plaintiff brings claims against both NYU and UCATS for negligent infliction of emotional distress ("NIED"). Plaintiff alleges that he experienced emotional distress because of the "employment discrimination" he experienced at NYU. (Am. Compl. 13).

As an initial matter, Plaintiff's NIED claim against NYU is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"). *See* N.Y. Work. Comp. Law § 11. The WCL provides the exclusive remedy for an employee who is injured "by the negligence or wrong of another in the same employ." *Rivera v. Baccarat, Inc.,* No. 95-CIV-9478 (MBM), 1996 WL 251850, at \*4, (S.D.N.Y. May 10, 1996). WCL precludes Plaintiff from recovering from claims of NIED that arise out of workplace conduct. *D'Annunzio v. Ayken, Inc.,* 25 F. Supp. 3d 281, 294 (E.D.N.Y. 2014); *Stevens v. New York,* 691 F. Supp. 2d 392, 397 (S.D.N.Y. 2009); *see* Torres v. Pisano, 116 F. 3d 625, 640 (2d Cir. 1997) (finding negligence claim for hostile work environment barred by exclusivity of workers compensation). While the Court is sympathetic to Plaintiff's distress, Plaintiff's allegations arise out of alleged workplace conduct. Accordingly, the claim is barred by the WCL and must be dismissed.

Plaintiff's NIED claim against UCATS also fails. First, while Plaintiff makes this claim against "NYU **and UCATS**" (Am. Compl. 25 at 13), he does not provide facts that support any allegation that UCATS as an entity or a UCATS employee did anything that would support a claim for negligent infliction of emotional distress. (Am. Compl. 25 at 13–14). While Plaintiff alleges that he was being stalked and is experienced a hostile work environment (allegations that appear to be targeted at NYU, not UCATS), these allegations are conclusory. *See* Goodrich v. Long Island R.R. Co., No. 10 Civ. 2195 (SAS), 2010 WL 2473593, at \*1, (S.D.N.Y. June 17, 2010) (following Plaintiff's coworker posting on a public bulletin board his positive HIV status, Plaintiff withdrew his NIED claim, conceding he " 'was never placed in fear of imminent bodily harm, nor did he ever suffer any physical impact' "). To the extent Plaintiff is alleging UCATS acted negligently by failing to file grievances for Plaintiff, as discussed, UCATS has wide discretion in those decisions, and Plaintiff does not adequately allege that they abused their discretion. *See supra* Section 1.

## V. Conclusion and Recommendation

For the reasons stated above, I recommend that the Motion be **GRANTED**. Although *pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated," *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir. 2002), amendment may be denied upon a finding of futility. *See* Chill v. Gen. Elec. Co., 101 F.3d 263, 271–72 (2d Cir. 1996). I do not recommend that Plaintiff be given leave to amend his conspiracy claim because his allegations, even liberally construed, are still fanciful and factually frivolous. *See* Kraemer v. City of New York, No. 19-CV-6671 (VEC), 2020 WL 1974204, at \*4 (S.D.N.Y. Apr. 24, 2020) ("While the Court has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources.") (finding Plaintiff's allegations of coordinated efforts by police, AMC movie theaters, T-Mobile, Starbucks, NYU and others to "surveil, mock, and harass Plaintiff" frivolous). Similarly, because Plaintiff's fair representation claims are time-barred, leave to amend would also be futile.

**\*25**  Because Plaintiff is proceeding *pro se,* however, I recommend that he be given **one final opportunity** to replead only his **Discrimination Claims for Hostile Work Environment and Retaliation, and his FMLA Claims,** and that he be directed to file a proposed second amended complaint within 30 days of Your Honor's final disposition of this motion. To the greatest extent possible, Plaintiff's amended complaint must allege facts to support that his claims, including:

(1) Identifying the NYU or UCATS employees, if any, who engaged in the specific discriminatory conduct; and

(2) Identifying and describing the specific acts by the NYU or UCATS employees that constitute discriminatory acts.

## VI. Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served.

Such objections, and any responses to objections, shall be addressed to the Honorable J. Paul Oetken, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Oetken.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 🔖 *Thomas v. Arn*, 474 U.S. 140, 155 (1985); 🔖 *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); 🔖 *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from the Defendants. *See* 🔖 *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff by mail and file proof of service on the docket within seven days. Alternatively, if circumstances related to the ongoing COVID-19 pandemic prevents their service, they must file a letter on the docket instead.

**All Citations**

Slip Copy, 2022 WL 1666918

## Footnotes

1    The case was reassigned earlier this year to Judge Oetken.

2    I reviewed ECF 40, Plaintiff's Proposed Second Amended Complaint, and do not find that Plaintiff's Proposed Second Amended Complaint alleges additional facts that would have been material to this Report & Recommendation.

3    Plaintiff alleged on October 7, 2021 that NYU was continuing to retaliate against him by sending the "answer to [his] complaint to his old address." (ECF 65 at 1). NYU filed an Affirmation and a "true and correct copy of the confirmation that Defendant's Motion to Dismiss papers were delivered" to Plaintiff's address listed on the docket. (ECF 71).

4    For purposes of deciding the Motion, the Court accepts as true all facts alleged by Plaintiff, *see* 🔖 *Krassner v. 2nd Ave Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007), and draws all inferences in the Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003).

5    To reduce the likelihood of confusion, all citations to the Amended Complaint reference PDF page numbers, ranging from one (1) to thirty-nine (39) (the entirety of ECF 25 in one PDF). Plaintiff did not include paragraph numbers until page 22. Accordingly, citations to the Amended Complaint on or after page 22 will also include paragraph citations.

6    Plaintiff does not identify or define "management," nor does he identify subsequent work reviews at which he was informed he was performing adequately.

7    Plaintiff does not identify these individuals nor does he detail any incidents in connection with this complaint.

8    Management also asked that Plaintiff not wear his coat/jacket while working, even though he was cold, because the security guard had complained about the way "it looked" on Plaintiff. (Am. Compl. 23 at ¶ 3).

9    Plaintiff does not allege whether Speizale was in fact senior to him, nor does he allege why his supervisors and union representative thought Speizale was senior to Plaintiff. Plaintiff also does not allege facts about other similarly situated coworkers and their work schedules.

10   Article 34 of the CBA governs the Grievance and Arbitration Procedure with UCATS. (ECF 49-1, CBA at 27).

11   Plaintiff alleges extremely similar facts occurred in 2018. (Am. Compl. 10). It is unclear whether these facts are for the same event in 2017 and Plaintiff misstates the date, or whether this is a different event entirely.

Plaintiff alleges that in 2018, he asked Rodriguez for unpaid time off to attend a "religious holiday," and his request was denied. (Am. Compl. 10). Plaintiff "brought up the fact that Gary Speizale gets his religious requests approved" but Plaintiff was told "to worry about [himself]." (Am. Compl. 10). Plaintiff alleges that Rodriguez told Plaintiff to "call out sick for those days," and told Plaintiff that he would not need a doctor's note. (Am. Compl. 10). Plaintiff followed Rodriguez's suggestion and upon returning, Caesar told Plaintiff that he had abused sick days and NYU "will have to let [him] go if [he doesn't] have a doctor's note." (Am. Compl. 10). Plaintiff alleges that he reported he was sick, produced a doctor's note, and therefore was not terminated. (Am. Compl. 10).

Plaintiff does not allege any additional facts about what Rodriguez advised him to do regarding his sick time and the festival, what doctor he saw, or what sickness, if any, he experienced.

12   Plaintiff does not identify "they," or whether "they" were supervisors.

13   Plaintiff does not provide any facts about when or to whom he disclosed his ADHD disability. He also does not plead the original length of his probationary period.

14   Plaintiff does not identify any of these individuals.

15   Plaintiff alleges that he "heard people in the library discussing videos [he] had watched, or things on [his] social media [ac]counts and email accounts and electronic devices, that no one but [Plaintiff] should have knowledge of." (Am. Compl. 26 at ¶ 19). He also alleges that "Amazon web IP addresses [were] popping up on [his] phone and laptop that weren't there before." (Am. Compl. 26 at ¶ 19).

16   Plaintiff said that "[he] noticed people on the train looking at [him], standing next to [him], raising their phones at [him] as if they were recording [him], stomping in front of [him], and engaging in other activity that [he] viewed as an effort to agitate [him]. [He] suspected that the Employer was involved in this because it was the same behavior [he] was experiencing at the library [a]nd only started after [his] initial complaints." (Am. Compl. 27 at ¶ 20).

17   Plaintiff alleges "[t]he meds the psychiatrist prescribed [Plaintiff], shouldn't have been prescribed, as [he] wasn't diagnosed with any of the ailments [that mandated] the medication." (Am. Compl. 38 at ¶ 72). Plaintiff further alleges that the psychiatrist had omitted all of his "confessions of the stalking from NYU" and other misconduct by Defendants but Plaintiff does not say why the psychiatrist did this. (Am. Compl. 38 at ¶ 72).

18   Plaintiff does not identify or describe specific acts that he believes constitute harassment other than the stalking and hacking events, and specific arguments and altercations, described in this section and Section III.11.

19   At this meeting, Rodriguez asked Plaintiff to sign "the verbal warning," but Plaintiff said he wanted to speak with a Union representative first. (Am. Compl. 27 at ¶ 23). Rodriguez then "shredded the verbal warning she asked [Plaintiff] to sign." (Am. Compl. 27 at ¶ 23).

20    The text messages stated "[N _ _ _ S] are not even human no more" and accused Plaintiff of being "involved in 'a whole lot of gang shit.' " (Am. Compl. 28 at ¶ 26).

21    Plaintiff thinks NYU "was using Olivia to spy on [him] to see why [he] wasn't at work." (Am. Compl. 28 at ¶ 27).

22    Plaintiff further "suspect[ed] that this was all part of the Employer's campaign to retaliate against [him]." (Am. Compl. 28 at ¶ 28). Plaintiff does not explain the nature of his "Course Reserve" work, the relevance or significance of his conversations with these faculty members, or how these alleged facts constitute retaliation.

23    Plaintiff does not "recall if they told [him] that it was because of the incident with Freddy [O]livia, but in the event they didn't, [he] understood that was what the meeting was about, because it was the only incident that happened that day." (Am. Compl. 29 at ¶ 31).

24    Plaintiff alleges that Wambaugh "should have known to file a grievance" for "racial discrimination," for him, since she "had the audio evidence" of the fight with Jameson. (Am. Compl. at 29 ¶ 32).

25    Plaintiff does not explain what the "final warning" threatened. Plaintiff states that he told O'Brian that "[he] didn't understand how [he] was getting a final warning and suspension, when [he] had audio of the incident which proves that [he] didn't threaten or touch anyone." (Am. Compl. 30 at ¶¶ 36–38).

26    It is unclear whether this was a new suspension, or a continuation of another suspension.

27    Plaintiff additionally notes that on December 9, 2019, his "phone(s) had been installed as a modems [sic]," (Am. Compl. 31 at ¶ 41), but Plaintiff does not explain what this means.

28    Plaintiff does not explain, and the Court cannot discern, the significance of the "suspicious Amazon IP addresses."

29    Plaintiff does not allege the purpose of the December 11 meeting with the Union and Human Resources. This meeting was previously scheduled for December 10, 2021, where Plaintiff requested Human Resources be present, and Human Resources rescheduled it. (Am. Compl. 31 at ¶ 43).

30    Plaintiff also asked Wambaugh about "the final warning grievance, and the Employer's failure to respond to the information request in time." (Am. Compl. 33 at ¶ 51). Plaintiff does not clarify what information he sought and whether any information was conveyed by Wambaugh.

31    Plaintiff alleges that Wambaugh told Plaintiff that she was not going to file the ADHD discrimination grievance and that she had not known that Plaintiff had ADHD. (Am. Compl. 33–34 at ¶ 52).

32    Plaintiff wanted his NYU emails because he sought proof that Defendants were being dishonest about the grievances they filed. (Am. Compl. 13). Plaintiff suggests that Defendants withheld his emails so that he "wouldn't have proof during arbitration." (Am. Compl. 13).

33    Plaintiff also had intended to file a grievance about the grievance process, which Lanzo allowed, but Wambaugh said was not done. (Am. Compl. 33 at ¶ 51); (Am. Compl. 34 at ¶ 57).

34    The amended document shows the provision violated changed from "Article 5 – No Discrimination and all other Articles that apply" to "Article 37 – Health and Safety." The nature of grievance was further amended from "Mr. Morren was discriminated against based on having a disability" to "The university failed in its obligation and policy's [sic] to maintain a healthy and safe working conditions [sic]." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance) (Amended 1/22/2020 Step 1 Grievance)).

35    Plaintiff further alleges:

"[T]hey said I requested FMLA while I was employed, they said that was false. Lincoln Financial also informed me that their point of contact at the Employer was Enrique Yanez. NYU, between the 24th and the 26th, how did they get in contact with Enrique Yanez, At home on his personal time? [A]nd, I note that Yanez is not the person who handles leave claims at NYU. As such, I believe that my claim was denied because the Employer is retaliating against me." (Am. Compl. 34 at ¶ 54).

36    Plaintiff then alleges:

"I believe that the approval of the short-term claim was part of the Employer's retaliation against me. I also believe that the Employer was engaged in a conspiracy with my doctor to retaliate against me, which led to medical malpractice, doctoring of my medical records, and prescribing me with medication for ailments I was not diagnosed with, which causes suicide and other life threatening diseases. Maliciously [i]nciting a suicide attempt is attempted murder." (Am. Compl. 36 at ¶ 61).

37    Allegations about Wambaugh allegedly giving Plaintiff the "incorrect FMLA leave Request Instructions (Am. Compl. at 6), and UCATS' failure to file a grievance—all of which occurred before June 18, 2020 (Am. Compl. at ¶¶ 7, 9, 14–16, 17, 20, 37–38, 40, 41) (Am. Compl. at 6)—are time barred.

Even if these claims were not time-barred, however, Plaintiff has not alleged any facts that support his claim that UCATS declined to file grievances on Plaintiff's request *with an improper intent, purpose, or motive.* Without any supporting facts, this assertion is conclusory, and insufficient to state a claim for breach of the duty of fair representation. *See Stoner v. Walsh,* 772 F. Supp. 790, 806–07 (S.D.N.Y. 1991) (Mukasey, J.). Where Plaintiff alleges slightly more, the allegations are still conclusory and circular, and should be dismissed.

38    Employment discrimination claims under Section 1981 and the NYSHRL are analyzed under the same framework as Title VII. *McGill v. University of Rochester,* 600 F. App'x 789, 790 (2d Cir. 2015). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination [to] plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks omitted). "[T]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.' " *Carter v. Verizon,* No. 13-CV-7579 (KPF), 2015 WL 247344, at *5 (S.D.N.Y. Jan. 20, 2015) (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.,* 552 F. App'x 100, 102 (2d Cir. 2014)).

39    Aside from the NYSHRL and NYCHRL having a broader definition of "disability," "[t]he standard for pleading a claim for disability discrimination under the NYSHRL and the NYCHRL is virtually identical to the ADA." *Marquez v. Starrett City Assocs.,* 406 F. Supp. 3d 197, 207 (E.D.N.Y. 2017).

40    Indeed, "[b]eing forced to endure a hostile work environment is one type of adverse employment action." *Dietrich v. City of New York,* No. 18 CIV. 7544 (CM), 2020 WL 4226591, at *16 (S.D.N.Y. July 23, 2020).

41    While Plaintiff alleges that he sought to file a grievance about the grievance process, he does not allege any facts about the process and procedure for filing grievances, or how the process was allegedly different for him due to his membership in a protected class. (Am. Compl. 34–35 at ¶ 53, 57).

42    The case law governing a union's liability for hostile work environment under the NYSHRL and NYCHRL is less clear. Most cases, however, hold that NYSHRL and NYCHRL claims against a union "are subsumed by the duty of fair representation when the gist of the claim is the failure to represent the plaintiff in a fair and

non-discriminatory manner." *Gallagher v. AEG Mgmt. Brooklyn, LLC*, No. 16-CV-4779, 2017 WL 2345658, at *7 (E.D.N.Y. May 30, 2017) (collecting cases).

43    Generally, an employer is not liable as a matter of law for harassment resulting "from nonwork-related, off-duty interactions between co-employees, because those actions are not part of the work environment." *See* 🚩 *Devlin v. Teachers' Ins. & Annuity Ass'n of Am.*, No. 02-CV-3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting the defendant's motion for summary judgment on the plaintiff's sexual harassment claim because, *inter alia,* the plaintiff's co-worker's acts occurred at a bar outside of work hours) (quotation & citation omitted).

44    To the extent any part of Plaintiff's claims under the NYSHRL fall under the less demanding NYCHRL standard, his claims also fail for the reasons discussed herein. The burden to state a claim under the NYCHRL is somewhat less demanding, requiring the plaintiff to allege: (i) that the plaintiff was "treated less well than other employees;" and (ii) that such treatment was because of the plaintiff's protected class. *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-CV-4558, 2021 U.S. Dist. LEXIS 45132, at *13 (S.D.N.Y. Mar. 10, 2021).

45    Plaintiff must also establish these elements under the NYCHRL, except that instead of an adverse employment action, he need only prove that "something happened that would be reasonably likely to deter a person from engaging in protected activity." Wilson, 2021 U.S. Dist. LEXIS 45132, at *20.

46    Even though Plaintiff has not pleaded a *prima facie* case for discrimination that would, under *McDonnell Douglas*, shift the burden to Defendants to provide a legitimate non-discriminatory reason for Plaintiff's suspension and termination, Plaintiff nonetheless acknowledges that NYU's proffered reasons for his suspensions and termination were because of Plaintiff's interpersonal conflicts with coworkers. (Am. Compl. 30 at ¶ 37, 38).

47    In fact, only Plaintiff's January 16, 2020 Grievance Form states that Plaintiff "was discriminated against based on having a disability." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance). The Grievance does not reference Plaintiff's race or national origin, at all.

48    Among other things, Plaintiff neither pleads when he made his employer aware of his ADHD nor how his ADHD is related to any alleged adverse employment action.

49    Even if Plaintiff has a disability under the broader NYSHRL definition in light of his ADHD diagnosis (ECF 65-7 at 1), it is unnecessary for me to evaluate this since Plaintiff fails to allege any adverse employment action giving rise to an inference of disability discrimination. *See* 🚩 *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-CV-5109 (JCF), 2007 WL 1149979, at *19 (S.D.N.Y. Apr. 18, 2007), *aff'd sub nom.* 🚩 *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008).

50    Plaintiff does not allege any facts involving UCATS and the Court cannot discern any Civil Rights 🚩 § 79-n claim against them.

51    As Defendants point out, at least one court has dismissed a 🚩 Section 79-n claim because it was brought against an organization and not an individual. *Morrison v. Shalach*, 67 Misc. 3d 451, 457, 124 N.Y.S.3d 512 (N.Y. Sup. Ct. Westchester Cty. 2020).

52    Plaintiff compares his experience to that of his coworkers Speizale and Wambold, who he alleges could come into the building "on their days off," use the workstations, and were "never asked to leave" or have NYPD "called to arrest them for criminally trespassing. (Am. Compl. 32 at ¶ 46). But Plaintiff's comparison falls short

in this instance because Plaintiff was not given a day off when he was told to leave—he had already been suspended from working at NYU.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1665013
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,

v.

NEW YORK UNIVERSITY, et al., Defendant.

20-CV-10802 (JPO)
|
Signed 05/25/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C., New York, NY, for
Defendant.

ORDER ADOPTING REPORT
AND RECOMMENDATION

J. PAUL OETKEN, District Judge:

**\*1** *Pro se* Plaintiff Darwyn M. Morren sues New York
University and UCATS Local 3382 under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;
42 U.S.C. § 1981; the Americans with Disabilities Act of
1990, 42 U.S.C. § 12101 *et seq.*; the Family and Medical
Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*; the Labor
Management Relations Act, 29 U.S.C. § 185; 42 U.S.C.
§ 1985; the Immigration Reform and Control Act of 1986,
8 U.S.C. § 1101 *et seq*; the New York State Human Rights
Law, N.Y. Exec. Law § 290 *et seq.*, the New York City
Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq*;
and New York Civil Rights Law § 79-n. Plaintiff also
brings claims for breach of contract and negligent infliction
of emotional distress. (*See* Dkt. No. 25 ("Am. Compl"); Dkt.
No. 25-1 ("Pl.'s Memo") 4-14.) Defendants have each moved
to dismiss the amended complaint for failure to state a claim.
(*See* Dkt. No. 47 ("UCATS Mot."); Dkt. No. 53 ("NYU
Mot.").) In a report and recommendation, Magistrate Judge
Ona T. Wang has recommended that Defendants' motions to
dismiss be granted. (*See* Dkt. No. 76 ("R. & R.") at 49.)

Plaintiff objects to the report and recommendation only on
the grounds that (i) he did not file a motion to amend his
complaint; (ii) he did not receive Defendants' motions to
dismiss; and (iii) UCATS Local 3882 did not process his
grievances. (*See* Dkt. No. 79 ("Pl.'s Objections") at 1-2.)
In reviewing a report and recommendation, a district judge
"must determine de novo any part of the magistrate judge's
disposition that has been properly objected to." Fed. R. Civ.
P. 72(b). In reviewing a *pro se* party's submissions, the
court is "obligated to afford a special solicitude," *Tracy
v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), so such
submissions are read "to raise the strongest arguments that
they suggest," *Triestman v. Fed. Bureau of Prisons*, 470
F.3d 471, 474 (2d Cir. 2006) (per curiam).

Plaintiff's objections here are without merit. Magistrate Judge
Wang's report and recommendation concerns Defendants'
motions to dismiss the amended complaint, not any motion to
further amend the complaint. (*See* R. & R. at 49.) Defendants
filed these motions on ECF, and Plaintiff had consented to the
electronic service of court documents through ECF. (*See* Dkt.
No. 3.) Finally, Plaintiff does not meaningfully contest that
his claims against UCATS Local 3882 relating to the failure
to process his grievances are time-barred. Plaintiff brings a
claim that UCATS breached its duty of representation, but a
plaintiff has only six months to bring suit from the time he
"knew or should have known of the breach of the duty of
fair representation." *White v. White Rose Food a Div. of
DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997). Such a
claim accrues "at the latest" by the date of a National Labor
Relations Board ("NLRB") charge. *Kovowras v. N.Y. Times
Co.*, 328 F.3d 50, 55 (2d Cir. 2003). Plaintiff filed an unfair
labor practice charge with the NLRB on June 15, 2020. (*See*
Dkt. No. 49-5 ("NLRB Charge").) In that charge, he alleged
that UCATS failed to fairly represent him. (*See id.* at 2.)
Plaintiff had until December 15, 2020, to bring suit, but he
did not do so. (*See* Dkt. No. 1 ("Compl").) Accordingly, even
if Plaintiff's allegations are true, his claim must be dismissed.

**\*2** The remainder of the report and recommendation is
adopted in full. Where there is no objection, a district court
reviews for clear error. *See* Fed. R. Civ. P. 72(b), Advisory
Committee's Notes (1983) ("When no timely objection is
filed, the court need only satisfy itself that there is no
clear error on the face of the record in order to accept the
recommendation."); *see also Borcsok v. Early*, 299 F. App'x
76, 77 (2d Cir. 2008). Magistrate Judge Wang's thorough and
well-reasoned report presents no errors, clear or otherwise.

For the foregoing reasons, Plaintiff's objections are overruled and Judge Wang's Report and Recommendation (Dkt. No. 76) is ADOPTED in full. Defendants' motions to dismiss are GRANTED. Further, for the reasons explained by Judge Wang, Plaintiff is granted leave to amend his discrimination claims for hostile work environment and retaliation and his FMLA claims, provided that he must file a proposed second amended complaint repleading those claims within thirty days after the date of this order.

The Clerk of Court is directed to close the motions at Docket Numbers 47 and 53.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1665013

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2619815
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lester LEFKOWITZ, Plaintiff,

v.

JOHN WILEY & SONS, INC., Defendant.

No. 13 Civ. 6414(KPF).
|
Signed June 2, 2014.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

**\*1** Plaintiff Lester Lefkowitz claims copyright infringement, contributory copyright infringement, and breach of contract against Defendant John Wiley & Sons, Inc., based on Defendant's alleged use of Plaintiff's photographs beyond the scope of Defendant's licenses and without Plaintiff's authorization.[1] Defendant has moved, pursuant to Federal Rule of Civil Procedure 12(c), to dismiss all of Plaintiff's claims for failure to state a claim; to dismiss Plaintiff's infringement claims to the extent those claims are barred by the statute of limitations; and to dismiss Plaintiff's breach of contract claim for lack of standing.

For the reasons set forth in the remainder of this Opinion, Defendant's motion is granted in part and denied in part. Specifically, because there are insufficient facts before the Court to determine whether Plaintiff's infringement claims are barred by the statute of limitations, Defendant's motion in this regard is denied. Defendant's motion to dismiss Plaintiff's copyright infringement claim is likewise denied because Plaintiff has sufficiently pleaded this cause of action. Conversely, because Plaintiff has failed adequately to plead a claim for contributory copyright infringement, Defendant's motion to dismiss that claim is granted. Finally, Plaintiff is estopped from asserting his breach of contract claim in the instant case because a United Stated District Court in the District of Massachusetts has already held that Plaintiff lacks standing to assert this claim.

**BACKGROUND**[2]

**A. Plaintiff's Photographs and Licensing Relationships**

Plaintiff Lefkowitz is an independent professional photographer residing in New York. (FAC ¶ 2). Plaintiff is the owner of an exclusive right under the copyright laws in the photographs displayed in Exhibit 1 to Plaintiff's FAC (the "Lefkowitz Images"). (*Id.* at ¶ 8, Ex. 1). The Lefkowitz Images have been registered with the United States Copyright Office. (*Id.* at ¶ 9).

On or about June 23, 1997, and July 27, 2000, Plaintiff entered into agreements (the "TSM Agreements") with The Stock Market ("TSM"), a stockphotograph licensing agency. (FAC ¶ 10). The TSM Agreements authorized TSM to issue limited licenses for use of the Lefkowitz Images by third parties, in exchange for "reasonable license fees." (*Id.*). The TSM Agreements also appointed TSM as Plaintiff's "exclusive agent ... with respect to the licensing of [his] stock images[,]" and specified that TSM would not license any images "on a buy-out or exclusive basis" without prior consent. (*Id.* at ¶ 11, Ex. 2 ¶ 1(d), Ex. 3 ¶ 1(d)).

On March 23, 2000, the TSM Agreements were assigned to Corbis Corporation ("Corbis"), another company that licenses the rights to photographs and other media. (FAC ¶ 12, Ex. 4). Plaintiff acceded to that assignment "with the understanding that all the terms and conditions of [his] current contract with [TSM would] remain in full force and effect." (*Id.*). Under the relevant agreements, both TSM and Corbis were required to pay to Plaintiff a portion of the fees that they received for licensing Plaintiff's images. (*Id.* at ¶ 43).

**\*2** Plaintiff also subsequently entered into a Photographer Representation Agreement with Corbis dated February 12, 2003 (the "Representation Agreement"), pursuant to which Corbis was authorized to grant third parties limited-use licenses for Plaintiff's photographs. (FAC ¶ 13, Ex. 5). The Representation Agreement also provided:

> Corbis, in its sole discretion and without obligation to do so, shall have full and complete authority to make and settle claims or to institute proceedings in Corbis' or your name but at Corbis' expense to recover damages for Accepted Images lost

or damaged by customers or other parties and for the unauthorized use of Accepted Images.... Any recovery, after payment of all costs and expenses including outside attorneys' fees, shall be treated as Revenue and you shall receive the appropriate royalty, or 100% in the case of lost/damages images. Following your notification, if Corbis declines to bring such a claim within sixty (60) days, we shall notify you, and you may bring actions in your own name at your own expense and retain all recoveries.

(*Id.,* Ex. 5).

### B. Defendant's Alleged Use of the Lefkowitz Images

Defendant John Wiley & Sons, Inc., is a global publisher of, among other things, educational materials, including textbooks for undergraduate and graduate students. (FAC ¶ 6). Many of Defendant's publications contain contributions from other sources, including photographs licensed to Defendant by third parties. (*Id* . at ¶ 7).

Plaintiff alleges that between 1999 and 2011, TSM and Corbis sold Defendant limited licenses to use copies of the Lefkowitz Images in numerous educational publications. (FAC ¶ 16). Although Plaintiff alleges that these licenses were "expressly limited by number of copies, distribution area, image size, language, duration and/or media (print or electronic)" (*id.* at ¶ 17), neither party has provided the Court with the relevant licenses for the images at issue. Instead, Plaintiff attaches to the FAC two standard Corbis license agreements —dated November 19, 2011, and June 2005 (the "Corbis Agreements")—that Plaintiff alleges were incorporated into the specific CorbisDefendant licensing agreements, and thus govern the Corbis–Defendant licensing arrangement. (FAC ¶ 45, Ex. 7). Under the Corbis Agreements, among other things:

Corbis in its sole discretion reserves the right to bill [the customer] (and [the customer] hereby agrees to pay) ten (10) times the normal license fee for any unauthorized use, in addition to any other fees, damages, or penalties

Corbis may be entitled to under this agreement or applicable law.

(*Id.* at Ex. 7, Nov. 19, 2001 agreement (the "Ten Times Provision")).

### 1. Defendant's Direct Copyright Infringement

As relevant here, Plaintiff identifies 66 instances of alleged infringement by Defendant in a chart included as Exhibit 1 to the FAC (the "Lefkowitz Chart"). (FAC, Ex. 1).[3] The Lefkowitz Chart is a summary of information that Plaintiff derived from Plaintiff's royalty statements from TSM and Corbis. (*Id.* at ¶ 16). The summary includes a copy of the image, the author and description of the image, the image identification number, the copyright registration number and date, an invoice date, and the particular imprint of Defendant's that licensed Plaintiff's image. (*Id.* at Ex. 1).

**\*3** Plaintiff alleges, upon information and belief, that Defendant exceeded the permitted uses under the terms of its licenses with TSM and Corbis for the Lefkowitz Images, in publications both of which Plaintiff is aware and others "yet to be discovered." (FAC ¶ 19). Specifically, Plaintiff contends that Defendant

copied the [the Lefkowitz Images] in numbers exceeding the limited print quantities in the licenses, displayed [the Lefkowitz Images] online or in digital media without permission to do so, distributed the [the Lefkowitz Images] in geographic territories that were not authorized, and copied [the Lefkowitz Images] in custom, statespecific, language, or international editions without permission to do so.

(*Id.* at ¶ 34).

Plaintiff attests that the infringing conduct occurred after the invoice date for each instance on the Lefkowitz Chart. (FAC ¶ 34). As for the particular publications in which the alleged infringement occurred, Plaintiff identifies nine of Defendant's publications in which he alleges his photographs

appear, although Plaintiff neither limits the instances of infringement to these publications, nor identifies which photographs in these publications were allegedly infringed. (*Id.* at ¶ 28). Plaintiff alleges that he does not have this specific information, inasmuch as the royalty statements did not specify the publication title in which his photographs would appear or the license limits for the image to which the invoice pertained. (*Id.* at ¶ 32). Instead, Plaintiff maintains that Defendant has custody of this information because it is identified in Defendant's licenses with TSM and Corbis. (*Id.* at ¶ 33). [4]

### 2. Defendant's Contributory Copyright Infringement

The FAC also includes allegations concerning Defendant's purported contributory infringement. In this regard, Plaintiff asserts that Defendant facilitated the international distribution of its publications and, in the course of so doing, Defendant reproduced and distributed Plaintiff's images without his permission to "other entities, subsidiary companies, divisions, affiliates and/or third parties ('Third Parties')." (FAC ¶ 37). Without Plaintiff's permission, the allegations continue, the Third Parties included Plaintiff's photographs in publications that had been translated into additional languages or published in local adaptations or reprints. (*Id.* at ¶ 38).

Plaintiff alleges that "[b]y transmitting [the Lefkowitz Images] to the Third Parties, Wiley enabled, induced, caused, facilitated, or materially contributed to the Third Parties' unauthorized reproduction and distribution of [the Lefkowitz Images]." (FAC ¶ 38). Plaintiff does not, however, identify any of the Third Parties who engaged in this alleged conduct.

### 3. Defendant's Pattern of Infringement

Finally, the FAC devotes an entire section to allegations regarding Defendant's pattern of infringement. In particular, Plaintiff alleges that Defendant has a general practice of infringing copyrights on the photographs it licenses for inclusion in its publications by exceeding the terms of the individual license agreements. (FAC ¶ 23). Plaintiff also identified numerous lawsuits in which Defendant has been sued for copyright infringement, including some in which juries have found Defendant liable for copyright infringement. (*Id.* at ¶¶ 23–27).

### C. The Instant Litigation

**\*4** Plaintiff commenced this action on April 1, 2013, by filing his complaint in the United States District Court for the

Eastern District of Pennsylvania. (Dkt.# 1). On May 13, 2013, Defendant moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to transfer venue to the Southern District of New York based on the forum selection clauses contained in all the agreements referenced in the complaint. (Dkt.# 5). On August 13, 2013, the Honorable Michael M. Baylson, United States District Judge for the Eastern District of Pennsylvania, granted Defendant's motion to transfer this case to this District. (Dkt.# 11). The case was transferred (Dkt.# 13), and assigned by the undersigned as related to *Lefkowitz v. McGraw–Hill Companies, Inc.,* No. 13 Civ. 5023(KPF), a case that had been similarly transferred from the Eastern District of Pennsylvania on July 19, 2013.

On October 2, 2013, Defendant filed a letter requesting a pre-motion conference regarding its anticipated motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Dkt.# 15). By letter dated October 7, 2013, Plaintiff opposed Defendant's request to file a motion to dismiss under Rule 12(b)(6) on the basis that Defendant could have included its arguments in the initial motion to dismiss before Judge Baylson, and thus was barred from filing a successive Rule 12(b)(6) motion. (Dkt.# 16). [5] At the same time, Plaintiff requested leave to file an amended complaint if the Court found that Plaintiff had not sufficiently pleaded standing for its breach of contract claim. (*Id.*).

On October 28, 2013, the Court held a telephone conference with counsel for the parties in this action (who, as noted, are also counsel in the related McGraw Action), to discuss the contemplated motions in both cases. At that conference, the Court determined that Defendant was precluded from filing a second motion to dismiss, and that the proper procedural course would be for Defendant to file a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The Court also granted Plaintiff's request for leave to amend his complaint. Accordingly, the Court ordered Plaintiff to file his amended complaint by November 4, 2013, and ordered Defendant to file its answer and motion for a judgment on the pleadings by December 6, 2013. (Dkt.# 21).

Plaintiff filed his FAC on November 4, 2013. (Dkt.# 24). The FAC asserts claims for copyright infringement, contributory copyright infringement, and breach of contract. For relief, Plaintiff requests (i) a permanent injunction against Defendant and anyone working in concert with Defendant from copying, displaying, distributing, selling or offering to sell the Lefkowitz Images; (ii) impoundment of all copies of

the Lefkowitz Images used in violation of Plaintiff's exclusive copyrights as well as related records and documents and, at final judgment, destruction or other reasonable disposition of the unlawfully used Lefkowitz Images, including digital files and any other means by which they could be used again by Defendant without Plaintiff's authorization; (iii) an award of Plaintiff's actual damages and all profits derived from the unauthorized use of the Lefkowitz Images or, where applicable and at Plaintiff's election, statutory damages; (iv) an award of Plaintiff's reasonable attorneys' fees; (v) an award of Plaintiff's court costs, expert witness fees, interest and all other amounts authorized under law; and (vi) an award of 10 times the license fee for unauthorized uses pursuant to the Corbis Agreements.

**\*5** In accordance with the Court's order, Defendant filed its answer and its motion for judgment on the pleadings on December 6, 2013. (Dkt.# 25, 26). Plaintiff filed his opposition on January 3, 2014 (Dkt.# 32), and the motion was fully submitted when Defendant filed its reply on January 10, 2014 (Dkt. # 33). On January 17, February 13, and May 22, 2014, Defendant filed three notices of supplemental authority (Dkt.# 35, 36, 39), and on February 27 and April 28, 2014, Plaintiff also filed notices of supplemental authority (Dkt. # 37, 38). Plaintiff responded to Defendant's May 22 supplemental authority on May 23, 2014. (Dkt.# 40).

### DISCUSSION

### A. Applicable Law

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994); *accord L–7 Designs, Inc. v. Old Navy, LLC.,* 647 F.3d 419, 429 (2d Cir.2011). When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 548 F.3d 82, 88 (2d Cir.2009)). A plaintiff is entitled to relief if he alleges "enough facts to state

a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570; *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'n, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 546); *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Although "[s]pecific facts are not necessary," the statement must "give the defendant fair notice of what ... the claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

**\*6** The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions ." *Rolon v. Hennenman,* 517 F.3d 140, 149 (2d Cir.2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002)); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal,* 556 U.S. at 678)).

In addition to the complaint, the Court may consider "any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir.2013). The Court may also consider any items of which judicial notice may be taken. *L–7 Designs, Inc.,* 647 F.3d at 422.

## B. Analysis

### 1. Plaintiff Sufficiently Alleges a Claim for Copyright Infringement

"[A] properly pleaded copyright infringement claim must allege [i] which specific original works are the subject of the copyright claim, [ii] that plaintiff owns the copyrights in those works, [iii] that the copyrights have been registered in accordance with the statute, and [iv] by what acts during what time the defendant infringed the copyright." *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D.N.Y.1992); *accord Warren v. John Wiley & Sons, Inc.,* 952 F.Supp.2d 610, 616 (S.D.N.Y.2013); *see generally Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir.2003).

The FAC alleges that Plaintiff is the owner of an exclusive right under the copyright of the Lefkowitz Images (FAC ¶ 8), and that these images have been registered with the United States Copyright Office (*id.* at ¶ 9), thereby satisfying the second and third requirements for copyright infringement. Plaintiff has also adequately alleged the first requirement—which specific original works are the subject of the copyright claim—by including the Lefkowitz Chart as an exhibit to the FAC. *See Schneider v. Pearson Educ., Inc.,* No. 12 Civ. 6392(JPO), 2013 WL 1386968, at *3 n. 3 (S.D.N.Y. Apr.5, 2013) (concluding that plaintiff had alleged sufficiently that specific works as to which he owned the copyright were infringed upon, where plaintiff listed the photographs at issue and also indicated that the infringement was not limited to these works); *but see Cole v. John Wiley & Sons, Inc.,* No. 11 Civ.2090(DF), 2012 WL 3133520, at *12 (S.D.N.Y. Aug.1, 2012) (finding it inadequate for Plaintiff "to base an infringement claim on overly-inclusive lists of copyrighted works" and "to list certain works that are the subject of an infringement claim, and then allege that the claim is also intended to cover other, unidentified works").[6] Defendant's arguments to the contrary (*see* Def. Br. 9–10), do not convince the Court otherwise.

**\*7** Defendant further contends that the fourth requirement —by what acts during what time the defendant infringed the copyright—is not satisfied because Plaintiff has failed to identify the license terms or the infringing publication for any of the instances of infringement on the Lefkowitz Chart and, as a result, Plaintiff has failed to put Defendant on notice of the nature of the claims asserted against it. (Def.Br.9–10).

Defendant's argument is unavailing. First, Defendant places a heightened pleading requirement upon Plaintiff that is not required by law. For example, Defendant charges that Plaintiff failed to "differentiate its allegations of conduct among" the instances of infringement listed in the Lefkowitz Chart. (Def.Br.9). Yet, as one court has already held, "it is not fatal" for a plaintiff's copyright claim if the complaint "fails to specify how each particular photograph has been infringed." *Warren,* 952 F.Supp.2d at 617.

Second, a review of the FAC demonstrates that it does provide the notice to Defendant required by Rule 8. Plaintiff alleges that, "[u]pon information and belief, the licenses granted to Wiley from TSM and Corbis were expressly limited by number of copies, distribution area, image size, language, duration and/or media (print or electronic)." (FAC ¶ 17). Plaintiff then alleges that upon information and belief, Defendant exceeded the permitted uses under the term of the limited licenses for the Lefkowitz Images (*id.* at ¶ 19), by (i) copying the Lefkowitz Images "in numbers exceeding the limited print quantities in the licenses"; (ii) displaying the Lefkowitz Images "online or in digital media without permission to do so"; (iii) distributing the Lefkowitz Images in "geographic territories that were not authorized"; and (iv) copying the Lefkowitz Images "in custom, state-specific, language, or international editions without permission to do so" (*id.* at ¶ 34). Plaintiff also identifies a set of Defendant's publications in which the Lefkowitz Images appear. (*Id.* at ¶ 28).

Under Rule 8, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson,* 551 U.S. at 93 (quoting *Twombly,* 550 U.S. at 555). Plaintiff's allegations surely meet this standard. The FAC identifies Plaintiff's copyright infringement claim, the images that Plaintiff claims were infringed, and the bases for Plaintiff's assertion that those images were infringed. The FAC further alleges that, upon information and belief, Defendant has a "general practice of infringing copyrights in its use of photographs in its publications." (*Id.* at ¶ 23). In support of this allegation, Plaintiff identifies 15 other lawsuits filed against Defendant in which litigants make the same claims that Plaintiff brings here, and two cases in which Defendant was found liable for engaging in the copyright infringement scheme that Plaintiff advances. (*Id.* at ¶¶ 23–26). These allegations, taken as a whole, make plausible that

Plaintiff is entitled to relief, and that this entitlement is more than speculative.[7]

**\*8** Plaintiff also sufficiently narrows the time period by alleging that, upon information and belief, Defendant engaged in the infringing conduct after the invoice date listed on the Lefkowitz Chart. (FAC ¶ 34). This allegation provides the starting date on which Defendant is alleged to have infringed, and therefore sufficiently identifies the time period during which the infringement may have occurred. *See E. Broadcasting Am. Corp. v. Universal Video, Inc.,* No. 04 Civ. 5654(DGT), 2006 WL 767871, at \*3 (E.D.N.Y. Mar.24, 2006) (holding that plaintiff sufficiently alleged the time frame of the infringing activity, where the complaint alleged that the infringement took place on or before a particular date); *cf. Blagman v. Apple Inc.,* No. 12 Civ. 5453(ALC) (JCF), 2013 WL 2181709, at \*3 (S.D.N.Y. May 20, 2013) (holding that the plaintiff adequately pleaded the requisite time period where, although he did not "specify the time period of infringement[,]" plaintiff did allege the defendants' "continued infringement, which courts in this Circuit have held satisfactory to survive a motion to dismiss" (collecting cases)).

Although many of the cases on which Plaintiff relies are cases in which the plaintiff provided additional specifications regarding the publications and licenses at issue (*see* Pl. Opp. 5 n. 16 (citing, among other cases, *Carr Clifton v. Pearson, Educ., Inc.* (N.D. Cal. No. 5:11 Civ.2090–EJD); *Alaska Stock, LLC v. Pearson Educ., Inc.* (D. Alaska No. 3:11 Civ. 00162(TMB)))), such details are not necessary for Plaintiff to plead his claim for copyright infringement adequately. *See Wu v. Pearson Educ., Inc.,* No. 09 Civ. 6557(RJH), 2010 WL 3791676, at \*6 (S.D.N.Y. Sept.29, 2010) (holding that plaintiff sufficiently alleged a claim for copyright infringement where plaintiff alleged that defendant had exceeded the allowed print run on the licenses governing the works at issue without first seeking prior authorization or paying any additional licensing fee); *Sensi v. Houghton Mifflin Harcourt Publ'g Co., et al.,* No. 13 Civ. 2891(GBD) (finding complaint sufficient where plaintiff did not include the license terms with its complaint: "I think the complaint minimally puts the defendant on notice that defendant was given licenses directly by the plaintiff and by the third party that they exceeded those licenses by exceeding the limited print run, and I [do not] think the burden is on the plaintiff at this point to specify every single excessive use in that regard. I don't think that the notice pleading requires that kind of

specificity." (Penchina Decl., Ex. 4 at 46)); *cf. Warren,* 952 F.Supp.2d at 618 ("[I]t is not fatal to [the] copyright claim that the Complaint fails to specify how each particular photograph has been infringed.").

By contrast, the cases on which Defendant relies in support of its argument that Plaintiff fails adequately to plead the necessary elements are readily distinguishable. (Def.Br.9). In *Palmer Kane LLC v. Scholastic Corp.,* the complaint made no mention of a time period, and only contained "several broad allegations" that the defendant had "exceeded the licenses it obtained to use Plaintiff's images, reused Plaintiffs works without a license[,]" and used the images without permission or prior to obtaining permission." No 12 Civ. 3890 (TPG), 2013 WL 709276, at \*3 (S.D.N.Y. Feb. 28, 2013). The court in *Palmer Kane* explained: "Although Exhibit A, listing [the plaintiff's] works contains an invoice date for each of the images, the complaint makes no mention of these dates, let alone how they relate to a time period in which [the defendant] infringed on [the plaintiff's] works." *Id.* Plaintiff's complaint is not deficient in this respect. The FAC identifies the exact relevance of the invoice dates, thereby delineating the relevant time period. And while it is true that the court in *Palmer Kane* faulted the plaintiff there for not limiting its claims to the works listed, *see id.* ("[S]ince [plaintiff] has provided a list of works but indicated that his list is not exhaustive, ... the complaint fails to specify which works are at issue."), the Court has already dismissed Plaintiff's claim with respect to works not identified in the Lefkowitz Chart. Even had it not, this similarity with the present case does not render the FAC inadequate. *See Schneider,* 2013 WL 1386968, at \*3 n. 3 ("To the extent, however, that ... other district court opinions set forth [a rule under which a plaintiff fails to state a claim for copyright infringement where the plaintiff provides a non-exhaustive list of infringed works,] this Court takes a different course.").

**\*9** As for the other cases on which Defendant relies, the plaintiff in *Marvullo v. Gruner & Jahr,* 105 F.Supp.2d 225, 228 (S.D.N.Y.2000), had conclusorily alleged that the defendants had published the works at issue "beyond the scope ... of the limited license ." The plaintiff in *Cole,* 2012 WL 3133520, at \*12–13, similarly, had neither identified any work that it claimed the defendant had infringed, nor included any detail as to any of the claimed infringing acts. In short, the FAC contains much more robust allegations than those contained in the complaints at issue in *Palmer, Marvullo,* and *Cole.*

It is also of no moment that many of Plaintiff's allegations are predicated "upon information and belief." Prefacing allegations with this standard pleading qualification does not eviscerate the sufficiency of a complaint. *Wu,* 2010 WL 3791676, at *6 ("Pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, however, plaintiffs may plead the allegations in complaints upon information and belief, and many of these qualifiers are roughly equivalent to so pleading."); *see also Schneider,* 2013 WL 1386968, at *3 ("[T]he Court fails to see why several discrete paragraphs in a Complaint should nullify other, factually specific allegations in the Complaint; it would be unjust and inappropriate to throw out these well-pleaded allegations, merely because Plaintiff's Complaint may also contain a bit of bathwater."). Plaintiff's pleading style is particularly appropriate in light of his allegations that key evidence supporting his claim is in Defendant's possession. (FAC ¶¶ 19, 27, 35). [8] As the Second Circuit has stated, in the context of reviewing the sufficiency of a plaintiff's claim for copyright infringement:

> The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged "upon information and belief" where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.

*Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010) (internal citations and quotation marks omitted). A district court should not dismiss a claim "unless it is satisfied that the complaint cannot state any set of facts that would entitle [the plaintiff] to relief." *Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001). This is not the case here; the FAC sets out facts entitling Plaintiff to relief. Moreover, "[a] claim has facial plausibility when the plaintiff pleads factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 679. The FAC as a whole satisfies the plausibility requirement; it gives rise to a plausible narrative supporting Plaintiff's claim, *see Twombly,* 550 U.S. at 570, and thus sufficiently alleges a claim for copyright infringement. *See Warren,* 952 F.Supp.2d at 618 ("[A]ll three Plaintiffs have sufficiently alleged: [i] which specific works have been infringed; [ii] that Plaintiffs registered and

own the copyright to those work; and [iii] in what way the works were infringed."); *Schneider,* 2013 WL 1386968, at *4 ("Plaintiff's Complaint sufficiently states a claim for copyright infringement; it both provides 'fair notice' to Defendant and contains specific factual allegations sufficient to 'nudge[ ]' Plaintiff's infringement claims 'across the line from conceivable to plausible.' " (quoting *Twombly,* 550 U.S. at 561, 570)). To require more at this stage in the litigation would be to place an impermissible burden on Plaintiff.

**\*10** Accordingly, Defendant's motion for a judgment on the pleadings as to Plaintiff's copyright infringement claim is denied, with the exception that Plaintiff's claims for copyright infringement for works not listed in the Lefkowitz Chart are dismissed.

### 2. Plaintiff Fails to State a Claim for Contributory Copyright Infringement

Defendant next argues that Plaintiff fails to state a claim for contributory copyright infringement, arguing that the FAC's allegations of Defendant's contribution to and knowledge of alleged infringement by others are nothing more than recitations of the legal standard bereft of factual support. (Def.Br.13). On this claim, Defendant is correct.

"Although the Copyright Act does not expressly render anyone liable for infringement committed by another[,][ ] doctrines of secondary liability [,]" such as contributory copyright infringement, "emerged from common law principles and are well established in the law." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005). As an initial matter, for Plaintiff adequately to plead a claim for contributory copyright infringement, he must initially plead a claim for direct infringement. *Marvullo,* 105 F.Supp.2d at 229. As just held, Plaintiff has satisfied this burden. Beyond that, Plaintiff must allege that "the defendant with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another." *Wolk v. Kodak Imaging Network, Inc.,* 840 F.Supp.2d 724, 750 (S.D.N.Y.2012) (internal quotation marks omitted); *Brought to Life Music, Inc. v. MCA Records, Inc.,* No. 02 Civ. 1164(RWS), 2003 WL 296561, at *2 (S.D.N.Y. Feb.11, 2003) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)). Liability

will exist if the "defendant engages in personal conduct that encourages or assists the infringement," *Arista Records, 604 F.3d at 118,* and there is either actual or constructive knowledge of the infringing activity, *Brought to Life Music, Inc.,* 2003 WL 296561, at *2.

The FAC contains seven allegations targeted toward Plaintiff's contributory infringement claim, all of which are pleaded on "information and belief." (FAC ¶¶ 36–42). Although it is generally appropriate for Plaintiff to plead by use of such caveats where "the facts are peculiarly within the knowledge of the defendants," it is nonetheless "axiomatic that the complaint must allege facts demonstrating the basis for the information and belief." *MLSMK Inv. Co. v. JP Morgan Chase & Co.,* 737 F.Supp.2d 137, 144 (S.D.N.Y.2010); *see also Kajoshaj v. New York City Dep't of Educ.,* 543 F. App'x 11, 16 (2d Cir.2013) (summary order) ("While [p]leading on the basis of information and belief is generally appropriate where information is particularly within [defendants'] knowledge and control, even such pleadings must be grounded in a good-faith basis in fact for believing that such comparators exist." (internal quotation marks and citations omitted)).

**\*11** Unlike Plaintiff's claim for direct infringement, which included allegations, among others, identifying the licenses, the photographs at issue, the known publications, and Defendant's purported penchant for violating licenses similar to those at issue in this action, Plaintiff's claim for contributory infringement provides no such factual foundation. Rather, the contributory infringement claim appears predicated on nothing more than Plaintiff's assumption that Defendant "facilitated the international distribution of its publications ... through its Subsidiary Rights, Global Rights, and Permissions Departments" (FAC ¶ 36), and then "reproduced and distributed" the Lefkowitz Images to third parties, whom Plaintiff fails to identify (*id.* at ¶ 37). Based on this, Plaintiff alleges that "[b]y transmitting" the Lefkowitz Images to third parties, Defendant "enabled, induced, caused, facilitated, or materially contributed to the Third Parties' unauthorized reproduction and distribution" of the Lefkowitz Images. (*Id.* at ¶ 38). Plaintiff does not, however, identify a single publication in which a third party published his images.

The participation prong will not be satisfied by "allegation[s] that a defendant merely provid[ed] the means to accomplish an infringing activity." *Brought to Life Music, Inc.,*

2003 WL 296561, at *2 (internal quotation marks omitted). "Rather, participation in the infringement must be substantial and the authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Id.* (internal quotation marks omitted). There is nothing in the FAC to provide a reasonable basis for the Court to conclude that Defendant engaged in the requisite level of participation.

Similar problems befall Plaintiff's efforts to demonstrate that Defendant had knowledge of the infringing activity. Plaintiff alleges that Defendant "knew when it reproduced and distributed the [Lefkowitz Images] that the Third Parties would reproduce and distribute the [Lefkowitz Images] without Plaintiff's authorization" (FAC ¶ 40), and that Defendant "knew that the Third Parties were reproducing and distributing the [Lefkowitz Images] without authorization" (*id.* at ¶ 41). These allegations of knowledge are inadequate, however, because "[m]ere knowledge of infringing potential or of actual infringing uses" is not sufficient to subject a party to liability. *Metro–Goldwyn– Mayer Studios Inc.,* 545 U.S. at 937. "[K]nowledge means actual or constructive knowledge of specific and identifiable infringements of individual items, not a general awareness that there are infringements." *Wolk,* 840 F.Supp.2d at 751 (internal quotations marks omitted). Read most generously, the FAC contains nothing more than a general awareness that third parties allegedly infringed on Plaintiff's copyrights.

Whether a party has sufficiently pleaded a claim for contributory copyright infringement "is a close question on which federal district courts have diverged when assessing similar complaints." *Muench Photography, Inc. v. Pearson Educ., Inc.,* No. 13–cv–03937–WHO, 2013 WL 6172953, at *5 (N.D.Cal. Nov.25, 2013) (collecting cases). The FAC here, however, fails adequately to plead a claim for contributory infringement under decisions on both sides of this divergence.

On one side of the spectrum, in *Panoramic Stock Images, Ltd. v. Pearson Educ., Inc.,* No. 12 Civ. 9918(SJC), 2013 WL 2357586, at *3 (N.D.Ill. May 29, 2013), the court held that the plaintiff failed to state a claim for contributory infringement because the plaintiff "fail[ed] to identify any third party or publication that allegedly infringed on its copyrights or any factual basis suggesting that [the plaintiff] induced or encouraged infringement." On the other side of the spectrum, in *Bavendam v. Pearson Educ., Inc.,* No. 13 Civ. 3096(FSH), 2013 WL 5530008, at *5 (D.N.J. Oct.3, 2013), the court held that plaintiff's complaint was sufficient

on substantially similar allegations, but where the plaintiff also provided "two examples of third-party publications that allegedly included photographs at issue." Unlike both of these cases, Plaintiff fails to identify even one publication in which a third party included Plaintiff's copyrighted works. The FAC's allegations are conclusory assertions tracking the elements of the claim that cannot suffice to state a claim to which Plaintiff is entitled to relief. *See generally* ⚑ *Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**\*12**  Plaintiff's failure to plead his contributory copyright infringement claim adequately at this early stage in the litigation is not fatal. "It is the usual practice upon granting a motion to dismiss to allow leave to replead." ⚑ *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). This principle is equally applicable to "a motion for judgment on the pleadings brought under Rule 12(c)." ⚑ *First Cent. Sav. Bank v. Meridian Residential Capital,* No. 09 Civ. 3444(DLI)(LB), 2011 WL 838910, at \*11 (E.D.N.Y. Mar. 3, 2011). To that end, the Court sees no reason to deny Plaintiff the opportunity to plead adequately his claim for contributory copyright infringement.

Accordingly, Plaintiff is granted leave to file a second amended complaint consistent with this Opinion. The second amended complaint must be filed and served no later than four weeks from the date of this Opinion. The dismissal of Plaintiff's contributory copyright infringement claim will be held in abeyance pending the filing of the second amended complaint. Plaintiff's failure to file a second amended complaint in a timely fashion will result in the entry of dismissal of his contributory infringement claim.

### 3. Defendant Has Not Demonstrated That Plaintiff's Claims for Copyright Infringement Are Barred by the Statute of Limitations

Having determined that Plaintiff has stated a claim for direct copyright infringement, the Court will now address the scope of Plaintiff's claim.

A civil action under the Copyright Act must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). The parties dispute whether the Court

should apply an "injury rule," under which "a claim accrues at the time of each act of infringement, regardless of the copyright holder's knowledge of the infringement," *Urbont v. Sony Music Entm't,* 863 F.Supp.2d 279, 281 (S.D.N.Y.2012), or a "discovery rule," under which "a claim for copyright infringement does not accrue until the aggrieved party knows or has reason to know of the injury that forms the basis of the claim," *id.* Defendant argues that the injury rule applies, and that any claims for copyright infringement under Counts I and II of the FAC based on alleged acts of infringement prior to April 1, 2010, are barred by the statute of limitations. (Def.Br.15–16). Conversely, Plaintiff contends that the discovery rule applies, and that because Plaintiff has not pleaded facts that would enable the Court to apply the discovery rule to the case at hand, Defendant's motion must be denied. (Pl.Opp.15).

Until recently, the Second Circuit had not determined the appropriate accrual rule for federal copyright infringement claims. *Urbont,* 863 F.Supp.2d at 282 ("Neither the Supreme Court nor the Second Circuit has ruled on the appropriate rule for federal copyright infringement claims."); *see also* ⚑ *TufAmerica, Inc. v. Diamond,* No. 12 Civ. 3529(AJN), 2013 WL 4830954, at \*17 (S.D.N.Y. Sept.10, 2013) (same). In the absence of Second Circuit precedent on this issue, the majority of the courts in this Circuit had initially applied the discovery rule in infringement cases, based on their interpretation of the Second Circuit's holdings in ⚑ *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992), and ⚑ *Merchant v. Levy,* 92 F.3d 51, 56 (2d Cir.1996). *See Muench Photography, Inc. v. Houghton Mifflin Harcourt Publ'g Co.,* No. 09 Civ. 2669(LAP), 2013 WL 4464002, at \*5 (S.D.N.Y. Aug.21, 2013) (recounting history). But, beginning with the Supreme Court's decision in ⚑ *TRW Inc. v. Andrews,* 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), and particularly after United States District Judge Lewis A. Kaplan's decision in ⚑ *Auscape Int'l v. Nat'l Geographic Soc'y,* 409 F.Supp.2d 235 (S.D.N.Y.2004), the pendulum had swung in the other direction, with the "majority of courts" in this District applying the injury rule to infringement claims. ⚑ *TufAmerica, Inc.,* 2013 WL 4830954, at \*17 ("Since *Auscape,* a growing majority of the courts in the Southern District of New York to address this question have followed Judge Kaplan's lead and applied the injury rule to infringement claims." (collecting cases)).

**\*13** On April 4, 2014, the Second Circuit put an end to the uncertainty when it held, in *Psihoyos v. Wiley & Sons., Inc.,* that the discovery rule applies to claims for federal copyright infringement. 748 F.3d 120, 124 (2d Cir.2014) ( "We agree with our sister Circuits that the text and structure of the Copyright Act, unlike the [Fair Credit Reporting Act], evince Congress's intent to employ the discovery rule, not the injury rule."). Under *Psihoyos,* "copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement." *Id.* Following *Psihoyos,* this Court applies the discovery rule here. [9]

The FAC is silent on when Plaintiff had "actual or constructive discovery" of Defendant's purported infringement. Rather, and as discussed earlier, the FAC provides the relevant time frame by alleging that upon information and belief, Defendant infringed after the date on the invoices listed on the Lefkowitz Chart. (FAC ¶ 34). Consequently, there are insufficient facts before the Court on which it may determine whether Plaintiff's direct copyright infringement claims are time-barred. Defendant's argument that Plaintiff's copyright infringement claims must be dismissed on statute of limitations grounds "is an affirmative defense for which [Defendant] bears the burden of proof." *United States v. Livecchi,* 711 F.3d 345, 352 (2d Cir.2013). Because Defendant has not satisfied this burden, its motion to dismiss on this basis is denied. *Connecticut Indep. Utility Workers Local 12924 v. Connecticut Natural Gas Corp.,* No. 3:12–cv–961 (JBA), 2013 WL 2946119, at *4 (D. Conn. June 14, 2013) ("Because Defendants' statute of limitations argument is an affirmative defense for which [they] bear[ ] the burden of proof, Defendants' motion to dismiss is denied on this ground." (internal quotation marks and citation omitted)).

### 4. Plaintiff Is Estopped from Asserting His Breach of Contract Claim

The preclusive effect of a prior judgment is dictated by the doctrines of claim preclusion and issue preclusion, also identified as collateral estoppel. *Taylor v. Sturgell,* 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.' "). "For judgments in federal-question cases ... federal courts participate in developing uniform federal

rule[s] of res judicata." *Id.* at 891 (internal quotation marks omitted). [10]

Under claim preclusion, a final judgment bars "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor,* 553 U.S. at 892 (internal quotation marks omitted). By contrast, issue preclusion forecloses "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* Issue preclusion can be "offensive" or "defensive." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). As relevant here, "[d]efensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Id.*

**\*14** "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,' " res judicata and collateral estoppel "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.' " *Taylor,* 553 U.S. at 892 (quoting *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)); *Marvel Characters,* 310 F.3d at 286 ("These related but distinct doctrines operate to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and vexation of multiple lawsuits.").

For issue preclusion to apply, four elements must be satisfied: "[i] the issues of both proceedings must be identical, [ii] the relevant issues were actually litigated and decided in the prior proceeding, [iii] there must have been 'full and fair opportunity' for the litigation of the issues in the prior proceeding, and [iv] the issues were necessary to support a valid and final judgment on the merits." *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995). In assessing these requirements, however, the Court is mindful that "[d]espite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinary harsh

and unfair results." *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1486 (2d Cir.1995).

Plaintiff's breach of contract claim seeks to enforce, in his own right, the Corbis Agreements that he alleges govern Corbis' and Defendant's relationship. (FAC ¶¶ 43–53). In particular, Plaintiff seeks to recover under the Ten Times Provision in those contracts. (*See id.* at ¶ 49). Plaintiff alleges that Defendant has breached the Corbis Agreements "by exceeding the material terms of the licenses and failing to pay the contractually agreed amount for doing so, i.e., refusing to pay the 10 times fees for its unauthorized uses of Lefkowitz's images." (*Id.*). [11] Defendant argues that Plaintiff is barred from asserting his breach of contract claim because a district judge in the United States District Court of Massachusetts, in *Lefkowitz v. Houghton Mifflin Harcourt Publ'g Co.,* No. 12–10614–FDS, 2013 WL 3816717, at *5 (D.Mass. July 19, 2013) (the "Massachusetts Action"), already held that Plaintiff lacks standing to enforce the Corbis Agreements.

Plaintiff does not dispute that he is "bound" by the decision in the Massachusetts Action. (Pl.Opp.18). Instead, Plaintiff contends that the first requirement of issue preclusion—that the issues in both proceedings be identical—is not satisfied because the Massachusetts court did not evaluate the principal-agency argument that Plaintiff advances here, and because Defendant has not demonstrated that the terms of the agreements in both actions are identical. (*Id.* at 18–19 ("[T]here is a real question whether the issues were identical.")).

***15** Plaintiff is wrong, and the requirements of issue preclusion are satisfied. As a preliminary matter, even though the Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in his favor, issue preclusion "will nonetheless bar a plaintiff's claim when [a] plaintiff's 'factual allegations have been decided otherwise in a previous litigation.' " *Poindexter v. Cash Money Records,* No. 13 Civ. 1155(RWS), 2014 WL 818955, at *3 (S.D.N.Y. Mar.3, 2014) (quoting *Jacobs v. Law Offices of Leonard N. Flamm,* No. 04 Civ. 7607(DC), 2005 WL 1844642, at *3 (S.D.N.Y. July 29, 2005)); *cf. Linden Airport Mgmt. Corp. v. N.Y.C. Econ. Dev. Corp.,* No. 08 Civ. 3810(RJS), 2011 WL 2226625, at *3 (S.D.N.Y. June 1, 2011) ("[I]t is well settled that a court may dismiss a claim on *res judicata* or collateral estoppel grounds on a Rule 12(b)(6) motion."). In such instances, dismissal is appropriate when " 'it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter

of law.' " *Linden Airport Mgmt. Corp.,* 2011 WL 2226625, at *3 (quoting *Conopco, Inc. v. Roll Int'l,* 231 F.3d 82, 86 (2d Cir.2000)); *U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.,* No. 98 Civ. 3099(JGK), 2001 WL 300735, at *23 n. 17 (S.D.N.Y. Mar.27, 2001) (relying on cases resolving Rule 12(b)(6) motions to identify that "[a] collateral estoppel defense [ ] may be analyzed on a Rule 12(c) motion where all the relevant facts are set forth in the complaint and in matters of which the Court may take judicial notice").

To resolve another preliminary matter, the Court must address Plaintiff's argument that Defendant has not met its burden with respect to the agreements at issue. (Pl.Opp.18). The Court agrees with Plaintiff that the burden of proving that the issues in both proceedings are identical is on Defendant. *Barnes v. Pozzi,* No. 10 Civ. 2554(JGK), 2012 WL 3155073, at *7 (S.D.N.Y. Aug.3, 2012) ("The burden of proving that the identical issue was previously decided is on the party asserting preclusion." (internal quotation marks omitted)). But one need only look at the agreements affixed to Plaintiff's complaint in the Massachusetts Action, which Defendant submitted with its motion (Penchina Decl., Ex 1), and the agreements attached to the FAC (FAC, Ex. 5, 7) to see that Defendant has discharged this burden. The Corbis Agreements and the Representation Agreement between Corbis and Plaintiff—the agreements on which Plaintiff relies to advance his standing argument—are the same in both cases. The Court will thus address the requirements of issue preclusion in turn.

Starting with the first requirement, the Supreme Court has held that there does not need to be perfect identity of issues. *Montana,* 440 U.S. at 155. Instead, a court must determine "first, whether the issues presented by this litigation are in substance the same as those resolved [in the prior litigation]; second, whether controlling facts or legal principles have changed significantly since the [prior litigation]; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." *Id.* The Court is not aware of, nor do the parties point to, any controlling facts or legal principles that have changed since the Massachusetts decision was issued. Similarly, there are no other special circumstances that counsel against applying issue preclusion to this case. In point of fact, courts in this District "have previously applied collateral estoppel to the issue of standing." *See, e.g., Hollander v. Members of The Bd. of Regents of The Univ. of the State of New York,* No. 10 Civ. 9277(LTS)(HBP), 2011 WL 5222912, at *2 (S.D.N.Y. Oct. 31, 2011), *aff'd,* 524

F. App'x 727 (2d Cir.2013) (summary order) ("This Court has previously applied collateral estoppel to the issue of standing."); *Poindexter,* 2014 WL 818955, at *7 (holding that "Plaintiff is collaterally estopped for lack of standing, and Defendant's motion to dismiss is granted").

*16  A review of the Massachusetts Action makes clear that the breach of contract claim presented here is virtually identical to the claim decided by the Massachusetts court. In the Massachusetts Action, Plaintiff similarly alleged that publisher Houghton Mifflin Harcourt Publishing Co. ("HMH") had used his photographs in violation of Plaintiff's copyrights, and in breach of the relevant license agreements. (*See* Penchina Decl., Ex. 1). Just as here, Plaintiff sought to enforce the Corbis Agreements against HMH in the Massachusetts Action, and attached the Corbis Agreements as well as the Representation Agreement to the complaint. (*Compare* Penchina Decl., Ex. 1, ¶¶ 10–13, 16–20 & Ex. 2–3, *with* FAC ¶¶ 43–53 & Ex. 5, 7). In particular, Plaintiff alleged, as he does here, that: (i) Corbis licensed photographs as Plaintiff's agent; (ii) "HMH entered into license agreements relating to Lefkowitz'[s] images, including but not limited to the [Corbis Agreements]"; (iii) HMH breached those agreements "by exceeding material terms of the licenses and failing to pay the contractually agreed amount for doing so"; (iv) "Lefkowitz suffered damages as a result of HMH's breach of contract"; and (v) "[b]y the terms of the agreements entered into by HMH, HMH is required to pay ten (10) times the license fee for any unauthorized use, in addition to any other remedies applicable under copyright law." (*Compare* Penchina Decl. Ex. 1, ¶¶ 26–29, *with* FAC ¶¶ 44, 60, 64–65). For relief, Plaintiff sought "an award of ten (10) times the license fee for any unauthorized use." (*Compare* Penchina Decl. Ex 1 ¶ 4, *with* FAC ¶ 6).

Among other things, HMH moved to dismiss Plaintiff's breach of contract claim for lack of standing. *Lefkowitz,* 2013 WL 3816717, at *1. HMH argued that Plaintiff had "no right to enforce the terms of the [Corbis Agreements], and therefore ha[d] no standing to bring the breach of contract claims set forth in the complaint." *Id.* at *3. The Honorable F. Dennis Saylor IV, United States District Judge for the District of Massachusetts, engaged in a detailed analysis of whether Plaintiff had standing to bring his breach of contract claims under the Corbis Agreements, ultimately holding that Plaintiff "ha[d] not set forth any adequate basis for [the court] to find that [Plaintiff] ha[d] standing to enforce the terms of the contracts between Corbis and HMH[,]" and thus "ha[d] not

adequately pleaded standing to bring any claims for breach of contract." *Id.* at *5.

Judge Saylor explained that Plaintiff "ha[d] not established that he ha[d] standing to sue as a third-party beneficiary" under New York law, the law governing the Corbis Agreements. *Lefkowitz,* 2013 WL 3816717, at *4. The court also rejected Plaintiff's argument that he had standing to sue because Corbis had assigned Plaintiff this right pursuant to a provision in Plaintiff's Representation Agreement with Corbis that, according to Plaintiff, granted him the right to sue for copyright infringement if Corbis declined to do so. *Id.* at *5. Because the court held that Plaintiff lacked standing, it granted HMH's motion to dismiss Plaintiff's breach of contract claims. *Id.*

*17  This Court is presented with the same issue of whether Plaintiff has standing to pursue his breach of contract claims against a party that licensed Plaintiff's photographs from Corbis, claims predicated on the exact same agreements on which Judge Saylor based his opinion. Moreover, the Massachusetts Action decided the issue under New York law, just as the parties would have the Court do here in accordance with the choice-of-law provision in the Corbis Agreements. (FAC, Ex. 7). Plaintiff contends that the actions are not sufficiently similar because the district court in Massachusetts did not assess the principal-agency argument that Plaintiff advances here. Even if true, the fact that Plaintiff relies on an additional argument here in support of his claim does not change the analysis. *See Hollander,* 2011 WL 5222912, at *2 (holding that collateral estoppel barred plaintiff's attempt to relitigate his standing to bring an Establishment Clause claim and stating that "[p]laintiff's attempt to litigate alternate grounds for standing in this lawsuit is improper and unavailing"). It is also irrelevant that the images at issue in the two cases may be different, because the court's ruling in the Massachusetts Action is based on the same agreements on which Plaintiff relies here to establish standing. *See Poindexter,* 2014 WL 818955, at *4 ("Although EMI concerned Plaintiff's alleged rights to the 'Thin Line Between Love and Hate' recording, Judge Swain's determination bars Plaintiff from re-litigating the ownership issue with respect to the 'Love Gonna Pack Up' recording as well, given that both recordings are governed by the same 1988 Agreement on which Judge Swain's determination is based."); *cf. Fulani v. Bentsen,* 862 F.Supp. 1140, 1149 (S.D.N.Y.1994) ("As Fulani's asserted injury has not changed, however, the Court finds that collateral estoppel is applicable despite the fact that the instant case involved the 1992 general

Lefkowitz v. John Wiley & Sons, Inc., Not Reported in F.Supp.3d (2014)

election debates, as opposed to the 1988 general election debates.").

Turning to the second requirement, the relevant issue— whether Plaintiff has standing to pursue his breach of contract claim pursuant to the Corbis Agreements—was actually litigated and decided in the Massachusetts Action. This is clearly demonstrated by the above summary of that action, and Plaintiff does not dispute that this requirement is satisfied. The Court's decision here, as it necessarily was in the Massachusetts Action, is limited to Plaintiff's ability to assert standing under the Corbis Agreements because it is those agreements on which Plaintiff relies and which he attached to the FAC. Plaintiff is, of course, not foreclosed from establishing standing on another basis, and the Court's decision here imparts no statement on Plaintiff's ability to do so. Indeed, Plaintiff alleges that Defendant "entered into license agreements relating to Lefkowitz's images, including but not limited to the Corbis agreements referenced in Exhibit 1" (FAC ¶ 60), thereby leaving open the potential for Plaintiff to establish standing on an agreement not now relied upon. For that reason, and because the Court has determined that Plaintiff lacks standing, the dismissal of Plaintiff's breach of contract claim will be without prejudice. *See Hernandez v. Conriv Realty Assoc.,* 182 F.3d 121, 123 (2d Cir.1999) ("Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist.").

**\*18** As for the third requirement, Plaintiff had a "full and fair opportunity" to litigate the standing issue in the Massachusetts Action, another point that Plaintiff does not refute. *Fulani,* 862 F.Supp. at 1150 (holding that plaintiff had a "full and fair opportunity" to litigate the standing issue in a prior proceeding, on appeal, and before the Supreme Court); *see also Jefferson Ins. Co. of New York v. Fortress Re, Inc.,* 616 F.Supp. 874, 877 (S.D.N.Y.1984) ("A party given a full and fair opportunity to litigate an issue of law in one action may be estopped from relitigating it in a subsequent action."). Particularly in light of Plaintiff's "control of and participation in the" Massachusetts Action, he cannot "seriously contend that he had no 'full and fair opportunity' to litigate all issues decided" in that action. *Cent. Hudson Gas & Elec.,* 56 F.3d at 369.

Lastly, it must be decided whether the issue decided in the prior proceeding was necessary to support a valid and final judgment on the merits. This final requirement is also satisfied because the Massachusetts court's decision that

Plaintiff lacked standing was the basis on which that court dismissed Plaintiff's breach of contract claim. *Lefkowitz,* 2013 WL 3816717, at \*5 ("Plaintiff has not set forth any adequate basis for this Court to find that he has standing to enforce the terms of the contracts between Corbis and [defendant].... Accordingly, defendant's motion to dismiss will be granted.").

Having found all of the requirements of collateral estoppel met, and there being no reason not to apply this doctrine here, the Court concludes that Plaintiff is estopped from asserting that he has standing to advance a breach of contract claim against Defendant predicated on the Corbis Agreements. Moreover, because the Court has found this issue precluded, it need not consider the merits of Plaintiff's breach of contract claims against Defendant. *See Fulani,* 862 F.Supp. at 1147 ("As the Court finds that plaintiffs are estopped from asserting that they have standing to challenge the CPD's taxexempt status, the Court need not consider the merits of plaintiffs' claims against the defendants."); *see also Hollander,* 2011 WL 5222912, at \*2 ("When one issue is dispositive of a matter, there is no need for the Court to address alternative grounds for disposition.").

Accordingly, Plaintiff's breach of contract claim is dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED in part and DENIED in part. To the extent Plaintiff's copyright infringement claim includes works not listed on the Lefkowitz Chart, those claims are dismissed. Defendant's motion with respect to Plaintiff's direct copyright infringement claim is otherwise denied. Defendant's motion with respect to Plaintiff's contributory copyright infringement and breach of contract claims is granted, and those claims are dismissed without prejudice.

**\*19** The Clerk of Court is directed to terminate Docket Entry No. 26.

Plaintiff is granted leave to file a second amended complaint consistent with this Opinion to cure the pleading deficiencies for Plaintiff's contributory copyright infringement claim. Plaintiff shall file his second amended complaint within four weeks from the date of this Opinion, and Plaintiff's failure to do so will result in the entry of dismissal of that claim. The Court will schedule the next pretrial conference in due course.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2619815

## Footnotes

1       Also pending before the Court is *Lefkowitz v. McGraw–Hill Global Education Holdings, LLC, et al.,* No. 13
        Civ. 5023(KPF), a related action commenced by Plaintiff against defendants McGraw–Hill Global Holdings,
        LLC and McGraw Hill School Education Holdings, LLC (the "McGraw Action"); there, Plaintiff asserts similar
        claims for copyright infringement and breach of contract, but not for contributory copyright infringement. The
        defendants in the McGraw Action have moved to dismiss Plaintiff's claims on the same bases as Defendant
        moves here. As would be expected, given the identity of issues (and of counsel), the parties have advanced
        nearly identical arguments. For this reason, the Court's Opinions in both cases, which are being issued on
        the same day, mirror one another in certain respects.

2       The facts set forth herein are taken from Plaintiff's First Amended Complaint ("FAC"), including the exhibits
        attached thereto, and matters of public record of which the Court may properly take judicial notice under
        Federal Rule of Evidence 201. ⚑ *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991) (holding
        that a court may consider matters of which judicial notice may be taken under Fed.R.Evid. 201). The facts
        drawn from Plaintiff's FAC are taken as true for purposes of this motion. *See* ⚑ *Bell Atl. Corp. v. Twombly,*
        550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("Factual allegations must be enough to raise a
        right to relief above the speculative level, on the assumption that all the allegations in the complaint are true
        (even if doubtful in fact)." (internal citation omitted)).

        For convenience, Defendant's supporting memorandum is referred to as "Def. Br."; Plaintiff's opposition
        memorandum is referred to as "Pl. Opp."; and Defendant's reply memorandum is referred to as "Def. Reply."

3       Because particular photographs can be the subject of multiple instances of infringement, the number of
        instances of alleged infringement does not correlate precisely with the number of images at issue. When the
        Court refers to an instance of infringement, it is referring to a line of the Lefkowitz Chart.

4       According to Plaintiff, prior to filing his complaint, Plaintiff asked Defendant to disclose its unauthorized uses
        of his photographs. (FAC ¶ 35). As of the time of the filing of the complaint, Defendant had not responded
        to Plaintiff's request. (*Id.*).

5       Federal Rule of Civil Procedure 12 states: "Except as provided in Rule 12(h)(2) or (3), a party that makes a
        motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was
        available to the party but omitted from its earlier motion." Fed.R.Civ.P. 12(g)(2).

6       Notably, Plaintiff does not restrict his claim to the works identified in the Lefkowitz Chart. Rather, Plaintiff
        alleges that Defendant exceeded the permitted uses under the terms of the limited licenses for the works
        identified in the Lefkowitz Chart *and* for other works "yet to be discovered." (FAC ¶ 19). To the extent that
        Plaintiff seeks to assert copyright infringement claims for works not listed in the Lefkowitz Chart, the Court
        charts a course closer to *Schneider* than to *Cole,* and dismisses that portion of the FAC. *See Warren,*
        952 F.Supp.2d at 617 n. 2 ("To the extent that [plaintiff] intends to assert copyright claims regarding these
        unspecified photographs, that portion of his Complaint is dismissed."); *Schneider,* 2013 WL 1386968, at *3

("[T]o the extent that Plaintiff has attempted to state a claim for copyright infringement concerning works other than the ten listed in Exhibit A of the Complaint, he has failed to do so.").

7    To be clear, Plaintiff's allegations are not made sufficient by the mere existence of the other lawsuits against Defendant. Rather, the alleged existence of these lawsuits, in conjunction with the rest of Plaintiff's allegations, imparts plausibility to Plaintiff's copyright infringement claim.

8    The parties dispute whether Plaintiff had access to information regarding the license terms for the works at issue. The Court must take Plaintiff's allegations that he does not have access to certain information as true for the purposes of this pleading. *Faber,* 648 F.3d at 104 (identifying that when considering a motion to dismiss for failure to state a claim, a court must "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)). In any event, Plaintiff was not required to allege this information here in order for the FAC to meet the pleading requirement, and so the Court need not resolve this issue in order to resolve the pending motion.

9    Defendant directs the Court to the Supreme Court's recent decision in *Petrella v. Metro–Goldwyn–Mayer, Inc.,* 572 U.S. ——, 134 S.Ct. 1962, —— L.Ed.2d ——, 2014 WL 2011574 (2014), reading that case to hold that the injury rule, not the discovery rule, applies to federal copyright infringement claims. *Petrella* does not hold as such. Rather, the Supreme Court in *Petrella* held that the equitable doctrine of laches did not bar a plaintiff's claim that was brought within the three-year statute of limitations period governing copyright infringement claims. In so doing, the Court plainly did not decide when a copyright infringement action accrues, stating:

> Although we have not passed on the question, nine Courts of Appeals have adopted, as an alternative to the incident of injury rule, a "discovery rule," which starts the limitations period when "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."

2014 WL 2011574, at *6 n. 4 (quoting *William A. Graham Co. v. Haughey,* 568 F.3d 425, 433 (3d Cir.2009)). The Court made no further comment on the issue, thereby purposely leaving it undecided. At the same time, however, the *Petrella* Court issued certain statements that could be interpreted to cast doubt on those decisions adopting the discovery rule, such as *Psihoyos. Id.* at *6 ("A copyright claim thus arises or accrue[s] when an *infringing act occurs[.]";* "Under the Act's three-year provision, an infringement is actionable within three years, and only three years, of *its occurrence."* (internal quotation marks omitted) (emphases added)). Be that as it may, a suggestion that the Supreme Court may favor the injury rule, without more, does not trump Second Circuit precedent. For now, *Psihoyos* remains the law of this Circuit.

10   "For judgment in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." *Taylor,* 553 U.S. at 891 n. 4. Plaintiff, however, alleges that this court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338 (providing district courts with "original jurisdiction of any civil action arising under any Act of Congress relating to ... copyrights"), and that it has supplemental jurisdiction over the breach of contract claims under 28 U.S.C. § 1367. Consequently, this Court need not assess New York State preclusion law. In any event, "there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002).

11   In the context of arguing that the Ten Times Provision is enforceable under New York law, Plaintiff claims in his papers that his breach of contract claim is not for Defendant's unauthorized use of the Lefkowitz Images, but only for Defendant's refusal to pay Plaintiff in accordance with the Ten Times Provision. (Pl.Opp.22). The FAC, however, ostensibly alleges a breach of contract claim in both respects by its inclusion of the

aforementioned allegation. The Court need not address this potential inconsistency, because under either scenario Plaintiff's contract claim is premised on Defendant's alleged breach of the Corbis Agreements.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5530308
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joshua MUZUMALA, Plaintiff,

v.

UNKNOWN FEDERAL AGENTS, et al., Defendants.

22-CV-7851 (LTS)
|
Signed August 28, 2023

**Attorneys and Law Firms**

Joshua Muzumala, Bronx, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1**  Plaintiff, who is appearing *pro se*, brings this action asserting claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. §§ 1981, 1983, 1985, and 1986. He alleges that federal agents and others conspired to violate his rights in the States of New York and Louisiana. By order dated January 23, 2023, the Court granted Plaintiff's request to proceed *in forma pauperis* ("IFP"), that is, without prepayment of fees. For the reasons set forth below, the Court dismisses this action.

STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

BACKGROUND

Plaintiff brings this action alleging a wide-ranging campaign of harassment and surveillance by private individuals and government actors to deprive him of his rights and have him deported. [1]  Named as defendants are: (1) "[u]nknown federal agents" (*id.* ¶ 26); (2) John Doe 1, "a federal agent most likely from immigration enforcement" (ECF 2, ¶ 25); (3) John Doe 2 and Jane Doe 1 (collectively "Doe couple"), a couple who were Plaintiff's neighbors in New Paltz, New York; (4) John Doe 3, a resident of Brooklyn, New York, "engaged" by John Doe 1 and the unknown federal agents (*id.* ¶28); (5) the University of New Orleans; (6) John Doe 4, a sergeant employed by the University of New Orleans Campus Police; (7) John Doe 5, a police officer employed by the University of New Orleans Campus Police; (8) Neal Maroney, a professor at the University of New Orleans; (9) John Doe 6, an employee

of the Bowery Residents' Committee's ("BRC") Boulevard Men's Residence, [2] a homeless shelter in Manhattan; and (10) Susan Brady, a doctor employed by BRC. The following is a summary of the information in the complaint, which is 96 pages long and contains 390 numbered paragraphs. [3]

## A. Defendants targeted harassment of Plaintiff at the New Paltz Garden Apartments in New Paltz, New York

**\*2** Plaintiff, who identifies himself as being "a male of African descent," moved to the United States in 2006, and since then has obtained multiple degrees. (ECF 2, ¶ 8.) [4] In September 2019, Plaintiff moved to New Paltz, New York, to enroll at the State University of New York at New Paltz ("SUNY New Paltz"). Plaintiff lived in an apartment complex close to campus called New Paltz Gardens, where he may have been the only Black resident. He "experienced xenophobia and racial animus" from a couple, John Doe 2 and Jane Doe 1, who lived in the same building. (*Id.* ¶ 10.) The Doe couple expressed their "angst" that Plaintiff had moved into the building by committing "inimical" acts towards him. This included saying that Plaintiff was "weird and sad," playing audio of monkey sounds loudly while "talking about Black people in a disparaging sense," and screaming, "[W]hy are you here?" and "Get out of here." (*Id.* ¶51.) Because of the "ongoing bias incidents" from the couple, Plaintiff asked to be released from his lease, but his request was denied, and instead he was allowed to move to another apartment in a different building within the complex. (*Id.*)

However, the Doe couple's harassment continued. They "influenced residents around Plaintiff's new apartment building and organized proxies to perpetrate the harassment of Plaintiff." (*Id.* ¶ 11.) For example, on his first day in the new apartment, a resident above him screamed, "[S]omebody get the monkey out of here." (*Id.* ¶ 52.) Plaintiff also heard Jane Doe 1 telling residents in the new building, "[W]e had to treat him like shit to get him out." (*Id.*) Plaintiff believes that the Doe couple "had for some reason become fixated with making [him] uncomfortable in his apartment and in the community." (*Id.*)

In April 2020, at about the time that Plaintiff's application for permanent residency was being processed by the United States Citizenship and Immigration Services, he noticed a change in the tenor of the harassment, as it "had started including intimations that [he] would be deported." (*Id.* ¶ 12.) Plaintiff believes that the Doe couple had involved "immigration enforcement," consisting of John Doe 1

and unknown federal agents, in the harassment "for the purposes of interfering with Plaintiff's petition for permanent residence" and "to try to get [him] removed from the country" (*Id.* ¶¶ 12, 53.) For the next seven months, the harassment escalated, forcing Plaintiff to move to Poughkeepsie, New York, in September 2020, hoping that it would stop.

## B. Defendants' harassment of Plaintiff continued in Poughkeepsie, New York

The Doe couple, John Doe 1, the unknown federal agents, and "their proxies tracked and followed" Plaintiff to Poughkeepsie, where they obtained access "under federal authority" to apartments adjacent to Plaintiff's apartment and "would surveil Plaintiff, including, but not limited to casting aspersions about [him], and alleging that [he] was a criminal and was getting deported." (*Id.* ¶¶ 16, 57.) In November 2020, Plaintiff received a positive Covid-19 test and informed his landlord of the test so that his neighbors could be informed. A few days later, Jane Doe 1 with unknown individuals drove into a parking lot adjacent to Plaintiff's apartment and screamed, "[D]ie already," after mentioning details about Plaintiff's Covid test. (*Id.* ¶ 62.)

## C. Plaintiff moved to Brooklyn, New York, where Defendants' harassment continued

In December 2020, Plaintiff decided to move to Brooklyn, New York, but all the defendants followed him there and continued the harassment, "[a]t one point, using [a] loudspeaker from an unmarked police car saying, '[Y]ou cannot hide from us.' " (*Id.* ¶ 18.) The defendants used local residents and their "proxies," including John Doe 3, who would verbally harass Plaintiff, "echoing false allegations that Plaintiff was a criminal and was getting deported." (*Id.* ¶ 69.)

On May 21, 2021, Plaintiff's petition for permanent residency was approved. When the defendants found out about the approval, Plaintiff heard Jane Doe 1 saying, "[W]e will keep doing this until we run him out of the country." (*Id.* ¶ 77.) The defendants "had made pursuing Plaintiff a personal matter and had become excessively obsessed with attempting to have Plaintiff deported from the United States." (*Id.* ¶ 79.)

## D. Defendants tracked and followed Plaintiff to New Orleans, Louisiana

**\*3** In June 2021, Plaintiff decided to move to New Orleans, Louisiana, to attend the University of New Orleans, where

he had been accepted into a Ph.D. program. Defendants again tracked him down and "repeatedly engaged in a course of conduct that would severely demonize, and defame Plaintiff." (*Id.* ¶ 21.) Defendants escalated their surveillance and harassment of Plaintiff, by (1) using "through-the-wall x-ray surveillance equipment," which caused radiation (*id.* ¶¶ 22, 105); (2) using proxies such as John Doe 4, who Plaintiff heard saying at a desk in the university library, " '[N]obody wants him. He's got to go,' and '[H]e is a weird guy,' " using language similar to language that had been used by John Doe 1, the unknown federal agents, the Doe couple, and their other proxies (*id.* ¶107); (3) "weaponizing surveillance equipment to furtively cause Plaintiff extreme pain and discomfort" (*id.* ¶ 111); and (4) subjecting Plaintiff to "ionizing radiation several times a day" (*id.* ¶ 120). Plaintiff sought assistance from the campus police, but it soon "appeared that university police were doing the bidding of Defendants John Doe 1 and [u]nknown federal agents," including following him around because they "viewed [him] as a safety concern." (*Id.* ¶¶ 102, 104.)

On September 28, 2021, Defendant Neal Maroney, a professor, responded to Plaintiff's attempt to clarify a question in class with "discriminatory and abusive language" by screaming, "[L]et's get rid of this shit." (*Id.* ¶ 124.) This language was consistent with that used by the defendants, and left Plaintiff "feeling out of place, afraid, embarrassed and unwelcome in his class." (*Id.*) Several days later, Maroney, several of Plaintiff's classmates, John Doe 1, and other unidentified individuals gathered in the hallway of a lecture hall at the university. Plaintiff believes they were having a conversation about him, which included using a "viewing device" to look at his brain. (*Id.* ¶ 128.) Plaintiff began "experiencing a severe headache, including pain and a burning sensation on the surface of his head and neck, and feeling extreme weakness in his arms and legs." (*Id.*) Defendants continued to target Plaintiff with "harassment and violence," leaving him "extremely traumatized." (*Id.* ¶¶ 131-141.)

### E. Plaintiff returned to New York and Defendants followed

Plaintiff feared for his safety, and on November 10, 2021, he withdrew from the University of New Orleans and returned to New York. Plaintiff sought temporary housing from the City of New York, and was housed in several shelters. However, Defendants had followed him and, in the shelters, continued their harassment, which included (1) using surveillance equipment and ionizing radiation to cause him pain; (2) housing him with roommates who threatened him and exposed him to second hand smoke and illicit substances; (3) conspiring with social service workers to get him to transfer to a mental health and substance abuse facility; (4) tracking and following him to Covid-19 isolation hotels; and (5) "advanc[ing] a false narrative that Plaintiff had a mental illness" (*id.* ¶ 189).

On December 29, 2021, Plaintiff attended a psych evaluation with Defendant Susan Brady, who asked why he was in temporary housing. He informed her of the actions taken against him by the Doe couple, John Doe 1, the unnamed federal agents, and their proxies, "tracking, following, surveilling, and harassing" him, which prevented or made it difficult for him to pursue his "education and employment goals." (*Id.* ¶ 191.) Instead of "identify[ing] the illegal immigration pursuit as the barrier in [his] current circumstances, and begin[ning] the process of addressing it," Defendant Brady diagnosed Plaintiff with schizophrenia. (*Id.* ¶¶ 192, 194.) Plaintiff, who had no history of mental illness, was "shocked, surprised and dismayed by the diagnosis," and decided that it was likely that Defendant Brady had been "influenced by John Doe 1 and the [u]nknown federal agents" in an effort to discredit him and "manufacture aggravating factors" to prevent him from getting future benefits. (*Id.* ¶ 194, 198.) After the diagnosis, Plaintiff was transferred to several mental health and substance abuse facilities, where he continued to face difficulties.

**\*4** Plaintiff brings this action seeking injunctive relief and money damages.

### DISCUSSION

Under the IFP statute, a court must dismiss an action if it determines that the action is frivolous or malicious. 28 U.S.C. § 1915(e)(2)(B)(i). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). A complaint is " 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless' – that is, if they are 'fanciful,' 'fantastic,' or 'delusional.' " *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Denton*, 504 U.S. at 32-33) (finding as frivolous and baseless allegations that set forth a fantastical alternative history of the September 11, 2001

terrorist attacks); *see also* Neitzke v. Williams, 490 U.S. 319, 324-25 (1989) (A claim is frivolous when it "lacks an arguable basis either in law or in fact."); Livingston, 141 F.3d at 437("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ...; or (2) the claim is based on an indisputably meritless legal theory." (internal quotation marks and citation omitted)). Moreover, a court has "no obligation to entertain pure speculation and conjecture." *Gallop*, 642 F.3d at 368.

Plaintiff's complaint is premised upon his belief that, the Doe couple, multiple federal agents, and their proxies mounted a campaign of harassment against him in an effort to have him deported, and then tracked and monitored his activities with x-ray equipment from New Paltz to New Orleans and back to New York. The defendant's actions included subjecting him to "ionizing radiation," "weaponizing surveillance equipment" against him, looking at his brain through a "viewing device," and causing him other harms. (ECF 2 ¶¶ 111, 120, 128.) However, a "[p]laintiff's beliefs – however strongly he may hold them – are not facts." *Morren v. New York Univ.*, No. 20-CV-10802, 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) (citation omitted), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022). Plaintiff provides no factual basis for his assertions that he was victim of a broad conspiracy perpetrated by the Doe couple, federal immigration agents, and their proxies. *See Lefkowitz v. John Wiley & Sons, Inc.*, No. 13-CV-6414, 2014 WL 2619815, at *10 (S.D.N.Y. June 2, 2014) (complaint must set forth facts showing basis for information and belief); *Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 266 (W.D.N.Y. 2010) (even where necessary evidence is in "exclusive control of the defendant, ... plaintiff must still set forth the factual basis for that belief").

The Court finds that Plaintiff does not provide any plausible factual support for his claims and that they rise to the level of the irrational. *See* Livingston, 141 F.3d at 437. Plaintiff has provided the court with a narrative full of details of what he believes – that he is a victim of a broad conspiracy perpetrated by Defendants with the initial goal of his deportation, and later to deprive him of his rights. Despite all of the details provided, Plaintiff has pleaded no factual predicate in support of his assertions. Plaintiff's allegations amount to conclusory claims and suspicions that are not plausible and must be dismissed as frivolous. *See Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2020) (holding that "the district court did not err in *sua*

*sponte* dismissing the complaint as frivolous," based on the plaintiff's allegations that he had "been the subject of 24-hour, multi-jurisdictional surveillance by federal 'fusion centers' and the New York State Intelligence Center, which put a 'digital marker' on him in order to collect his personal data and harass him."); *Khalil v. United States*, No. 17-CV-2652, 2018 WL 443343, at *4 (E.D.N.Y. Jan. 12, 2018) (dismissing complaint where "[p]laintiff allege[d] a broad conspiracy involving surveillance of and interference with his life by the United States and various government actors" because his allegations were "irrational and wholly incredible").

**\*5** District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See* Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Plaintiff's complaint does not suggest that he is in possession of facts that would cure the identified deficiencies. *See Gallop*, 642 F.3d at 369 (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188, 2019 WL 3034866, at *7 (S.D.N.Y. July 11, 2019) (declining to grant leave to amend as to certain claims in the absence of any suggestion that additional facts could remedy defects in the plaintiff's pleading). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend and dismisses the action as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

## CONCLUSION

Plaintiff's complaint is dismissed as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i). All other pending matters in this case are terminated.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See* Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 5530308

# Footnotes

1    This action is the second of three complaints Plaintiff filed in this court arising from the same events. In the first
     action, *Muzumala v. Mayorkas*, No. 22-CV-3789 (JGK) (S.D.N.Y. filed May 9, 2022) ("*Muzumala I*"), Plaintiff
     asserted claims under the Freedom of Information Act ("FOIA"), 🚩 5 U.S.C. § 552, *et seq.*, alleging that the
     United States Immigration and Customs Enforcement ("ICE") and the Federal Bureau of Investigation ("FBI")
     failed to adequately respond to his document requests. He also brought statutory and constitutional claims
     against officials stemming from his belief that private individuals and government agents are trying to have
     him deported. On June 22, 2022, Judge John G. Koeltl dismissed Plaintiff's claims against the officials and
     his assertions concerning the government actors' efforts to deport him. *See Muzumala I*, 2022 WL 2916610
     (S.D.N.Y. July 22, 2022). Judge Koeltl allowed the FOIA claims to proceed. A motion to dismiss filed by ICE
     and the FBI is pending in that case.

     Plaintiff's third case, filed after submission of this action, is *Muzumala v. The City of New York*, No. 22-
     CV-8423 (LTS) (S.D.N.Y. filed Oct. 3, 2022) ("*Muzumala III*"). In that action, he asserted constitutional claims
     under 🚩 42 U.S.C. § 1983, arising from his shelter experiences in New York City. On February 21, 2023,
     the Court dismissed most of the claims, but granted Plaintiff leave to amend. *See Muzumala III*, ECF 1:22-
     CV-8423, 12. Plaintiff subsequently filed a second amended complaint, which remains pending.

     There is some duplication of allegations among Plaintiff's three actions. In all three actions, he describes
     events occurring in New Paltz, Poughkeepsie, Brooklyn, and New Orleans, involving federal agents and their
     proxies attempting to have him deported. In both this action and *Muzumala III*, Plaintiff discusses some of
     the same shelter experiences and names Dr. Susan Brady as a defendant. The Court will not address in this
     order matters that have been addressed in *Muzumala I* and *Muzumala III*.

2    BRC is a nonprofit organization that, among other things, manages shelter facilities in partnership with the
     New York City Department of Homeless Services. *See* https://www.brc.org/ (last visited Aug. 16, 2023);
     https://www.nyc.gov/site/dhs/about/bowery-residents-committee.page (last visited Aug. 16, 2023).

3    On February 2, 2023, the Court received a motion from Plaintiff requesting leave to submit an amended
     complaint. (ECF 10.) On April 10, 2023, the Court denied Plaintiff's motion as unnecessary because he could
     amend his complaint once as of right within a certain timeline under Rule 15(a) of the Federal Rules of Civil
     Procedure. (ECF 11.) The Court directed Plaintiff, if he chooses, to submit his amended complaint within
     45 days, and that, if he did not file an amended complaint within that time, the Court will treat the original
     complaint as the operative pleading. (*Id.*) Plaintiff did not file an amended complaint.

4    The Court quotes the complaint verbatim. All spelling, grammar, and punctuation are as in the original unless
     otherwise indicated.

Case 6:22-cv-00982-GTS-ML    Document 13    Filed 09/08/23    Page 67 of 97

Khalil v. United States, Not Reported in Fed. Supp. (2018)

2018 WL 443343
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Adil KHALIL, Plaintiff,

v.

UNITED STATES of America, Four Unknown
Federal Agents, United States Air Force General
Council [sic] Joseph M. McDade, Jr., United States
Air Force General Council [sic] Unknown Federal
Agent United States Air Force Attorney General,
United States Air Force Unknown Federal Agent,
United States Air Force Inspector General, and
Federal Agent Natalie P. Becerra, Defendants.
Adil Khalil, Plaintiff,

v.

Governor Andrew M. Cuomo, Ann M.
Sullivan, Commissioner, NYS Office of
Mental Health; New York State Trooper John
Does 1-3, the State of New York, Defendants.

17-CV-2652 (JFB) (SIL)
|
17-CV-5458 (JFB) (SIL)
|
Signed 01/12/2018

**Attorneys and Law Firms**

Adil Khalil, Shirley, NY, pro se.

Robert B. Kambic, United States Attorneys Office, Central
Islip, NY, for Defendants.

ORDER

Joseph F. Bianco, United States District Judge

**\*1** On June 2, 2017, *pro se* plaintiff Adil Khalil ("plaintiff")
filed a complaint against the United States Air Force and
the Federal Bureau of Investigations ("defendants") as well
as an application to proceed *in forma pauperis. Khalil v.
United States Air Force*, 17-cv-2652 (E.D.N.Y. June 2, 2017)
("*Khalil I*"), Dkt. Nos. 1, 2. On July 17, 2017, plaintiff moved
to transfer the action to the United States Court of Federal
Claims (*id.* Dkt. No. 6), where plaintiff had filed a related
action on July 13, 2017, *Khalil v. United States of America*,

17-cv-0962 (Fed. Cl. July 13, 2017). On August 1, 2017,
defendants requested that the Court dismiss the complaint
on subject matter jurisdiction grounds. (*See Khalil I*, Dkt.
No. 7.) However, because 28 U.S.C. § 1292(d)(4), which
governs the transfer of actions to the Court of Federal Claims,
prevents courts from taking any action when a transfer motion
is filed until sixty (60) days after that court has ruled upon
the motion, the undersigned requested that defendants submit
any opposition to the motion to transfer by August 31, 2017.
(*See id.* Dkt. No. 8.) On August 19, 2017, before defendants
responded to that Order, plaintiff opposed defendants' request
for dismissal on subject matter grounds and filed an amended
complaint. (*See id.* Dkt. No. 9). The amended complaint
names as defendants: the United States of America, four
unknown federal agents (John Does 1-4), United States Air
Force General Council Joseph M. McDade, Jr., "United States
Air Force General Council unknown Federal Agent United
States Air Force Attorney General", "United States Air Force
unknown Federal Agent", United States Air Force Inspector
General, and Federal Agent Natalie P. Becerra ("Becerra"
and collectively, "defendants"). By letter dated September
11, 2017, defendants indicated that they did not object to the
request to transfer. (*See id.* Dkt. No. 10.) In response, by
motion dated September 18, 2017, plaintiff requested that the
Court: (1) find defendants in contempt for responding to the
Court's Order on September 11, 2017, when their response
was due August 31, 2017; and (2) enter default judgment in
plaintiff's favor. (*See id.* Dkt. No. 14.)

On August 2, 2017, the Court of Federal Claims issued an
Order that: (1) dismissed the complaint, (2) denied plaintiff's
motion to transfer that case to this Court (which he filed
on the same day he moved to transfer the instant action),
and (3) denied plaintiff's motion for leave to proceed *in
forma pauperis. See Khalil v. United States*, No. 17-CV-0962
(Fed. Cl. Aug. 2, 2017), Dkt. No. 7. Given the dismissal,
by Order dated September 27, 2017, the undersigned denied
plaintiff's motion to transfer. (*Khalil I*, Dkt. No. 15.) In
addition, in light of 28 U.S.C. § 1292(d)(4)'s prohibition on
any action in a case in which a motion to transfer to the
Court of Federal Claims is filed until sixty (60) days after the
court has ruled upon the motion, the undersigned stayed all
pending motions in the instant action for sixty (60) days. (*Id.*)
On November 28, 2017, defendants renewed their request
for a pre-motion conference in order to establish a briefing
schedule for their motion pursuant to Federal Rules of Civil
Procedure 12(b)(1) and 12(b)(6) to dismiss the complaint for
lack of subject matter jurisdiction and failure to state a cause

Case 6:22-cv-00982-GTS-ML   Document 13   Filed 09/08/23   Page 68 of 97

Khalil v. United States, Not Reported in Fed. Supp. (2018)

of action. (*Khalil I*, Dkt. 16.) To date, plaintiff has not opposed defendants' request.

**\*2** In addition, on September 18, 2017, plaintiff filed another *in forma pauperis* complaint. *Khalil v. Cuomo*, 17-CV-5458 (E.D.N.Y. Sept. 18, 2017) ("*Khalil II*"), Dkt. Nos. 1, 2. *Khalil II* is against the State of New York, Governor Cuomo, Ann M. Sullivan, Commissioner of the New York State Office of Mental Health, and three unidentified New York State Troopers, John Does 1-3. For the reasons stated below, plaintiff's motions to proceed *in forma pauperis* are granted; however, because neither the amended complaint in *Khalil I*, nor the complaint in *Khalil II* alleges a plausible claim, the complaints are *sua sponte* dismissed pursuant to 🔖 28 U.S.C. § 1915(e)(2)(B).

## BACKGROUND

### I. *Khalil I*

Plaintiff's amended complaint is submitted on the Court's complaint form and purports to allege *Bivens* claims against defendants. (*See Khalil I*, Dkt. No. 9, Compl. ¶ II.) Plaintiff claims that the defendants have deprived him of his First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendment rights, and have conspired to do so, in connection with their "covert or overt" surveillance of plaintiff's activities on the "world wide web (internet/electronic) and telephone conversation[s]." (*Id.* ¶¶ II.B-D., III.A.) According to the amended complaint, from June 16, 2011 to the present, plaintiff has suffered "a denial of service attack on [his] personal computer" and "the federal government has failed to protect [his] internet rights." (*Id.* ¶ 13.) Plaintiff also complains that the government has violated his rights by "intruding [his] private computer or iPhone and monopolizing or compromising his internet privacy and rights to free expression." (*Id.*) Plaintiff further complains that the government has "allowed a schizophrenic bipolar federal employee [to] violate[ ] online impersonation laws and cyber stalking laws." (*Id.* ¶ 14.)

Plaintiff alleges that, since his filing of the original complaint in this case on June 2, 2017, "the federal government continues to restrict [his] internet access" and "continues to allow the federal employee female stalker to threaten the plaintiff's mental well-being." (*Id.* ¶ 20.) Plaintiff claims that Becerra is being used by the FBI "as an informant/asset/operative against [him] in an attempted entrapment sting" and, since 2010, the "FBI has monopolized and [taken]

total control of [his] computer and internet." (*Id.* ¶ 25.) As evidence, plaintiff describes that "frequent Goggle [sic] search results and pop up ads on [his] computer has resulted in [a] surge of conspiracy theorists who, otherwise, without the FBI influence, would be unknown to [plaintiff.]" (*Id.*) Thus, plaintiff claims the "FBI in controlling advertisement and search results in an attempted brainwashing scheme, and is a violation of the plaintiff's fourth amendment right." (*Id.*) Plaintiff also claims that the "FBI was working in conspiracy with the NYPD" to designate plaintiff as a mentally disturbed person and that such conduct has caused plaintiff to suffer a "mental breakdown from internet stalking." (*Id.* ¶¶ 27, 28-29.)

As a result, plaintiff claims to have suffered "mental illness (adjustment disorder), complications and metastasis of an auto-immune disease, loss of employment (adjustment disorder)" and seeks to recover a damages award in total sum of $550,000,000.00. (*Id.* ¶¶ IV-V.)

### II. *Khalil II*

As noted above, on September 18, 2017, plaintiff filed an additional complaint and application to proceed *in forma pauperis* against the State of New York, Governor Andrew M. Cuomo, Ann M. Sullivan, Commissioner of the New York State Office of Mental Health, and three unidentified New York State Troopers (John Does 1-3). Like *Khalil I*, the complaint in *Khalil II* is difficult to comprehend. Plaintiff appears to complain that, on December 26, 2015 and September 7, 2017, New York State police troopers did not assist him during telephone calls he made to them. (*Khalil II*, Dkt. No. 1, Compl. ¶ 1.) Plaintiff claims he called the police to report internet harassment by "a mentally ill female stalker" he identifies as Becerra, a defendant in *Khalil I*. (*Id.* ¶ 2.) Plaintiff alleges that the State of New York has "inflict[ed] mental illness through a series of continued adjustment disorders[,] [a]nd with the filing of this instant action against the State of New York, progressing to Axis 1 major mental illness which resulted in a complete collapse of my immune system through the auto immune disease and psychological disorder Sarcoidosis." (*Id.*) Plaintiff also complains that the State of New York "has failed to enforce several laws" and cites various sections of the New York Penal Law relating to stalking and harassment. (*Id.* ¶ 4.) Plaintiff further alleges that "[t]he State of New York continues to use me as a scapegoat for their anger and frustration for the terrorist attacks on 911." (*Id.* ¶ 5.) Based on the foregoing, plaintiff claims to have suffered "mental illness (adjustment disorder), complications and metastasis of an auto-immune disease, loss

of employment (adjustment disorder). (*Id.* ¶ IV.) For relief, plaintiff seeks damages totaling $13 million. (*Id.* ¶ V.)

DISCUSSION

I. *In Forma Pauperis* Applications

**\*3** Upon review of plaintiff's declarations in support of the applications to proceed *in forma pauperis*, the Court finds that plaintiff is qualified to commence these actions without prepayment of the filing fees. 28 U.S.C. § 1915(a)(1). Therefore, plaintiff's applications to proceed *in forma pauperis* are granted.

II. Sufficiency of the Pleadings

A. Legal Standard

It is axiomatic that district courts are required to read *pro se* complaints liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), and to construe them "to raise the strongest arguments that [they] suggest," *Chavis*, 618 F.3d at 170 (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). Moreover, at the pleadings stage, the Court must assume the truth of "all well-pleaded, non-conclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010), *aff'd,* 133 S. Ct. 1659 (2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678 (citation omitted).

Notwithstanding a plaintiff's *pro se* status, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011). While "detailed factual allegations" are not required, "[a]

pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Further, a district court has the inherent power to dismiss a case *sua sponte* if it determines that the action is frivolous. *See Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). An action is "frivolous" when "the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (internal citations omitted). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992); *see also Scanlon v. Vermont*, 726 Fed.Appx. 78, 79 (2d Cir. 2011) (summary order) ("An action is frivolous if it lacks an arguable basis in law and fact—i.e., where it is 'based on an indisputably meritless legal theory' or presents 'factual contentions [which] are clearly baseless.' " (quoting *Neitzke v. Williams*, 490 U.S. 319,327 (1989), *abrogated on other grounds by Twombly*, 550 U.S. at 544)); *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.' " (quoting *Denton*, 504 U.S. at 32-33)).

B. Application

**\*4** As is readily apparent from the amended complaint in *Khalil I* and the complaint in *Khalil II*, plaintiff's claims "rise to the level of the irrational or the wholly incredible." *Denton*, 504 U.S. at 33. Plaintiff alleges a broad conspiracy involving surveillance of and interference with his life by the United States and various government actors. [1] Upon a careful reading of plaintiff's pleadings, the allegations presented appear wholly incredible and can only be described as the "product of delusion or fantasy." *Livingston*, 141 F.3d at 437. Construing plaintiff's pleadings liberally and raising the strongest arguments they suggest, the Court finds that plaintiff's allegations rise to the level of irrational and wholly incredible.

Case 6:22-cv-00982-GTS-ML    Document 13    Filed 09/08/23    Page 70 of 97

Khalil v. United States, Not Reported in Fed. Supp. (2018)

In short, having reviewed the amended complaint in *Khalil I* and complaint in *Khalil II*, it is clear that plaintiff's claims are factually frivolous, "rising to the level of the irrational or wholly incredible," ⚑ *Denton*, 504 U.S. at 26, and they are therefore dismissed. *Mecca v. U.S. Gov't*, 232 Fed.Appx. 66, 677 (2d Cir. 2007) (affirming district court dismissal of complaint that was "replete with fantastic and delusional scenarios"); *Gonzales v. Wright*, 9:06-CV-1424, 2010 WL 681323, at * 12 (N.D.N.Y. Feb. 23, 2010) ("As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions.") (collecting cases). The Court has considered affording plaintiff an opportunity to amend the complaints, ⚑ *Foman v. Davis*, 371 U.S. 178, 182 (1962), but declines to do so because the deficiencies therein could not be cured by amendment. ⚑ *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 69 (2d Cir. 2002).

## CONCLUSION

For the reasons above, plaintiff's *in forma pauperis* applications are granted. However, the amended complaint in *Khalil I and* the complaint in *Khalil II are sua sponte* dismissed pursuant to ⚑ 28 U.S.C. § 1915(e)(2)(B). The Clerk of the Court is directed to mail a copy of this order to the plaintiff at his last known address and to close the cases.

The Court certifies pursuant to ⚑ 28 U.S.C. § 1915(a)(3) that, should plaintiff seek leave to appeal *in forma pauperis*, any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is therefore denied for the purpose of any appeal. *See* ⚑ *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 443343

## Footnotes

1    In addition, given that sovereign immunity shields the United States, its agencies, and government officials acting in their official capacity, ⚑ *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), and that the Eleventh Amendment precludes suit in this Court against New York State, and against state officials in their official capacities seeking monetary damages, ⚑ *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007), the Court likely lacks subject matter jurisdiction to adjudicate these claims. However, because the nature of the claims set forth in plaintiff's submissions is far from clear, the Court declines to determine at this juncture that it lacks subject matter jurisdiction.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4451107
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Cheryl D. UZAMERE, Plaintiff,

v.

Ehigie Edobor UZAMERE, et al., Defendants.

22-CV-4876 (LDH) (LB)
|
Signed September 23, 2022

**Attorneys and Law Firms**

Cheryl D. Uzamere, Brooklyn, NY, Pro Se.

## MEMORANDUM AND ORDER

LaSHANN DeARCY HALL, United States District Judge:

**\*1** On July 12, 2022, Plaintiff Cheryl D. Uzamere, appearing *pro se*, filed this action in the United States District Court for the Northern District of Georgia. (Compl., ECF No. 1.) Plaintiff paid the filing fee to commence the action. (*Id.*) On August 18, 2022, the Honorable Steve C. Jones, United States District Judge, dismissed the action in part and transferred the remaining claims to this Court. (Order, ECF No. 9.) On August 25, 2022, Plaintiff filed an amended complaint naming 482 Defendants and consisting of over 3000 pages, including exhibits. (Am. Compl., ECF Nos. 12–15.)

In the span of just one week, Plaintiff filed: (a) a 418-page motion for recusal, (ECF No. 21); (b) a 137-page application for an order to show cause to compel disclosure under Fed. R. Civ. P. 26(a) (ECF No. 22); (c) a 171-page application for an order to show cause seeking relief from Judge Jones's Order under Fed. R. Civ. P. 60 (ECF No. 23); (d) a motion seeking reasonable accommodations and an extension of time to serve (ECF No. 25); and (e) a 232-page request for a certificate of default against Defendants Ehigie Edobor Uzamere and Austin I. Idehen pursuant to Fed. R. Civ. P. 55(a). (ECF Doc. Nos. 26-27.) To date, Plaintiff has not filed proof of service for the majority of the 482 Defendants.

For the reasons set forth below, Plaintiff's motions and applications are DENIED, the amended complaint is DISMISSED and Plaintiff is directed to SHOW CAUSE

within 30 days why a filing injunction should not be entered barring her from filing any new action in this Court without first seeking permission.

## MOTION FOR RECUSAL

At the outset, the Court considers Plaintiff's motion for recusal ("Recusal Motion"). (ECF No. 21.) It is important to note that Plaintiff does not appear to seek the district judge's recusal, but rather seeks to recuse Magistrate Judges and court staff whom Plaintiff characterizes as "Babylonian Talmud-adherent Ashkenazi Jews. (Recusal Mot. at 2.) A party may request the removal of "[a]ny justice, judge, or magistrate judge of the United States ... in which his impartiality might reasonably be questioned." 28 U.S.C. § 455; *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007) ( Section 455(a) "requires that a judge recuse himself 'in any proceeding in which his impartiality might reasonably be questioned.' " (quoting *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 859 (1988))). But "a judge should not disqualify himself in the absence of a violation of § 455." *Amico*, 486 F.3d at 781 n.4 (2d Cir. 2007). Here, Plaintiff's conclusory claims of "extrajudicial bias" (Recusal Mot. at 2), are entirely unsupported. Therefore, Plaintiff's motion is denied. *See Dekom v. Nassau Cnty.*, 595 F. App'x. 12, 15 (2d Cir. 2014) (affirming the denial of a motion for recusal where the "plaintiffs advanced no basis for the district judge to recuse herself").

## DISMISSAL OF COMPLAINT

### BACKGROUND

Plaintiff filed a 707-page complaint against 306 Defendants in the Northern District of Georgia. (*See generally* Compl.) On August 17, 2022, Judge Jones dismissed Plaintiff's Part I spousal support claim for lack of subject matter jurisdiction and transferred Plaintiff's Part II claims to this Court. (ECF No. 9.)

**\*2** After the transfer to this Court, Plaintiff filed a voluminous amended complaint, consisting of over 3000 pages against 482 Defendants. (Am. Compl., ECF Nos. 12–15.) In Part I, Plaintiff again seeks spousal support from her

alleged estranged husband Ehigie Edobor Uzamere. [1] (Am. Compl. at 69–80 (Part I)). Plaintiff contends that based on an order issued by the Kings County Family Court Support Magistrate, Defendant Uzamere owes her spousal support of $17,500.00. (*Id.* at 69.)

In Part II, Plaintiff alleges ten causes of action, including violations of the Sherman Act, 15 U.S.C. § 1 *et seq*, the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*, the Social Security Act, 42 U.S.C. § 301, *et seq*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq*, as well as claims arising under 42 U.S.C. § 1983, *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), 18 U.S.C. § 2441, and state law claims of intentional infliction of emotional distress and gross negligence. (ECF Nos. 12-1, 12-2, 12-3 (Part II)). The defendants include various United States Senators, including those representing states that are not New York, various Secretaries in the Executive Branch, and New York agencies.

Supporting Plaintiff's claims are a plethora of fantastical and outlandish allegations, many of which are rooted in Plaintiff's blatantly anti-Semitic beliefs. For example, Plaintiff repeatedly claims that:

> [D]efendants ... are members of the Democratic Party's Babylonian Talmud-adherent, Ashkenazi Jewish ethnoreligious cartel

> * * *

> [A] seditious conspiracy that manifests itself by the defendants' operation of a Sherman Antitrust violating, racketeer-influenced, corrupt organization for which the goal is to normalize the practice of pedophilia and associated sexual and non-sexual acts of violence and domestic terrorism against the American people, and especially against Native Americans and people of African descent to satisfy the Ashkenazi Jewish community's disproportionately high percentage of individuals who are practitioners of pedophilia

(Am. Compl., at 2, 5.) Plaintiff seeks damages, declaratory and injunctive relief. (ECF No. 12-3 at 77–86.) Plaintiff also includes numerous exhibits consisting of thousands of pages. (ECF Nos. 12-3–6, 12-13–14.) Notably, the exhibits included

graphic images of children, as well as personal identifying information necessitating sealing.

## STANDARD OF REVIEW

A complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 678). But the Court need not accept as true "legal conclusions." *Iqbal,* 556 U.S. at 678. In addition, a *pro se* complaint is to be liberally construed, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

**\*3** Nevertheless, a district court may dismiss the complaint *sua sponte* if it determines that it lacks subject matter jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), or that the complaint is frivolous, *see Fitzgerald v. First E. Seventh Street Tenants Corp.*, 221 F.3d 362, 363–64 (2d Cir. 2000). "An action is 'frivolous' when either: (1) 'the "factual contentions are clearly baseless," such as when allegations are the product of delusion or fantasy;' or (2) 'the claim is "based on an indisputably meritless legal theory." ' " *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (quoting, *inter alia,* *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

## DISCUSSION

### A. Part I – Spousal Support

Federal courts are courts of limited jurisdiction and must independently verify the existence of subject matter jurisdiction before proceeding to the merits. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005);

*Doe v. United States*, 833 F.3d 192, 196 (2d Cir. 2016). The plaintiff bears the burden of establishing subject matter jurisdiction. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "[F]ailure of subject matter jurisdiction ... may be raised at any time ... by the court *sua sponte*[,]" and "[i]f subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000) (citations omitted); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); Fed. R. Civ. P. 12(h)(3).

In Part I of the amended complaint, Plaintiff seeks this Court's intervention in her ongoing attempts to bring her estranged husband to account for his alleged misconduct and abandonment. (Am. Compl. at 69–80.) Specifically, Plaintiff seeks to enforce a spousal support order dated April 1, 2021 issued by the Family Court Support Magistrate (*see* Ex. A at 88–89, ECF No. 12-1), that appears to have been later dismissed. (ECF No. 12-1 at 4 ("Defendant the Honorable Ben J. Darvil dismissed my family offense petitions."); ECF No. 12-1 at 138 ("Support Magistrate Harris' Order of dismissal which was issued on 6/27/22.").)

Plaintiff relies on Title IV of the Social Security Act, 42 U.S.C. § 660 (Am. Compl. at 61), to provide a basis for the Court's jurisdiction over Plaintiff's spousal support claim. This statute, also known as the Child Support Enforcement Act, provides that the "district courts of the United States shall have jurisdiction, without regard to any amount in controversy, to hear and determine any action certified by the Secretary of Health and Human Services under section 652(a) (8) of this title." *See* 42 U.S.C. § 660. In *Blessing v. Freestone*, the Supreme Court held that this section of the Social Security did not "give rise to individual rights." 520 U.S. 329, 343–44 (1997) ("Title IV-D [of the Social Security Act, 42 U.S.C. §§ 651-669(b)] contains no private remedy—either judicial or administrative—through which aggrieved persons can seek redress."). Nothing Plaintiff has alleged establishes that she has an enforceable right under this provision of the Social Security Act.

Moreover, the domestic relations abstention doctrine prevents the Court from intervening in Plaintiff's spousal support matter unless Plaintiff can show an obstacle to the full and fair determination of that dispute in state court. *See Am. Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) (federal district court should abstain from exercising its federal-question jurisdiction over claims in which it is "asked to grant a divorce or annulment, determine support payments, or award custody of a child[ ]" (internal quotation marks and citation omitted)); *see also Deem v. DiMella-Deem*, 941 F.3d 618, 622–24 (2d Cir. 2019). Plaintiff has not sufficiently alleged that an obstacle exists to the fair determination of this dispute in state court. Thus, Part I of Plaintiff's complaint is dismissed for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). [2]

### B. Part II – Other Claims

**\*4** Plaintiff's remaining federal claims are frivolous because " 'the "factual contentions are clearly baseless," ' " and " 'are the product of delusion or fantasy.' " *Livingston*, 141 F.3d at 437. "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Even a well-pleaded complaint may be dismissed as factually frivolous "if the sufficiently well-pleaded facts are clearly baseless—that is, they are fanciful, fantastic, or delusional." *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (internal quotation marks omitted). Plaintiff's complaint contains allegations of the delusional variety. The federal claims rely entirely on her contention that all 482 Defendants are part of a wide-ranging "Babylonian Talmudic, Ashkenazi Jewish ethnoreligious cartel" that allegedly condones "pedophilia and sexual violence," and is somehow responsible for Plaintiff's failure to obtain spousal support from her estranged husband. (*See generally* Am. Compl.) Among the 482 Defendants is anyone ever associated with Plaintiff's claim for spousal support, judges (federal and state), elected officials (federal and state), government officials (federal and state), agencies of the federal, state, and local governments, attorneys, federal and state prosecutors, newspapers, private companies, non-profit organizations, and the Attorney General for every state in the nation. Parsing the amended complaint reveals zero factual allegations that support this alleged conspiracy, which demonstrates the claims' delusional nature. [3] The amended complaint, therefore, must be dismissed.

### ORDER TO SHOW CAUSE

It is well-settled that "[t]he district courts have the power and the obligation to protect the public and the efficient

administration of justice from individuals who have a 'history of litigation entailing vexation, harassment and needless expense to other parties and an unnecessary burden on the courts and their supporting personnel.' " *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000) (citation omitted). "If a litigant has a history of filing 'vexatious, harassing or duplicative lawsuits,' courts may impose sanctions, including restrictions on future access to the judicial system." *Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) (citation omitted); ⚑ *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986) (outlining factors to be considered in imposing a filing injunction); *see also* ⚑ 28 U.S.C. § 1651(a).

Plaintiff has a history of filing vexatious and harassing lawsuits necessitating restrictions on access to the court. She has filed over 20 federal cases in the district courts of New York and Rhode Island, the United States Court of Federal Claims, and the United States Court of Appeals for the First and Second Circuits. The vast majority of these cases are related to Plaintiff's issues with her estranged husband. For example, Plaintiff has filed the following cases in the Eastern District of New York:

- *Uzamere v. John Doe, et al.*, No. 07-CV-2471 (NGG) (LB) (E.D.N.Y. July 6, 2007) (case dismissed for lack of subject matter jurisdiction regarding Plaintiff's divorce);

- *Uzamere v. Bush, et al.*, No. 08-CV-0891 (NGG) (LB) (E.D.N.Y. Apr. 8, 2008) (case dismissed and Plaintiff warned that the filing of frivolous and vexatious complaints may result in sanctions);

- *Uzamere v. State of New York, et al.*, No. 09-CV-2703 (NGG) (LB) (E.D.N.Y. July 9, 2009) (same), *appeal dismissed*, No. 09-3197-cv (2d Cir. Oct., 13, 2009);

- *Uzamere v. USPS*, No. 09-CV-3709 (NGG) (LB) (E.D.N.Y. Oct. 21, 2009) (same);

- *Uzamere v. Cuomo, et al.*, No. 11-CV-2831 (NGG) (LB) (E.D.N.Y. June 22, 2011) (case dismissed as frivolous and noting that "Plaintiff has a long, tired history of vexatious litigation in this court."), *appeal dismissed*, No. 11-2713-cv (2d. Cir. Nov. 28, 2011), *cert. denied*, 565 U.S. 1264 (Mar. 19, 2012).

**\*5** Plaintiff has filed in the Southern District of New York:

- *Uzamere v. Family Court*, No. 94-CV-4200 (TPG), slip op. (S.D.N.Y. June 8, 1994) (case dismissed);

- *Uzamere v. Allen E. Kaye, P.C., et al.*, 09-CV-3506 (LBS) (S.D.N.Y. Apr. 2, 2009) (case dismissed for lack of subject matter jurisdiction and immunity and warning Plaintiff that she may be barred from filing complaints related to her husband without first seeking leave of Court), *appeal dismissed*, No. 09-1600-cv (2d Cir. June 24, 2009), *cert. denied*, 558 U.S. 965 (Oct. 13, 2009);

- *Uzamere v. USPS, et al.*, No. 10-CV-7668 (LAP) (S.D.N.Y. Oct. 6, 2010) (case dismissed);

- *Uzamere v. State of New York, et al.*, No. 19-CV-9064 (CM) (S.D.N.Y. Oct. 22, 2019) (case dismissed and Plaintiff barred from filing future *in forma pauperis* actions in the SDNY without first obtaining permission from the Court), *appeal dismissed*, No. 19-3825 (2d Cir. Apr. 10, 2020).

Plaintiff has filed in the Federal Court of Claims:

- *Uzamere v. United States*, Nos. 10-585C, 10-591C, 2010 WL 3528897 (Fed. Cl. Sept. 3, 2010) (two cases consolidated and dismissed for lack of subject matter jurisdiction).

Plaintiff has filed in the District of Rhode Island:

- *Uzamere v. United States*, No. 13-505 (WES), 2013 WL 5781216 (D.R.I. Oct. 25, 2013) (case dismissed and Plaintiff warned against filing further frivolous actions), *aff'd*, No. 13-2454 (1st Cir. Apr. 11, 2014), *cert. denied*, 574 U.S. 981 (Nov. 3, 2014).

In light of the nature of Plaintiff's instant action, her incessant submission of vexatious and repetitive lawsuits, and Plaintiff's persistence despite numerous warnings and a prior filing injunction issued by the Southern District of New York, she is hereby directed to show cause why she should not be barred from filing any new action (regardless of whether

Plaintiff pays the filing fee or seeks *in forma pauperis* status)
in this Court without first obtaining permission. Plaintiff shall
file an affirmation within 30 days from the date of this order
setting forth good cause why the Court should not impose a
filing injunction. If Plaintiff fails to file an affirmation within
the time allowed or if her affirmation fails to provide good
cause for why the filing injunction should not issue, an order
barring Plaintiff from filing any new action in this Court,
without first obtaining the Court's permission, shall enter.

## CONCLUSION

For the reasons set forth above, the spousal support claim
is DISMISSED for lack of subject matter jurisdiction, and
the remaining federal claims are DISMISSED as frivolous.
Having dismissed all the federal claims, the Court declines
to exercise supplemental jurisdiction over Plaintiff's state
law claims. 🚩 28 U.S.C. § 1367(c)(3). Plaintiff's motion
for recusal is DENIED and all other pending motions are
DENIED as moot. Unless otherwise directed by the Court,
Plaintiff is prohibited from directly contacting any judicial
chambers by telephone, electronic mail, fax or other means.

The Court further directs Plaintiff to SHOW CAUSE why
she should not be barred from filing any new civil action
without first obtaining the Court's permission within 30 days
as set forth above. The Court directs Plaintiff to utilize the
Affirmation form included with this Memorandum and Order
and to refrain from submitting inappropriate or voluminous
documents. All further proceedings shall be stayed for 30 days
or until Plaintiff files the Affirmation, whichever is earlier.

  **\*6**  Although Plaintiff paid the filing fee to commence this
action, the Court certifies pursuant to 🚩 28 U.S.C. § 1915(a)
(3) that any appeal from this Order would not be taken in good
faith and therefore *in forma pauperis* status is denied for the
purpose of an appeal. 🚩 *Coppedge v. United States*, 369 U.S.
438, 444–45 (1962).

Attachment

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

CHERYL D. UZAMERE,

                        Plaintiff,          **PLAINTIFF'S AFFIRMATION**
       -against-                            22-CV-4876 (LDH) (LB)

EHIGIE EDOBOR UZAMERE, *et al.*,

                        Defendants.
_____X

    CHERYL D. UZAMERE, appearing *pro se*, make the following affirmation under the
penalties of perjury:  I am the Plaintiff in this action and I respectfully submit this affirmation in
response to the Court's Order to Show Cause dated _____.

    I should not be barred from filing any new action without first obtaining the district
court's permission because _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

                [YOU MAY ATTACH ADDITIONAL PAGES]
        In view of the foregoing, it is respectfully submitted that the Court should not enter a filing
injunction.

DATED: _____

                                  _____
                                  Signature

                                  _____
                                  Address

                                  _____
                                  City, State & Zip Code

## All Citations

Slip Copy, 2022 WL 4451107

# Footnotes

1   Plaintiff's own papers reveal that Ehigie Edobor Uzamere has disputed that he is Plaintiff's spouse. (Ex. 1 at 132, ECF No. 12-1.)

2   Plaintiff also alleges diversity jurisdiction (Am. Compl. at 61), but complete diversity of citizenship is lacking. *See* ⚑ 28 U.S.C. § 1332; *see* ⚑ *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 118 (2d Cir. 2014) (diversity requires that "all plaintiffs ... be citizens of states diverse from those of all defendants."). Even if diversity of citizenship existed, the domestic relations exception doctrine would deprive the Court of subject matter jurisdiction over this claim. ⚑ *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992) (domestic relations exception to subject matter jurisdiction "divests the federal courts of power to issue divorce, alimony, and child custody decrees").

3   The Court notes that Plaintiff has filed a number of exhibits that do not support any plausible claims. For example, in addition to her anti-Semitic submissions, she includes explicit photographs of genitalia and other photographs which are disturbing and have nothing to do with her underlying claim for spousal support. (*See, e.g.*, Am. Compl., ECF No. 12-4.) The Court takes further notice that Plaintiff has inundated the Court with voluminous submissions which has burdened the Court's resources and that she has, at times, engaged in harassing, and sometimes antisemitic telephone calls to the Clerk's Office and to chambers. Plaintiff has also attempted to contact judicial staff outside of the Courthouse.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

## Attorneys and Law Firms

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

## DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 6:22-cv-00982-GTS-ML    Document 13    Filed 09/08/23    Page 78 of 97

additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right.

*See* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

 **\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* Camardo v. General Motors Hourly–Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); Schoolfield v. Dep't of Correction, 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); Vargas v. Keane, 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* Scipio v. Keane, 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P.

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:22-cv-00982-GTS-ML    Document 13    Filed 09/08/23    Page 79 of 97

72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

 **\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.


CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.


**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.


BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

 **\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams,

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:22-cv-00982-GTS-ML    Document 13    Filed 09/08/23    Page 80 of 97

the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:22-cv-00982-GTS-ML   Document 13   Filed 09/08/23   Page 82 of 97

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3848871
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kent A. ALLEN, Plaintiff,

v.

Valdimer TENEV (Robinhood); Baiju Bhatt
(Robinhood); Radric Davis (Gucci Mane), Defendants.

1:21-CV-4119 (LTS)
|
Signed 08/26/2021

**Attorneys and Law Firms**

Kent A. Allen, Kissimmee, FL, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District
Judge:

**\*1** Plaintiff, who is appearing *pro se*, asserts claims for
the alleged appropriation of his idea for Robinhood, an
internet website that provides stock-trading services. He also
alleges appropriation of his ideas for the domain names for
other internet websites, including Google, Visio, Instagram,
Postmates, "Kangeroo," and Amazon. He sues: (1) Vladimir
Tenev, a co-founder and co-Chief Executive Officer of
Robinhood; (2) Baiju Bhatt, another co-founder and co-Chief
Executive Officer of Robinhood; and (3) Radric Davis, a
recording artist who is also known as "Gucci Mane." Plaintiff
invokes the diversity of citizenship statute, 28 U.S.C. §
1332, as the basis for this Court's jurisdiction. By order dated
August 19, 2021, the Court granted Plaintiff's request to
proceed without prepayment of fees, that is, *in forma pauperis*
("IFP"). For the reasons set forth below, the Court dismisses
this action.

**BACKGROUND**

Plaintiff alleges the following: When Plaintiff was 10 years
old and living in rural Georgia, he played with his friend,
Defendant Radric Davis, who would become the recording
artist also known as "Gucci Mane." During that time, one
of Plaintiff's favorite "cartoon shows to watch was Robin

Hood." (ECF 2, at 6.) One day, while he was playing with
Davis, Plaintiff "thought about how Robin Hood the cartoon
show should also be used for stock trading. At first, [Davis]
was puzzled at the idea. [Plaintiff] explained to him that the
name ma[de] [Plaintiff] think of stock trading." (*Id.*)

Plaintiff's "myth was that the theme of the [Robin Hood]
show means that a person steal[s] from the rich and give[s]
to the poor. In stock trading, you see this as poor traders
look to become enriched. Additionally, stock trading is a
zero sum game." (*Id.*) Plaintiff assured Davis, who was still
puzzled, that his idea would work and asked Davis to trust
him. Plaintiff told Davis that "once [they] introduce this to the
cartoon creators of Robin Hood they will love it." (*Id.*) Davis
agreed. "Years later, [Davis] became a famed entertainment
artist and put out the idea [to] the public...." (*Id.*) As a child,
Plaintiff also developed the ideas for internet domain names
including Google, Visio, Instagram, Postmates, "Kangeroo,"
and Amazon.

Plaintiff "look[s] to be compensated and ... given credit for
[his] ideas." (*Id.* at 12.) He is "[a]lso just looking to have [his]
personal life back...." (*Id.*) "Due to the welfare of Robinhood
employees," Plaintiff feels that "the remedy of $57 million
would be fair." (*Id.* at 13.)

**DISCUSSION**

The Court must dismiss an IFP complaint, or any portion
of the complaint, that is frivolous or malicious, fails to state
a claim on which relief may be granted, or seeks monetary
relief from a defendant who is immune from such relief. 28
U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack
Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). A claim is
"frivolous when either: (1) the factual contentions are clearly
baseless, such as when allegations are the product of delusion
or fantasy; or (2) the claim is based on an indisputably
meritless legal theory." *Id.* (internal quotation marks and
citation omitted). Moreover, a court has "no obligation to
entertain pure speculation and conjecture." *Gallop v. Cheney*,
642 F.3d 364, 368 (2d Cir. 2011) (finding as frivolous and
baseless allegations that set forth a fantastical alternative
history of the September 11, 2001 terrorist attacks).

**\*2** Plaintiff should be familiar with these standards, which
the Court has applied in dismissing multiple other actions that
he has filed. Based on Plaintiff's history of filing vexatious

litigation, by order dated June 28, 2021, the Court barred Plaintiff from filing future civil actions in this court IFP without first obtaining leave to file. *Allen v. Almanzar*, ECF 1:21-CV-3838, 5 (S.D.N.Y. June 28, 2021).

Because Plaintiff filed this action before the Court issued the filing restriction, this action is not subject to it. But this action is not a departure from Plaintiff's pattern of vexatious litigation.

The Court finds that Plaintiff's factual allegations – that as a young child, Plaintiff developed Robinhood and numerous internet domain names, including Google, Visio, Instagram, Postmates, "Kangeroo," and Amazon, and that Defendant Radric Davis revealed Plaintiff's idea for Robinhood to the public – present no basis for a legally viable claim and are factually baseless. [1]

As the Supreme Court of the United States has held, where, as here, "the facts alleged are 'clearly baseless,' a category encompassing allegations that are 'fanciful,' 'fantastic,' and 'delusional,' " a court may dismiss a claim as "factually frivolous." *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992) (internal citations omitted). "As those words suggest, a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible...." *Id.* at 33. Even if Plaintiff's assertions could be construed as claims of cybersquatting, [2] Plaintiff clearly does not have protectible interests in the ideas for the internet websites and domain names listed in the present complaint.

*See* *Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989) ("Examples of [claims based on an indisputably meritless legal theory include] ... claims of infringement of a legal interest which clearly does not exist.... Examples of [claims whose factual contentions are clearly baseless] are claims describing fantastic or delusional scenarios, claims with which federal district judges are all too familiar."). For these

reasons, the Court dismisses this action as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

**\*3** In deference to Plaintiff's *pro se* status, the Court would normally permit Plaintiff to amend his complaint. But the Court finds that the complaint cannot be cured with an amendment. Where an amendment would be futile, leave to amend is not required. *Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (court may dismiss a complaint *sua sponte* and without providing leave to amend "where the substance of the claim pleaded is frivolous on its face"). The Court therefore declines to grant Plaintiff leave to amend.

The Court reminds Plaintiff that the filing restriction remains in effect with respect to any future civil actions he files in this court IFP.

## CONCLUSION

The Court dismisses this action as frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

Plaintiff has consented to receive electronic service of notices and documents in this action. (ECF 3.)

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See* *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 3848871

## Footnotes

[1]    In other actions Plaintiff filed in this court, Plaintiff alleged that he developed well-known internet websites and domain names, including most of those mentioned in the present complaint. *Allen v. Patton*, 1:21-CV-3468, 6 (S.D.N.Y. Aug. 11, 2021) (dismissing for failure to state a claim and as frivolous Plaintiff's claims of appropriation of his ideas for Google and Instagram, and his development of the domain names for

Google, Visio, Postmates, Kangaroo, and Amazon); *Allen v. Patton*, ECF 1:21-CV-3457, 7 (S.D.N.Y. June 3, 2021) (same, not including Visio); *Allen v. Patton*, 1:21-CV-3459, 7 (S.D.N.Y. June 3, 2021) (same, not including Visio); *Allen v. Patton*, 1:21-CV-4123, 5 (S.D.N.Y. June 1, 2021) (same, not including Visio); *Allen v. Cole*, 1:21-CV-3450, 6 (S.D.N.Y. May 7, 2021) (dismissing for failure to state a claim Plaintiff's claims of appropriation of his ideas for Google and Instagram); *Allen v. Patton*, 1:21-CV-3434, 6 (S.D.N.Y. Apr. 30, 2021) (same).

2    "[C]ybersquatting is the Internet version of a land grab. Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 431 (S.D.N.Y. Apr. 23, 2013) (internal quotation marks and citation omitted). "A claim of cybersquatting is governed by 🚩 15 U.S.C. § 1125(d)(1)(A), which imposes liability on any person who registers, traffics in, or uses a domain name that ... is identical or confusingly similar to a trademark." *Salvatore Ferragamo S.p.A. v. Does 1-56*, No. 18-CV-12069, 2020 WL 774237, at *3 (S.D.N.Y. Feb. 18, 2020) (internal quotation marks omitted).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 137775
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gwendolyn SHERMAN, Plaintiff,

v.

YONKERS PUBLIC SCHOOLS, Yonkers Public
Schools Board of Education, Edwin M. Quezada,
Superintendent, Cesar E. Chaves Elementary School, f/
k/a Cedar Place School, Magdaline M. Delany, Principal,
John Doe, #1-50, and Mary Roe, #1-50, Defendants.

No. 21-CV-7317 (CS)
|
Signed January 9, 2023

**Attorneys and Law Firms**

Adrian J. Johnson, Johnson & Associates, PC, Iselin, New
Jersey, Counsel for Plaintiff.

Joanna M. Topping, Abrams Fensterman, LLP, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, United States District Judge

 **\*1** Before the Court is the motion to dismiss of Defendants
Yonkers Public Schools and Yonkers Public Schools Board
of Education (together, "YPS"), Dr. Edwin M. Quezada, and
Magdaline M. Delany (collectively, "Defendants"). (ECF No.
25.)[1] For the following reasons, the motion is GRANTED.

## I. BACKGROUND

I accept as true the facts, but not the conclusions, set forth in
Plaintiff's AC.

### A. Factual Background

Plaintiff Gwendolyn Sherman is Black woman employed by
YPS as a special education teacher at the Cesar E. Chavez
School ("Chavez"). (AC ¶¶ 14-15.) Defendant Magdaline M.
Delany is the principal at Chavez. (Id. ¶¶ 16-17.) Plaintiff
alleges that Defendants created a hostile work environment;
discriminated against her on the basis of her race, (AC ¶¶ 36,
78, 79), color, (id. ¶ 79), religion, (id.), gender, (id. ¶ 78), and

veteran status, (id.); and retaliated against her for speaking out
about student placement, (id. ¶ 46), student misconduct, (id.
¶32), and child abuse (id. ¶¶ 64-67).

Plaintiff alleges that from 2009 to 2019, Defendants
"collectively and individually" publicly belittled and
humiliated her and reprimanded her without basis. (Id. ¶¶
18-20.) She alleges she faced "verbal, mental and emotional
abuse" daily during this period. (Id. ¶ 71.) She does not
provide examples or any specifics regarding these alleged
belittlings, reprimands or abuses.

Plaintiff states that Defendants have reassigned Plaintiff's
classroom aides to allegedly "increase the difficulty"
for Plaintiff. (Id. ¶ 87.) As early as 2012, Defendant
Delany allegedly started punishing Plaintiff for protesting
the reassignment by transferring back to Plaintiff's class
"difficult" students who had earlier been transferred to
non-white co-workers by the Special Education Placement
Department. (Id. ¶¶ 24, 46.) These transfers from non-white
teachers are also alleged to constitute "favoritism towards
Caucasian teachers." (Id. ¶ 83.)

She alleges that starting in 2013, Defendant Delany
purposefully tampered with her evaluations, "in an attempt to
cause fear," (id. ¶ 21), and "force her to resign or retire," (id.
¶¶ 31, 55). She provides no facts regarding what was changed
in her evaluations or what effect this alleged conduct had.
She alleges that Defendants defamed her by portraying her
negatively to others outside of the school, preventing her
from transferring, being promoted, or being hired in other
districts. (Id. ¶¶ 97-99.) No specifics are provided regarding
any allegedly false statements made by Defendants, to whom
they were made, when they were made, how they were
communicated, or what connection they had to positions
for which Plaintiff applied. Plaintiff further alleges that
from 2014 through 2019, Delany allegedly "blackballed"
Plaintiff from applying for or obtaining higher-level positions
for which Plaintiff believes she was qualified, (id. ¶ 73),
and Plaintiff had to train staff members newly appointed
to those positions, (id. ¶ 74). No information is provided
about these positions, what Delany said or did, how Delany
communicated with the decision makers, or how Plaintiff's
qualifications compared to those of other applicants.

 **\*2** Pursuant to New York state law, Plaintiff was required
to report suspected child abuse. (Id. ¶¶ 61-63); see N.Y.
Soc. Serv. Law § 413(1)(a) (teachers, among others, "are
required to report ... when they have reasonable cause to

suspect that a child coming before them in their professional or official capacity is an abused or maltreated child."). During the 2016-2017 school year, Plaintiff reported to her building principal (presumably Delany) that she believed another teacher at the school was abusing a student, and was told that she should not report it, as the school would conduct an internal investigation. (AC ¶¶ 64-66.) She alleges that she was then "targeted" for opposing orders to not report such incidents, (*id.* ¶ 33; *see id.* ¶ 32), in that "harassing activities," (*id.* ¶ 67), directed against her intensified, (*id.* ¶¶ 67, 71). She does not describe what she said or did to protest the alleged orders. The only specific she provides about the retaliation is that "Defendants, collectively and individually, kept [her] from leaving her classroom at any time for any reason," (*id.* ¶ 68), but she also alleges that "Defendant Delany instructed [her] not to leave her classroom outside of her lunch or planning period," (*id.* ¶ 69). Plaintiff believes that the retaliatory harassment was intended to hamper her ability to teach and advocate on behalf of her special education and African-American students. (*Id.* ¶ 34.) Plaintiff also believes that because she expressed concerns about "the sexual misconduct of emotionally disturbed students, both disabled and non-disabled," Defendants retaliated against her by writing negative and false evaluations, verbally abusing and threatening her, humiliating her in front of her peers, and more. (*Id.* ¶ 32.) She does not say when or how she expressed these concerns, nor are there any facts regarding the evaluations or the other abuse.

Plaintiff also alleges she was assaulted by Defendant Delany. In November 2017, after meeting with Plaintiff in her office, Delany allegedly "had an angry attitude and rushed [Plaintiff] out of the door." (*Id.* ¶¶ 89-90.) Plaintiff turned around to ask Delany a question but she "slammed her door in [Plaintiff]'s face." (*Id.* ¶ 91.) Although the door did not touch her, Plaintiff believed she was in "imminent danger of being hit by the door." (*Id.* ¶ 92.)

Beginning in 2018 and through 2019, according to Plaintiff, Delany "embarrassed, humiliated and belittled Plaintiff in the presence of other staff members." (*Id.* ¶ 45.) At unstated times, "Defendants, collectively and individually," would allegedly reprimand Plaintiff "openly and publicly throughout the building," (*id.* ¶ 26), and publicly humiliate her during staff meetings, (*id.* ¶ 29), but again no facts about the alleged conduct are provided. Plaintiff alleges that she is "treated ... differently" in the presence of non-white team members, (*id.* ¶ 23), but does not say from whom she is treated differently, how she is treated, or how that treatment is different if white

staff members are present. Defendants allegedly stated that they had received complaints about Plaintiff from other staff members, but would not identify who lodged these complaints and did not put any complaints in her employee file. (*Id.* ¶¶ 26-27.)

Plaintiff is allegedly the only special education teacher who is denied access to information related to students' assessments and performance. (*Id.* ¶¶ 28, 52; *see id.* ¶ 85.) Plaintiff was "forced ... to come out of her classroom to address behavioral needs of students in other classrooms," which was not required of other teachers. (*Id.* ¶ 84.)

Allegedly at the instruction of Defendant Delany, (*id.* ¶ 54), support staff, "collectively and individually," would not schedule meetings for Plaintiff with the District superintendent or other administrators, (*id.* ¶ 30). Further, she claims she was denied funding for class trips, even though her white counterparts regularly received funding approval. (*Id.* ¶¶ 80-81.) She also believes she was intentionally excluded from administrative emails that were sent to other staff members. (*Id.* ¶ 82.)

Plaintiff alleges that as a result of Defendants' actions, she has suffered from many panic attacks, (*id.* ¶ 56), and in September 2019 applied to retire "to escape this nightmare," (*id.* ¶ 57), but due to the alleged stress her co-workers were facing, she withdrew her application and returned to work in November 2019, (*id.* ¶ 58). She also claims that she would have earned more had she gotten one of the positions she believes she was denied as a result of Defendants' "slanderous statements." (*Id.* ¶ 99; *see id.* ¶ 100.) These false statements have also resulted in her taking a medical leave of absence. (*Id.* ¶ 101.)

## B. Procedural History

Plaintiff filed her IC in this Court on August 31, 2021, bringing federal and state employment discrimination claims against Defendants YPS, Quezada, Cesar E. Chaves Elementary School, Delany, John Does #1-50, and Mary Roes #1-50. (ECF No. 1.) The case was initially assigned to Judge Paul A. Crotty. No summons was issued, yet Plaintiff purported to have served Defendants. (*See* ECF Nos. 6, 8.) On December 7, 2021, Defendants requested an extension of time to respond to the IC, which Judge Crotty granted. (ECF Nos. 4-5.) Defendants then requested a conference in advance of their anticipated motion to dismiss. (ECF No. 6.) On January 26, 2022, the matter was reassigned to the undersigned in White Plains. The Court then set a date for a pre-motion conference and ordered Plaintiff to respond to Defendants'

earlier letter. (ECF No. 7.) Plaintiff responded, (ECF No. 8), and on February 23, 2022, the Court held a pre-motion conference, granted Plaintiff leave to amend her complaint, and set a briefing schedule for this motion, (Minute Entry dated Feb. 23, 2022). [2] Plaintiff filed her AC on April 8, 2022, summonses were issued, and the instant motion followed. (AC; ECF Nos. 13-22; ECF Nos. 25-28.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

**\*3** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). [3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). [4]

## III. DISCUSSION

Plaintiff brings seven claims: (1) race-based discrimination and retaliation under 42 U.S.C. § 1981, (AC at 8-9); (2) conspiracy under 42 U.S.C. § 1985(3), (*id.* at 9-10); (3) hostile work environment, untethered to any provision of law, (*id.* at 10-13); (4) retaliation, untethered to any provision of federal law, (*id.* at 13-15); (5) discrimination under Title VI of the Civil Rights Act of 1964, (*id.* at 15-17); [5] (6) assault, (*id.* at 17-18); and (7) defamation, (*id.* at 18-19). All of these claims are dismissed.

### A. Federal Claims

#### 1. Statute of Limitations

**\*4** Defendants argue that the statute of limitations limits Plaintiff's discrimination and retaliation claims under § 1981 and Title VI. (Ds' Mem. at 14.)

"[E]mployment discrimination claims arising under ... § 1981 are subject to the four-year federal 'catch-all' statute of limitations...." *Bedden-Hurley v. N.Y.C. Bd. of Educ.*, 385 F. Supp. 2d 274, 278 (S.D.N.Y. 2005); *see James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 317-18 (E.D.N.Y. 2012). A three-year statute of limitations governs Title VI claims. *Singh v. Wells*, 445 F. App'x 373, 376 (2d Cir. 2011) (summary order). Recovery for discrete acts of discrimination that occur outside the applicable limitations period are barred, but a hostile work environment claim is timely, even if some of the conduct at issue occurred before the limitations period, so long as an act contributing to that environment occurred within that period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

Plaintiff filed her IC in this Court on August 31, 2021. Accordingly, any discrete acts of discrimination or retaliation under § 1981 that are alleged to have occurred prior to August 31, 2017, and any such acts under Title VI that are alleged to have occurred prior to August 31, 2018, are time barred.

#### 2. Claims as to YPS

Defendants argue that Plaintiff's § 1981 and Title VI claims against YPS fail because Plaintiff does not allege that

any civil rights violations occurred because of a municipal policy or custom. (Ds' Mem. at 3-4.) Plaintiff did not address this argument in her opposition, and thus has abandoned those claims as to YPS. *Horsting v. St. John's Riverside Hosp.*, No. 17-CV-3230, 2018 WL 1918617, at *6 (S.D.N.Y. Apr. 18, 2018) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."); *Johnson v. City of N.Y.*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017) ("By failing to address Defendants' arguments in support of dismissing this claim, it is deemed withdrawn or dismissed as abandoned.");

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (claims abandoned where Plaintiff "did not raise any arguments opposing Defendants' motion") (collecting cases); *Bonilla v. Smithfield Assocs. LLC*, No. 09-CV-1549, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009) (claims deemed abandoned and dismissed as a matter of law where defendants raised three arguments for dismissal of those claims and plaintiff responded to only one).

But while Defendants are correct that when a municipality (or an individual in his official capacity, *see* *Hafer v. Melo*, 502 U.S. 21, 25 (1991)), is sued for discrimination under § 1981, the plaintiff must show that the challenged acts were performed pursuant to a municipal custom or policy, *see, e.g.*, *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989), it has not provided authority for the proposition that the same is true under Title VI. Thus, despite Plaintiff's failure to oppose, I will dismiss only the § 1981 claims against Defendant YPS for failure to allege a policy or custom. As will be seen, the Title VI claim fails for different reasons.

### 3. **Personal Involvement**

**\*5** Defendants argue that Plaintiff has failed to plead facts showing the personal involvement of Defendant Quezada. (Ds' Mem. at 5-6.) As for claims under 42 U.S.C. § 1983, a showing of personal involvement by the defendant is required for liability under § 1981. *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *Baker v. Connecticut*, No. 03-CV-1994, 2006 WL 581205, at *10 (D. Conn. Mar. 8, 2006); *see* *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("[P]ersonal

liability under section 1981 must be predicated on the actor's personal involvement."). While *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), laid out a special test for supervisory liability, outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit has clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "Simply put, there's no special rule of liability for supervisors." *Id.* While " '[t]he factors necessary to establish a [§ 1981] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676), "[t]he violation must be established against the supervisory official directly," *id.*

Plaintiff has not pleaded enough facts to render it plausible that Defendant Quezada – the Superintendent of YPS, (AC ¶ 8) – was personally involved in the alleged violations. While Plaintiff alleges that "Defendants, collectively and individually" retaliated against Plaintiff, created a hostile work environment, belittled and humiliated her, and reprimanded her for no reason, (*id.* ¶¶ 18-20, 35-38), these allegations are insufficient because they "lump[ ] all the defendants together in each claim and provide[ ] no factual basis to distinguish their conduct." *Tracey v. City of Geneva*, No. 17-CV-6567, 2018 WL 1509355, at *3 (W.D.N.Y. Mar. 26, 2018); *see Ruiz v. Westchester County*, No. 18-CV-7007, 2020 WL 4340788, at *4 (S.D.N.Y. July 28, 2020) (collecting cases); *see also Gonzalez v. Yepes*, No. 19-CV-267, 2019 WL 2603533, at *7 (D. Conn. June 25, 2019) ("As a corollary of the personal involvement requirement, complaints that rely on 'group pleading' and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.") (collecting cases); *5465 Route 212, LLC v. N.Y. State Dep't of Transp.*, No. 19-CV-1510, 2020 WL 6888052, at *9 (N.D.N.Y. Nov. 24, 2020) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations"). Plaintiff provides no specifics as to anything Quezada did or did not do, or how he was involved in the alleged mistreatment of Plaintiff.

It is apparent that Quezada is being sued merely based on his supervisory position, which even before *Tangreti* would not have sufficed to show personal involvement. *See, e.g.,* Banks v. Annucci, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2004) ("Where a defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (*i.e.,* under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct."). Further, Plaintiff in her opposition does not address how Quezada may have been personally involved, so her § 1981 claims against him have been abandoned.

The § 1981 claims against Quezada are dismissed.

### 4. Discrimination Claims

a. Section 1981 Claim

As established above, Plaintiff's § 1981 claim remains only as to Defendant Delany. To state a claim under that statute, a plaintiff "must allege facts supporting the following elements: (1) plaintiff [is a] member[ ] of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000).

**\*6** In her AC, Plaintiff summarily states, "Defendants' conduct ..., motivated in substantial respect by race-based animus, violated Plaintiff's rights as guaranteed [under] 42 U.S.C. § 1981." (AC ¶ 36.) But despite this allegation, the vast majority of the facts she provides are wholly unconnected to race. Plaintiff states that she was singled out – for example, she alleges she is the only special education teacher who was denied information on students' assessments and performance, (*id.* ¶¶ 28, 86); she was excluded from administrative emails that had been sent to other staff members, (*id.* ¶ 83); and, unlike other teachers, she had to leave her classroom to address other students' behavioral issues, (*id.* ¶ 84) – but nowhere does she provide facts suggesting that she was subjected to such treatment because of her race, as opposed to, say, Delany not liking her. She does not describe any racially discriminatory remarks by Delany or any mistreatment of other Black teachers. Indeed,

that Plaintiff attributes her mistreatment variously to her race, color, gender, veteran status, and religion, (*id.* ¶¶ 78-79), illustrates that Plaintiff lacks facts supporting the notion that her treatment was attributable to any particular protected characteristic.

The only allegations Plaintiff connects to race are that Defendants never approved her requests to fund class trips, even though her white colleagues regularly received approval, (*id.* ¶ 81), and that Delany reassigning difficult students back to Plaintiff was favoritism toward Caucasian teachers, (*id.* ¶ 83). Elsewhere Plaintiff alleges that the difficult students came back to her from non-white teachers, (*id.* ¶ 24), so it is hard to see how that conduct could reflect favoritism toward white teachers. And Plaintiff provides no facts about her trip requests or those of other teachers that would show the requests to be sufficiently similar to give rise to an inference of discrimination. *See Wegmann v. Young Adult Inst., Inc., Trustees of Supplemental Pension Plan for Certain Mgmt. Emps. of Young Adult Inst.,* No. 20-1147, 2021 WL 3573753, at \*4 (2d Cir. Aug. 13, 2021) (where plaintiff seeks to make out *prima facie* case by reference to disparate treatment of other employees, situation of those employees must be sufficiently similar to support minimal inference that difference in treatment may be attributable to discrimination).

But even if she had, and even assuming that she meant to say that the difficult students came back to her from white teachers, Plaintiff's claim fails as to the third element of her *prima facie* case, because the treatment she describes does not amount to an adverse employment action. For purposes of a discrimination claim, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment," Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008), "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities," Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).

As a general matter, "assignments that are part of an employee's normal responsibilities are not adverse employment actions where, as here, the rate of pay and

benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013) (collecting cases); *see* Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radically change the nature of work are not typically adverse employment actions.") But "[a] change in duties or job reassignment may be an adverse employment action, if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013). "A plaintiff can make such a showing by demonstrating that the new assignment was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Id.* But unfair work assignments or undesirable duties, absent negative ramifications for employment status, do not rise to the required level. *Grant v. N.Y. State Off. for People with Developmental Disabilities*, No. 12-CV-4729, 2013 WL 3973168, at *7 (E.D.N.Y. July 30, 2013). Nor does being berated or embarrassed by a supervisor. *Voss v. McDonough*, No. 17-CV-9015, 2021 WL 4199941, at *10, *17 (S.D.N.Y. Sept. 15, 2021); *see Stewart v. City of N.Y.*, No. 18-CV-7140, 2022 WL 4485048, at *5 (E.D.N.Y. Sept. 27, 2022) (reprimands, admonishments, and other actions causing embarrassment and anxiety are not adverse actions where they result in no tangible employment consequences).

 **\*7** Disapproval of trip requests and assignment of "difficult" students do not involve a guaranteed employment benefit or a term or condition of employment, such that the denial amounted to a material adverse action. *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (unfair criticism, unfavorable schedules, or undesirable work assignments do not rise to level of adverse employment actions because they do not have material impact on terms and conditions of employment). Nor does Plaintiff allege that teaching "difficult" students was outside her job responsibilities, *see Rodriguez*, 2013 WL 5230037, at *3 ("[I]t is well established that assignments that are part of an employee's normal responsibilities are not "adverse employment actions" where, as here, the rate of pay and benefits remains the same."), or "so significant as to constitute a setback to the plaintiff's career," *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000). At most, what Plaintiff describes can be characterized as "mere inconvenience," which is not enough to constitute an adverse employment action. *Brown*, 673 F.3d at 150. [6]

Therefore, Plaintiff's § 1981 discrimination claim is dismissed.

### b. Title VI Claim

Section 601 of Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. For the same reasons described above, Plaintiff has not made out a plausible discrimination claim. She has provided only conclusions, not facts, to support the notion that her race resulted in any discrimination. But her Title VI claim must also be dismissed for independent reasons.

To begin, Title VI does not provide for individual liability, *see* Bayon v. State Univ. of N.Y. at Buffalo*, No. 98-CV-578, 2001 WL 135817, at *2 (W.D.N.Y. Feb. 15, 2001), so any Title VI claim against Defendants Quezada and Delany in their individual capacities would have to be dismissed. Further, "covered entities can only be sued for employment discrimination [under Title VI] 'where a primary objective of the Federal financial assistance ... is to provide employment.' " *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 (10th Cir. 1995) (quoting 42 U.S.C. § 2000d-3). Thus, "for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment." *Ass'n Against Discrimination in Emp., Inc. ("AADE") v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981); *see Sulehria v. New York*, No. 13-CV-6990, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) ("To state a claim under Title VI, a plaintiff must plausibly allege ... that the federal funds have been made available primarily for providing employment."). "This section essentially requires a logical nexus between the use of federal funds and the practice toward which the action is directed." *Johnson v. County of Nassau*, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006).

Plaintiff has not alleged, even in conclusory fashion (which in any event would not suffice), that the federal funds received by YPS were primarily intended to provide employment. *See*

*Gilmore v. Univ. of Rochester*, 410 F. Supp. 2d 127, 132 (W.D.N.Y. 2006) (Title VI claim dismissed where complaint alleged only that defendant received federal funds, not that the funds were primarily intended to provide employment. The AC alleges that "[a]ll Defendants in this matter, in some form or another, receive financial benefits that can be traced back to Federal spending," (AC ¶ 76), but that is not enough to show that any federal funds were primarily intended to provide employment. *Verdi v. City of N.Y.*, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018) (Title VI claim dismissed because the "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints"). Plaintiff thus has not plausibly alleged any "logical nexus between the use of federal funds and the practice toward which agency action is directed." *AADE*, 647 F.2d at 276; *see Dobroff v. Hempstead Union Free Sch. Dist.*, No. 21-CV-1567, 2022 WL 4641128, at *5 (E.D.N.Y. Sept. 30, 2022). [7]

**\*8**  Plaintiff's Title VI claim is therefore dismissed.

### 5. Conspiracy Claim Under

### Section 42 U.S.C. § 1985(3)

To state a claim under § 1985(3), a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015); *see* 42 U.S.C. § 1985(c). "[T]o maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Here, Plaintiff has provided no more than a conclusory allegation of conspiracy, stating, "Under the premises Defendants' conduct violated Plaintiff's rights .... [W]e have such conspiracies by Defendants to violate Plaintiff's constitutional rights." (AC ¶¶ 40, 42.) On this basis alone, Plaintiff's conspiracy must be dismissed for

failure to state a claim. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper). That Plaintiff's conclusory allegations are aimed at Defendants "collectively" does not, as Plaintiff argues in her opposition, render it plausible that Defendants acted as a collective and "with one objective in mind." (*See* P's Opp. at 8.)

Defendants also argue that Plaintiff's conspiracy claim fails because she does not show that racial animus motivated Defendants' claimed conspiracy. (Ds' Mem. at 10-11.) To plead a § 1985(3) claim, "[t]he conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.' " *Dolan*, 794 F.3d at 296 (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)). The AC does not explicitly allege any race-based motivation for her conspiracy claim, and – as discussed above – barely mentions facts related to race. Even in her opposition, Plaintiff simply states that she has adequately shown that Defendants acted in concert toward her, (P's Opp. at 8), with no effort to describe any such actions or connect them to race.

Moreover, even if a sufficient connection to race were pleaded, the AC (as discussed) provides facts only against Delany, and she cannot conspire with herself. *See Jianjun Li v. Vill. of Saddle Rock*, No. 22-CV-2289, 2021 WL 1193618, at *10 (E.D.N.Y. Mar. 30, 2021); *Heinfling v. Colapinto*, 946 F. Supp. 260, 266-67 (S.D.N.Y. 1996). Finally, even if Plaintiff had pleaded facts as to Quezada, her claim would be barred by the intracorporate conspiracy doctrine. Under this doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999) (applying doctrine in § 1985(3) context). [8]

**\*9**  For all these reasons, the § 1985(3) conspiracy claim is dismissed.

### 6. Retaliation

Plaintiff brings a "workplace retaliation" claim, alleging Defendants retaliated against her after she reported a

potential instance of child abuse in 2016-2017. (AC ¶¶ 64-66.) She claims that after she reported the incident, Defendants harassed her by keeping her from leaving her classroom; verbally, mentally, and emotionally abused her; and obstructed her ability to apply for and get a higher-level administrative position. (*Id.* ¶¶ 67-74.)

As an initial matter, Plaintiff's retaliation claim is pleaded without specifying the statute under which it is brought. Defendants analyze it as a claim under § 1983 for retaliation for opposition to a discriminatory employment practice, and note that such a claim is analyzed under the same standards as a retaliation claim under Title VII. (Ds' Mem. at 12-14); *see Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). In her opposition, Plaintiff seems to concur, citing Title VII standards. (P's Opp. at 5). Accordingly, Plaintiff's retaliation claim can only be brought against Defendant Delany, for the reasons stated above. "[F]or a retaliation claim under § 1983 to survive a ... motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against h[er], (3) because [s]he complained of or otherwise opposed discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). "That is, [Plaintiff] must plead (1) engagement in opposition to an unlawful employment practice; (2) an adverse employment action; and (3) factual matter rendering plausible an inference of causation between her protected activity and the adverse employment action." *Ray v. N.Y. State Ins. Fund*, 2018 WL 3475467, at *9 (S.D.N.Y. July 18, 2018). "[T]o establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a good faith, reasonable belief that such a violation existed." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989). "Moreover, the employer must be able to reasonably understand that the complaint was directed at conduct prohibited by Title VII." *Bamba v. Fenton*, 758 F. App'x 8, 12-13 (2d Cir. 2018) (summary order).

Plaintiff's claim fails. First, Plaintiff alleges she reported a suspected incident of child abuse in 2016-2017, which is outside of three-year statute of limitations period. *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) ("Section 1983 actions in New York are subject to a three-year statute of limitations."). Thus any alleged retaliatory activity that occurred prior to August 31, 2018 is time-barred. Even

assuming that at least some of the retaliatory activity occurred after this date [9] – and if it did, it is hard to see how it could be connected to the protected activity, *see Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (To establish causation based on temporal proximity, period between protected activity and adverse action must be "very close.") – Plaintiff's claim fails because she does not plead a sufficient protected activity. Protected activity is complaining about or otherwise opposing discrimination. *Vega,* 801 F.3d at 91; *see Littlejohn v. City of N.Y.,* 795 F.3d 297, 316-17 (2d Cir. 2015). Here, Plaintiff does not allege that she complained about unlawful discrimination; rather, she reported a potential incident of child abuse. [10] Plaintiff does not even allege, let alone plausibly show, that she had a good faith reasonable belief that she was opposing an employment practice that is outlawed by federal law, or that there was any way her employer could have understood her report as such.

**\*10** Therefore, Plaintiff's retaliation claim must also be dismissed.

## 7. Hostile Work Environment

Plaintiff also alleges a hostile work environment claim, and as with her retaliation claim, does not state under which statutory scheme she intends this claim to fall, but I will assume she meant to invoke a race-based or gender-based § 1981 or § 1983 claim.

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn,* 795 F.3d at 320-21. Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 321. Plaintiff must come forward with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so. *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 745 (2d Cir.

2003); *see* 🏳 *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." 🏳 *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff alleges that from 2009 to 2019, Defendants, "collectively and individually," created a hostile work environment by publicly belittling and humiliating her, (AC ¶¶ 18-19; *see id.* ¶ 45), but because no details about this alleged abuse are provided, it is impossible to conclude that an objectively reasonable employee would plausibly view it as severe or pervasive. She also specifies that: (1) from 2012 to 2019, Delany reassigned difficult students back to Plaintiff's classroom as punishment for Plaintiff speaking out, at an unspecified time, about removal of aides, (*id.* ¶¶ 46-47) [11]; (2) from 2010 through 2019, Delany reprimanded Plaintiff without cause, (*id.* ¶ 48); (3) from 2013 to 2019, Delany tampered with Plaintiff's evaluations in an unspecified way, (*id.* ¶¶ 49, 55); (4) from 2009 through 2019, Delany ordered Plaintiff to take on students "outside her teaching grade group," train staff members for positions she did not hold, and work with staff members against whom Plaintiff had filed complaints, (*id.* ¶ 50); (5) at an unspecified time, Delany did not provide Plaintiff with information about students' assessments and performances, (*id.* ¶ 52); (6) throughout Plaintiff's entire tenure, Delany divulged unspecified sensitive information about Plaintiff, (*id.* ¶ 53); and (7) at an unspecified time, Delany directed support staff to not schedule Plaintiff for meetings with administrators, (*id.* ¶ 54).

 **\*11** Without more detail, it is dubious whether these alleged events, over a ten-year period, are plausibly objectively severe or pervasive enough to constitute a hostile work environment. But regardless, Plaintiff plainly fails to show how any of these allegations, singularly or in the aggregate, occurred because of her membership in a protected class. Even in her opposition, Plaintiff addresses only whether the environment was sufficiently hostile, and makes no effort to suggest, let alone point to facts that support, that the hostility arose because she is Black and/or female. Allegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class. *See* *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors

is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); 🏳 *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient.").

> Unfortunately, the term "hostile work environment" has been interpreted by some in the general public to refer to workplaces with abusive bosses, bullying, cutthroat competition, nastiness, or unfairness. While those workplaces may be hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic.

*Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2021 WL 3115452, at *19 n.21 (S.D.N.Y. July 19, 2021), *aff'd*, No. 21-1988, 2022 WL 16843460 (2d Cir. Nov. 10, 2022).

Accordingly, Plaintiff's hostile work environment claim is also dismissed.

### B. State Law Claims

Defendants argue that Plaintiff's state law claims for assault and defamation must be dismissed because Plaintiff did not file a notice of claim, as required by 🏳 N.Y. Educ. Law. § 3813, and they are time-barred, given that state law claims brought against a school district or its employees are subject to a one-year statute of limitation. (Ds' Mem. at 15-17.) Plaintiff did not address her state law claims in her opposition, and as a result, those claims are deemed abandoned and dismissed.

### C. Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended, after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (ECF No. 8), and the discussion at the February 23, 2022 pre-motion conference, (see Minute Entry dated Feb. 23, 2022). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), aff'd sub nom. Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007) (per curiam) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

**\*12** Moreover, Plaintiff has not asked to amend or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion. See TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); Horoshko v. Citibank, N.A., 373 F.3d 248, 249-50 (2d Cir. 2004) (per curiam) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte.*

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 25), and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 137775

## Footnotes

1    Defendants state, and Plaintiff does not dispute, that Cesar E. Chavez School – erroneously named as "Cesar E. Chaves Elementary School" in the initial Complaint, (ECF No. 1 ("IC")), and Amended Complaint, (ECF No. 11 ("AC")) – is within YPS and therefore not a separate legal entity. (ECF No. 26 ("Ds' Mem.") at 1 n.1.)

2    At the pre-motion conference, Plaintiff's counsel had no explanation for why he had served Defendants with an unsigned, unsealed "summons" that had not been issued by the Court, but in the interest of resolving the claims on the merits, I extended Plaintiff's time to serve to 21 days after the filing of the AC.

3        Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

4        Plaintiff's counsel acknowledges that *Twombly* and *Iqbal* are more recent than 🚩 *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), yet seems to rely on *Conley*'s statement that dismissal is not warranted unless it is apparent that Plaintiff can prove no set of facts that would entitle it to relief. (ECF No. 27 ("P's Opp.") at 9.)

         *Conley*'s "no set of facts" standard, however, was "retire[d]" by the Supreme Court in 📙 *Twombly*, 550 U.S. at 562-63, and the applicable standard is now one of plausibility, *see* 📙 *Iqbal*, 556 U.S. at 678; 📙 *Twombly*, 550 U.S. at 570. No attorney should be citing to or relying on the "no set of facts" standard over a decade after it has been overruled.

5        The fifth claim in the AC is captioned "Title VII of the Civil Rights Act of 1964, 📙 42 U.S.C. § 2000d et seq." (AC at 15.) This caption is puzzling, because 📙 § 2000d is Title VI of the Civil Rights Act, whereas Title VII is § 2000e. It is even more puzzling because I specifically told Plaintiff's counsel at the pre-motion conference to make clear under which Title Plaintiff was bringing her claim. "Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." 📙 *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). Because Plaintiff in her fifth claim alleges that Defendants receive federal funds, (AC ¶ 76), and because at the pre-motion conference Defendants represented that no administrative complaint had been filed, as would be required for a Title VII claim, I conclude that Plaintiff means to assert a Title VI claim.

6        To the extent Plaintiff wishes to bring discrimination claims based on gender, those claims also fail. Gender is not a protected class under 📙 § 1981. 📙 *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("📙 Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age.") More fundamentally, the AC is devoid of any facts even faintly suggesting that Defendants discriminated on the basis of her gender. The same is true as to Plaintiff's religion (which she does not describe) and veteran status.

7        In addition, as Defendants point out, (ECF No. 28 "Ds' Reply") at 4-5), Plaintiff does not address this argument in her opposition, and thus has abandoned her Title VI claim.

8        "There is a 'personal interest' or 'personal stake' exception to the intracorporate conspiracy doctrine, however, which permits a 📙 § 1985 claim where there are individuals who are 'motivated by an independent personal stake in achieving the corporation's objective.' " *Salgado v. City of N.Y.*, No. 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (quoting 📙 *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71-72 (2d Cir. 1976)). Plaintiff does not allege that any such exception applies, and courts in this district have held that personal bias, by itself, is insufficient to defeat the intracorporate conspiracy doctrine. *See Salgado*, 2001 WL 290051, at *9 (officer defendants' derogatory remarks about plaintiff's sexual orientation were insufficient to properly allege "personal interest" exception to intracorporate conspiracy doctrine); 📙 *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723 (S.D.N.Y. 1997) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine," or else the exception would swallow the rule.).

9        The AC states that the directive to remain in her classroom (if indeed that is what Plaintiff was told, as opposed to being required to stay in her room except for her free periods) followed "[s]oon after" the report, (AC ¶¶ 67-69), and that the verbal abuse "intensified" after the report, (*id.* ¶¶ 67, 72). But it also says that Delany "increased" her abuse "[s]tarting in 2009 and running through 2019," (*id.* ¶ 71), and that Delany blackballed Plaintiff "[s]tarting in 2014 and running through 2019," (*id.* ¶ 73). It is hard to see how mistreatment after

August 31, 2018 – which by Plaintiff's account was the continuation of years of increasing abuse – could be attributable to the protected activity. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order).

10    To the extent Plaintiff meant to advance a claim of retaliation under 🚩New York Social Services Law § 413(c) and 🚩New York Labor Law § 740 – and she makes no such suggestion in her opposition – it would be even further outside the statute of limitations, *see Lomonoco v. Anne*, No. 15-CV-1163, 2016 WL 4402029, at *6 (N.D.N.Y. Aug. 18, 2016) (no private right of action under N.Y. Social Services Law so Plaintiff must bring action under 🚩N.Y. Labor Law § 740) (collecting cases); *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 630 (S.D.N.Y. 2010) ("The statute of limitations for bringing an action under 🚩Section 740 is one year after the alleged retaliatory action was taken"), and would fail for the same reasons as her other state-law claims, as discussed below. Plaintiff plainly did not intend to advance a claim of First Amendment retaliation, as her IC contained such claims, (IC at 8, 11-12), and they were removed in the AC.

11    To the extent this allegation could be interpreted as advancing a claim that the hostile work environment was retaliation for this protest, it would fail for two reasons. First, as set forth in note 11 above, Plaintiff withdrew her First Amendment claims. Second, when teachers complain internally about their work conditions, they are speaking as employees, not citizens, and their speech does not constitute protected activity that can support a retaliation claim. *See, e.g.*, *Brooke v. County of Rockland*, No. 21-598-CV, 2022 WL 6585350, at *3-4 (2d Cir. Oct. 11, 2022); 🚩*Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010); *Geer v. Gates Chili Cent. Sch. Dist.*, 577 F. Supp. 3d 147, 177 (W.D.N.Y. 2021).

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.      12